JERRY R. AND PATRICIA A. DIXON, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Dixon v. Commissioner
Docket Nos. 9382-83, 16900-83; 17640-83, 19321-83; 4201-84, 15135-84; 15907-84, 31236-84; 40159-84, 22783-85; 30010-85, 30965-85; 30979-85, 29643-86.
United States Tax Court
T.C. Memo 1991-614; 1991 Tax Ct. Memo LEXIS 661; 62 T.C.M. (CCH) 1440; T.C.M. (RIA) 91614; December 11, 1991, Filed Dixon v. Commissioner, 90 T.C. 237, 1988 U.S. Tax Ct. LEXIS 15 (1988)
*661 Decisions will be entered for the respondent in docket Nos. 9382-83, 16900-83, 17640-83, 19321-83, 4201-84, 15907-84, 31236-84, 40159-84, 22783-85, 30010-85, 30965-85, 30979-85, 29643-86. Decision will be entered under Rule 155 in docket No. 15135-84. Joe Alfred Izen, Jr., for the petitioners in docket Nos. 9382-83, 17640-83, 4201-84, 15907-84, 40159-84, 22783-85, 30010-85, 30979-85, and 29643-86. [2]
Luis C. DeCastro and Philip J. Hoskins, for the petitioners in docket Nos. 19321-83, 31236-84, and 30965-85. John R. Cravens, pro se in docket Nos. 16900-83 and 15135-84. Kenneth W. McWade, Jeffrey A. Hatfield *662 , and Thomas A. Dombrowski, for the respondent. GOFFE, Judge
GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION The Commissioner determined deficiencies in and additions to petitioners' Federal income taxes, as follows: Jerry R. and Patricia A. Dixon
[3]Additions to Tax, Secs. Year
Deficiency
6653(a)
6653(a)(1)
1977
$ 9,885.00 $ 494.00  --    1978
17,375.00
868.75
--    1979
18,087.00
904.35
--    1980
29,448.00
1,649.70
--    1981
28,061.00
--   $ 1,759.90*
John R. and E. Maria Cravens
Year
Deficiency
Sec. 6653(a) Addition to Tax
1979
$ 4,508.00 $ 225.40
1980
19,251.70
962.59
Ralph J. Rina
Year
Deficiency
Sec. 6653(a) Addition to Tax
1979
$ 16,236.38
$ 811.81  1980
39,015.00
1,950.75
*663 John R. and Maydee L. Thompson
Additions to Tax, Secs.
Year
Deficiency
6653(a)
6653(a)(1)
6651(a)(1)
1979
$ 18,161.00
$ 908.00
--    --   1980
24,838.00
--  --    --   1981
36,294.52
--  $ 1,958.28*
$ 4,934.32
The Commissioner also determined an increased interest rate for 1981 under section 6621(c), formerly section 6621(d). Hoyt W. and Barbara D. Young
Additions to Tax, Secs.
Year
Deficiency
6653(a)
6653(a)(1)
6661(a)
1979
$ 15,658.00
$ 783.00  --    --   1980
23,582.00
1,179.00
--    --   1981
23,819.00
--  $ 1,191.00*
--   1982
13,773.59
--  688.68*
$ 1,377.36
1983
2,163.42
--  108.17*
--   *664 The Commissioner also determined an increased interest rate for 1982 and 1983 under section 6621(c). Robert L. and Carolyn S. DuFresne
Additions to Tax, Secs.
Year
Deficiency
6653(a)
6653(a)(1)
6661(a)
1980
$ 25,877.00
$ 1,293.85
--    --    1981
21,790.00
--   $ 1,089.50*
--    1982
16,684.70
--   834.24*
$ 1,668.47
1983
15,851.64
--   792.58*
1,585.16
The Commissioner also determined an increased interest rate for 1982 and 1983 under section 6621(c). Terry D. and Gloria K. Owens
Year
Deficiency
Sec. 6653(a) Addition to Tax
1975
$ 4,341.00
$ 217.00
1976
2,786.00
139.00
1977
1,195.00
60.00
1978
1,069.00
53.00
Richard and Fidella Hongsermeier
Year
Deficiency
Sec. 6653(a) Addition to Tax
1978
$ 9,303.00
$ 465.00
1979
11,866.00
593.00
1980
18,717.00
936.00
Petitioners resided in California, Hawaii, Tennessee, and Texas when they filed *665 their petitions. These cases have been selected by the parties as "test" cases which will resolve all of the common issues in a group of over 1,300 cases. The parties in the nontest cases have stipulated to be bound by the final outcome in the test cases. ISSUES The issues for decision are: (1) Whether this Court lacks jurisdiction over some of these cases because the notices of deficiency are invalid; (2) whether petitioners are entitled to deduct interest under section 163(a) in connection with their participation in certain investment programs involving the purchase of stock or an investment certificate; [4] *667 (3) if petitioners are so entitled, whether section 61 requires a corresponding increase in income based upon their receipt of corporate cash distributions; (4) whether petitioners Terry D. and Gloria K. Owens are entitled to deductions for losses and interest associated with certain entities structured as subchapter S corporations, [5] deductions for interest associated with a "mortgage funding" program, and deductions for investment expenses; (5) for any interest deductions from issues (2) and (4) to which petitioners are entitled, whether deductibility is limited *666 by the investment interest provisions of section 163(d); (6) whether petitioners are liable for additions to tax for negligence under section 6653(a); (7) whether petitioners John R. and Maydee L. Thompson for 1981 are liable for an addition to tax under section 6651(a)(1) for failure to file a timely return; (8) whether petitioners Hoyt W. and Barbara D. Young for 1982, and petitioners Robert L. and Carolyn S. DuFresne for 1982 and 1983, are liable for additions to tax under section 6661(a) because of substantial understatements of income tax; and (9) whether petitioners Thompson for 1981, petitioners Young for 1982 and 1983, and petitioners DuFresne for 1982 and 1983 are liable for the increased interest rate provided in section 6621(c). We previously resolved other matters relating to these cases, concerning the issuance and execution of a search warrant, in Dixon v. Commissioner, 90 T.C. 237 (1988). FINDINGS OF FACT I. Promoter Background
Henry Kersting (Kersting) created and administered the investment programs at issue in these cases, and also managed most of the participating corporations. Born in Germany in 1923, Kersting emigrated to Canada in 1951. Before leaving Germany, he graduated from high school, served in the military, spent several semesters pursuing but not attaining a college medical degree, and in 1949 married. In 1952 or 1953, while employed as an aircraft mechanic in Toronto, he started a mail order business that he managed until moving his family to Los Angeles, California, in 1959. While there he invested *668 in Eastern Lenders Services, which originated Federally approved mortgages. Among the subjects he learned about from this investment were originating, warehousing, and selling mortgages, and negotiating lines of credit. In about 1964, he separated from Eastern Lenders Services and invested in a savings and loan association in Ukiah, California. He moved to Hawaii in 1968 and has lived there ever since. One of the first entities that Kersting incorporated while living in Hawaii was First Atlas Funding Corporation in 1968, which engaged in what Kersting termed a "mortgage funding" business. A participating investor borrowed approximately 10 times his monthly home mortgage payment from a corporation with which Kersting was associated and invested this amount to start the program. Thereafter, the investor had both an investment account and a loan account with Kersting. For the investment account, the investor typically supplied funds in a constant monthly amount, and First Atlas Funding [6] reported investment results. From the loan account, the investor borrowed monthly amounts, approximately equal to his monthly investments, in order to make payments on his home mortgage. To *669 the extent that the balance in the investment account exceeded the balance in the loan account, periodic printed statements informed the investor that the overall account had a "net value." These statements also compared the investment earnings to the interest expenses for "net results." First Atlas Funding ceased operations in the mid-1970s. The State of Hawaii considered it involuntarily dissolved in 1977 for failure to make required annual filings with the State. In 1972 or 1973, Kersting organized his first of many automobile-leasing entities structured as subchapter S corporations. Prior to organizing this corporation, he had no direct experience in the leasing business, having only read about it. Over the next few years, this corporation leased 8 to 10 automobiles. [7] Kersting's involvement with subchapter S leasing corporations was considered *670 by this Court in some detail in Pike v. Commissioner, 78 T.C. 822 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). Kersting has had no formal education or specialized training in either business or law. He and his wife, Ute Charlotte Kersting (Ute Kersting), have four children, including two daughters whose married names are Gabriele LeMond and Heidi Moseley. II. Kersting Corporations
A. Generally
References herein to "Kersting corporations" are to corporations that participated in the investment programs Kersting oversaw during the years at issue. [8] He served as both a director and president of most of these corporations and also sometimes owned stock. For those corporations in which he served as president during the years at issue, *671 he had exclusive management authority. His administrative assistant and secretary throughout these years was Sherrill Pang (Ms. Pang), who knew nearly as much as he did about the workings of his investment programs. Ms. Pang, who was heavily involved in the day-to-day clerical tasks associated with those programs, worked under Kersting's managerial control. For most of the Kersting corporations, Ute Kersting was an incorporator, an officer, a director, or some combination. She did not, however, play any meaningful active role in management or operations. Heidi Kersting had a similar status and eventually asked her father to stop using her name on corporate documents. Gabriele Kersting did some work related to the investment programs, at least to the extent of corresponding with investors on occasion. *672 Most of the Kersting corporations most of the time had Hawaii offices located together, with one benefit being minimized expenses. These offices contained the normal trappings of a business office, including desks, telephones, and personnel. A given clerical worker generally performed duties for any of several corporations depending upon where the need was at the time. The Kersting corporations did not each maintain a separate file for a given investment transaction, but instead shared a file that was referenced by the name of the investor and one of the corporations involved in the transaction. Throughout the years at issue, at least some of the Kersting corporations solicited proxies from shareholders and, in combination rather than separately, held shareholders meetings that Kersting attended. Kersting generally held a sufficient number of proxies from shareholders to take the actions he desired regardless of how the attending shareholders voted. Although Kersting announced and attended shareholders meetings after 1981, he never prepared corporate minutes of these later-year meetings. The Kersting corporations did not prepare annual reports during the years at issue, and *673 there was no active market for their stock. Kersting did not participate in any public offerings of stock during this time. B. Holding Companies and Subsidiaries
1. Charter Financial Corporation
Kersting organized Kershwin, Ltd., in the 1950s while living in Toronto. The shareholders during the years at issue were his four children and a trust for their benefit. In the early 1970s, Kershwin, Ltd., acquired most of the stock of Confidential Finance Company, Ltd., which had been incorporated in Hawaii in 1959. Confidential Finance had been an industrial loan company that dealt primarily with local people in Hawaii, and, with Kersting now the president, activity relating to outstanding loans continued. Kersting was initially both a director and the president of Colt Financial Corporation, which was incorporated in Hawaii in 1975 with Confidential Finance subscribing for the initial shares. Ms. Pang was also an initial director and officer. After a transaction involving exchanges of stock, Kershwin, Ltd., became the direct owner of about 80 percent of the Colt Financial stock, an interest that was first diluted over the years by the addition of new shareholders and *674 then eventually sold. Also as a result of the exchange transaction, Confidential Finance became a subsidiary of Colt Financial, which in 1976 changed its name to Charter Financial Corporation. Kersting acquired the outstanding stock and became a director of Carey Trading Inc., a Nevada corporation that changed its name in 1980 to Charter Financial Corporation. This new Charter Financial Corporation took over the activities of its Hawaii namesake, and, without corporate formalities or the issuance of new stock, Kersting began to treat the shareholders of the Charter Financial incorporated in Hawaii as shareholders of the Charter Financial incorporated in Nevada. [9] He was a director and the president of Charter Financial (Nevada) through the last year at issue. During this period, Ute Kersting was a director and both she and Ms. Pang were officers. *675 Confidential Finance changed its name to Federated Finance Co., Ltd., in 1976, at which time Kersting was the president and Ute Kersting held the office of secretary. The State of Hawaii granted the renamed corporation an industrial loan business license in July of that year. In May of 1978, Federated Finance Co. Inc. was incorporated in Nevada. Kersting was an incorporator, an initial director, and through the last year at issue the president of Federated Finance (Nevada). Ms. Pang and Heidi Kersting were the other incorporators and initial directors, and Ms. Pang and Ute Kersting were the other officers during this time. At least most of the lending activity of Federated Finance (Nevada) consisted of loans to airline pilots to facilitate their purchases of stock. Federated Finance (Hawaii) at some point voluntarily surrendered its industrial loan business license, which the State of Hawaii then canceled in late 1981. Sometime before this, with the exception of outstanding loans owed to and retained by Federated Finance (Hawaii), the principal activities of that corporation, including the making of loans for stock purchases, shifted to Federated Finance (Nevada). Although *676 Federated Finance (Hawaii) never formally liquidated, the State of Hawaii considered the corporation involuntarily dissolved in December of 1983 for failure to make required filings with the State. In about 1975, the president of Cosmopolitan Financial Corporation, a widely held Hawaii corporation engaged primarily in factoring accounts receivable, discussed with Kersting the possibility of selling the corporation. Confidential Finance soon acquired most of the Cosmopolitan Financial stock through a tender offer, and in 1976 Cosmopolitan Financial changed its name to Federal Finance & Mortgage Ltd. Federal Finance & Mortgage sometimes made loans to pilots, but it was mainly a licensed industrial loan company involved in factoring accounts receivable. It was not a regular participant in the Kersting investment programs that are the subject of the instant cases. Kersting was an officer and director of Federal Finance & Mortgage for several years, and exercised management control, but he left these positions near the end of or after the years at issue. Federated Finance (Hawaii) was wholly owned by Charter Financial during the years at issue, and Charter Financial conducted no *677 significant business other than as a holding company. Federated Finance (Nevada) was wholly owned by either Charter Financial or Federated Finance (Hawaii) during this time. At least from 1978 through 1981, Federated Finance (Hawaii) and Charter Financial owned 75 percent or more of the Federal Finance & Mortgage stock. At the end of 1983, a wholly owned subsidiary of Charter Financial named Quintana Investments, Inc., owned 89 percent of the Federal Finance & Mortgage common stock. Although most of the eventual Charter Financial shareholders were airline pilots, not all were. Kersting himself, for example, was a shareholder. Even the nonpilots, however, generally acquired their shares the same way the pilots did, as part of a Kersting investment program. An exception was Denis Alexander (Alexander), a broker and investor who knew that Charter Financial was a holding company. Throughout the years at issue, he held over 100,000 shares indirectly acquired in the mid-1970s. He had lent over $ 100,000 to assist in the acquisition of Cosmopolitan Financial, and this creditor's interest evolved into his stock interest in Charter Financial. As of December 30, 1988, Charter Financial, *678 as common parent of an affiliated group, had filed consolidated Federal income tax returns for calendar years 1976, 1978, and 1979, but had filed no returns for 1977 or 1980 through 1983. 2. Investors Financial Corporation
Kersting and Alexander first met in Los Angeles in the early 1960s. Alexander, who moved to Hawaii in 1964, lent $ 80,000 to Kersting's subchapter S leasing corporations during the 1970s, which he understood would be used to purchase automobiles. The two met in about 1977 to discuss the possible acquisition of First Savings and Loan Association (First Savings) in Honolulu, Hawaii, a State-chartered and Federally insured institution. Alexander was a minority shareholder of First Savings and acquainted with the majority shareholder. Kersting and Alexander eventually arranged for the acquisition of most of the stock of First Savings, with 40-some Kersting clients (including petitioner John R. Thompson) becoming shareholders. Alexander, who expected First Savings to profit from its real estate loans, joined the acquiring group and thus added to his First Savings stockholdings. The total cost to the acquiring group was approximately $ 2.8 million, with about *679 $ 1 million of that amount paid in cash. The remaining $ 1.8 million was borrowed from First Hawaiian Bank, which required a pledge of the First Savings stock as security. Charter Financial was a guarantor on this loan, and Kersting corporations rather than the individual investors paid at least some of the interest. Kersting was an incorporator, an initial director, and the initial president of Investors Financial Corporation, which was incorporated in Nevada in April of 1978, the month after the acquisition of First Savings. Ms. Pang and Heidi Kersting were the other incorporators and initial directors. Kersting arranged for the members of the First Savings acquiring group to relinquish their stock in First Savings and become shareholders of Investors Financial, which was to be a holding company for First Savings. Investors Financial later began to sell its stock to other people than those in the First Savings acquiring group, including some of petitioners, thereby diluting the interests of the acquiring group. In 1980 Investors Financial had over 200 shareholders. Although Investors Financial applied to Federal banking authorities to be approved as a holding company for *680 First Savings, those authorities never approved the application. Michael Provan was the president of Investors Financial from 1978 to 1982. Alexander was an officer, a director, or both into 1980. For at least some parts of 1978 and 1979, Kersting was neither an officer nor a director. Beginning in 1980, he served as secretary/treasurer. He became the president in 1982 and continued at least through 1983, during which time the other officers included Ms. Pang and Ute Kersting. Sometime prior to February of 1980, during a period of sharply rising interest rates, Federal banking authorities determined that First Savings should be merged with another institution. The banking authorities forced a merger with First Federal Savings of Honolulu in February of 1980, which terminated the stock interest of Investors Financial in First Savings. Although the initial arrangement was for First Federal Savings to assume the liabilities of First Savings and to purchase the assets at a price somewhat above the audited net worth, First Federal Savings ultimately paid nothing to First Savings. Shortly after the forced merger, Federal banking authorities and First Hawaiian Bank commenced a lawsuit *681 against Mortgage Guarantee Insurance Corp. based upon a First Savings director-and-officer policy. Most members of the First Savings acquiring group assigned their interests in the litigation to First Hawaiian Bank, which agreed to release them from their obligations on the First Savings stock acquisition indebtedness. The parties eventually settled. Much of the over $ 3-million recovery went to First Hawaiian Bank and attorneys, but none of it went to the First Savings acquiring group or Investors Financial. Almost all members of the First Savings acquiring group eventually recouped their original cash investments from Kersting, who used Charter Financial funds. At the time of the forced merger, the only significant asset of Investors Financial was its stock interest in First Savings. Investors Financial has not acquired any additional significant assets since then. As of December 30, 1988, Investors Financial had filed Federal income tax returns for its taxable years ending in 1978 and 1980, [10] but for no years since. *682 C. Acceptance Corporations
The word "Acceptance" in the name of a Kersting corporation indicated that it was not licensed by the State of Hawaii, which did require licenses for certain types of lending institutions such as commercial banks and savings and loan institutions. Kersting acceptance corporations did not actively solicit business from the general public, but instead engaged in lending activity directed primarily at airline pilots. For each of the following entities, incorporated in Nevada in the year parenthetically indicated, Kersting was an incorporator, an initial director, and throughout the years of corporate existence that coincide with the years at issue the president of the corporation: Forbes Acceptance Corporation (1976), Fargo Acceptance Corporation (1977), Candace Acceptance Corporation (1978), Mahalo Acceptance Corporation (1978), Windsor Acceptance Corporation (1978), Delta Acceptance Corporation (1979), Avalon Acceptance Corporation (1980), and Lombard Acceptance Corporation (1982). The Fargo Acceptance incorporators signed the Certificate of Incorporation on March 11, 1977, and filed it with the State of Nevada on March 17, 1977. The other two *683 incorporators and initial directors of these acceptance corporations were, with one exception, Ms. Pang and either Ute or Heidi Kersting. The exception was Larry Rinaldis, who, along with Kersting and Ms. Pang, was an incorporator and initial director of Forbes Acceptance. Rinaldis structured leases for Kersting's subchapter S leasing corporations. The other officers of these acceptance corporations throughout the years at issue were, with two exceptions, Ms. Pang and Ute Kersting. Rinaldis was an officer of Forbes Acceptance until Ute Kersting replaced him in 1977. Gabriele Kersting was an officer of Fargo Acceptance until Ute Kersting replaced her in 1977 or 1978. Kersting was also a director and the president of Aztec Acceptance Corporation, which was incorporated in Nevada in the late 1970s or early 1980s. Prior to the Nevada incorporation of Windsor Acceptance Corporation in 1978, Windsor Acceptance Corporation Ltd. had been incorporated in Hawaii in 1974 with Kersting's mother-in-law as the initial shareholder. The initial officers and directors had been Kersting and his two daughters. Without consideration of or adherence to legal formalities, Kersting considered the *684 corporation shifted from Hawaii to Nevada in 1978. Norwick Acceptance Corporation was incorporated in Nevada under another name, Mendocino Financial Corporation, in 1966. Kersting was an incorporator, an initial director, and the initial president of Mendocino Financial. The name change to Norwick Acceptance Corporation was filed with the State of Nevada in 1979, but an entity calling itself Norwick Acceptance engaged in transactions well before that time in connection with Kersting's subchapter S leasing corporations. [11] Kersting was the president of Mendocino Financial/Norwick Acceptance during all of the years at issue. Ute Kersting was also an officer throughout this period, as was Ms. Pang beginning in 1976. Except for Windsor Acceptance and Norwick Acceptance, the shareholders of each of the acceptance corporations were predominantly or entirely airline *685 pilots. Although Kersting required a pilot who became a shareholder to execute what was in form a subscription agreement for the purchase of additional stock, the acceptance corporation never issued the additional stock to the shareholder or otherwise sought to consummate the stock purchase transaction called for by the agreement. Sometime after 1981, Kersting authored a form letter [12] to investors that began as follows: If you have been with us over the years you will have noticed that we have organized by now eight Acceptance Companies. We will list below in which of these companies you became an investor and shareholder. All of these companies were structured to make a profit after a reasonable start-up period. This, in turn, assured the profit motive which the IRS expects of you when you engage in investments and the prospects of taxable income or gains. All of your companies are operating and money making entities today. The stock which you initially purchased has increased in value intrinsically which, I trust, will some day be reflected in a market price in excess of your acquisition cost. As it would be impractical to take each of the Acceptance Companies public *686 separately we decided years ago to combine all of the companies in a Financial Holding Company * * *
Kersting then discussed the mechanics of exchanging acceptance corporation stock for the stock of the proposed holding company, Escon Financial Corporation. As of December 30, 1988, Federal income tax returns had not been filed by Avalon Acceptance, Forbes Acceptance, and Lombard Acceptance for any taxable year that overlaps the years at issue. Four other acceptance corporations had filed the following returns on September 25, 1985, for taxable years ending as indicated, but no other returns that overlap the years at issue: Fargo Acceptance for 1977 and 1978, Mahalo Acceptance for 1978 and 1979, Candace Acceptance for 1979 and 1980, and Delta Acceptance for 1980 and 1981. Kersting signed each of these eight returns on September 10, 1985. Although Fargo Acceptance reported a tax liability *687 of over $ 30,000 on its initial return for a short taxable year ending in 1977, it has made no payments on this liability. D. Leasing Corporations
Kersting was the initial president and an initial director of Aztec Leasing Inc., which filed articles of association with the State of Hawaii on October 1, 1974, and Maurier Leasing Inc., which made a similar filing on December 2, 1974. The other initial officers and directors of these two corporations were Gabriele Kersting and Heidi Kersting. All or almost all of the leasing activities of these corporations were with their respective shareholders. Aztec Leasing filed a U.S. Small Business Corporation Income Tax Return (Form 1120S) for calendar year 1975 that indicated December 1, 1974, as its date of election as a small business corporation. Maurier Leasing also filed a Form 1120S for calendar year 1975, which indicated March 15, 1975, as its date of election. Aztec Leasing and Maurier Leasing were abandoned as corporate entities in part due to Internal Revenue Service (IRS) audit challenges and in part due to the cumbersome administrative tasks attributable to the large number of Kersting's subchapter S corporations. The *688 first Kersting leasing corporation for which subchapter S status was not sought was Universal Leasing Corporation, incorporated in Nevada in 1976. [13] Kersting, who intended Universal Leasing to replace the several subchapter S leasing corporations, had the leases transferred from the subchapter S corporations to Universal Leasing. Anseth Leasing, Inc., and Escon Leasing Corporation were incorporated in Nevada in 1977. [14] The Escon Leasing incorporators signed the Certificate of Incorporation on February 4, 1977, and filed it with the State of Nevada on February 11, 1977. Kersting was an incorporator, an initial director, and through the last year at issue the president *689 of Universal Leasing, Anseth Leasing, and Escon Leasing. For Anseth Leasing and Escon Leasing, the other two incorporators and initial directors were Ms. Pang and Heidi Kersting, and the other officers throughout these years were Ms. Pang and Ute Kersting. Ms. Pang was also an incorporator, an initial director, and an officer of Universal Leasing. All three leasing corporations engaged in the business of automobile leasing, primarily to pilots, and Universal Leasing also leased other items such as boats and aircraft. They did not advertise, employ salespersons, or otherwise actively solicit a substantial amount of business from the general public. From its inception, however, Universal Leasing leased some automobiles to businesses, as did Anseth Leasing and Escon Leasing in 1980 and following years. Kersting's duties included structuring leases, negotiating purchases and trade-ins of automobiles, monitoring leasing revenue, and ensuring that the residual values of the automobiles would be realized. The leasing corporations, which annually filed corporate exhibits with the State of Nevada listing officers and directors, registered to do business in Hawaii as foreign corporations *690 in October of 1982. They repossessed automobiles occasionally and had dealings with General Motors Acceptance Corp. (GMAC). For 1977 and following years, Hawaii registration and ownership certificates that show Escon Leasing as the registered owner of automobiles also often show Federal Finance & Mortgage or GMAC as the "legal owner or lien holder." During this period, Hawaii registration certificates that show Universal Leasing as the registered owner show as the "legal owner or lien holder," among others, Universal Leasing itself, Federal Finance & Mortgage, and Federated Finance (Hawaii). Although Kersting's family-owned corporation, Kershwin, Ltd., initially subscribed for Universal Leasing stock, new shareholders, who were airline pilots, gradually replaced it. The shareholders of Anseth Leasing and Escon Leasing were also, for the most part, pilots, although beginning in 1978 or 1979 Universal Leasing held a $ 5,000 stock interest in Anseth Leasing. Universal Leasing also had a $ 240,000 investment in Mahalo Acceptance and a $ 120,000 investment in Investors Financial that began at this time. On September 25, 1985, Anseth Leasing filed Federal income tax returns for its *691 taxable years ending in 1977 through 1979 and 1981 through 1984. On the same date, Escon Leasing filed returns for its taxable years ending in 1977 through 1984. Kersting had signed all of these returns for the two leasing corporations on September 10, 1985. Although Universal Leasing filed a return in each of 1979 and 1981 for taxable years ending in 1977 and 1978, respectively, it did not file returns for its taxable years ending in 1979 and following until 1985 or later. E. Other Kersting Corporations
Atlas Funding Corporation, which made loans primarily to pilots, was incorporated in Nevada in 1976. Kersting was an incorporator, an initial director, and the president through the last year at issue. Ms. Pang was also an incorporator and initial director. From July of 1977, Ms. Pang and Ute Kersting were the only other officers. Kershwin, Ltd., was the initial stock subscriber and remained the sole shareholder. As of December 30, 1988, Atlas Funding had not filed a Federal income tax return for any taxable year other than that ending in 1976. Atlas Guarantee Corporation issued interest-bearing investment certificates as part of the Kersting investment program called *692 "CAT-FIT," described in part III (E), below. Kersting and Ute Kersting owned all of the stock. Ventures Funding Corporation, which became inactive before the mid-1980s, was incorporated in Nevada in 1978 and made loans for the purchase of stock in other Kersting corporations. Kersting was an incorporator, an initial director, and throughout its active existence the president of the corporation. The other incorporators and initial directors were Ms. Pang and Ute Kersting, both of whom were also officers from 1981 through 1983. No one outside of the immediate family of pilot Leon Lipsky, who was a corporate officer from 1978 to 1981, ever owned stock in Ventures Funding. As of January 6, 1989, Ventures Funding had not filed a Federal income tax return for any year. F. Books and Records; Tax Return Preparation
Alice Combs was a bookkeeper, but not a certified public accountant, from 1942 until her retirement in 1983. She met Kersting through her employer shortly before becoming self-employed in 1971, and she eventually began to keep the books for some Kersting corporations. She and her daughter, Margo Akamine, were both self-employed as bookkeepers in the same office space *693 in the mid-1970s when Ms. Akamine began to assist her mother with Kersting's subchapter S corporations. The women incorporated a bookkeeping business in 1980, and when Ms. Combs retired in 1983, Ms. Akamine continued to perform bookkeeping duties for Kersting corporations. Ms. Combs and Ms. Akamine did not keep the books for all of the Kersting corporations. Ms. Akamine did no such work, for example, for Ventures Funding or Windsor Acceptance, and neither woman did such work for Norwick Acceptance or Atlas Funding. Federal Finance & Mortgage used its own in-house accountant and hired outside certified public accountants to prepare audited financial statements. The women generated manual journals and ledgers in a double-entry bookkeeping system, primarily from bank statements and canceled checks. Among the records they maintained were accounts receivable and related subsidiary accounts for the leasing and acceptance corporations, which accounts corresponded to a list of promissory notes supplied by the Kersting offices. The subsidiary accounts were eventually computerized. Ms. Combs did not keep a stock record book per se, but she attempted to keep records of Kersting's investors *694 by means of general ledger accounts such as accounts receivable, notes receivable, and capital stock. She was not aware of direct transfers of stock from shareholders to other individuals. At some point she suggested to Ms. Pang that better stock records should be kept. The women prepared financial statements (balance sheets and profit-and-loss statements) at Kersting's request and not on a regular monthly or quarterly basis. He usually requested financial statements, which were always done by hand rather than on a computer, at least once a year. The women also prepared Federal income tax returns for Kersting corporations, again when instructed by Kersting, and by 1976 Ms. Combs was experienced in preparing consolidated returns. They did not always prepare tax returns annually, and Ms. Akamine was never certain whether the returns she prepared were actually filed with the IRS. [15]
*695 However, as far as Ms. Combs knew, Kersting and his associates did not alter the tax returns or bookkeeping work she submitted. For those acceptance and leasing corporations with outstanding subscription agreements applicable to their stock, Kersting often instructed Ms. Akamine to treat the interest received under those agreements as deferred and thus to exclude it from current taxable income. Among the returns that show a Schedule M adjustment reducing book income for deferred subscription interest are the following, for taxable years ending as indicated: Fargo Acceptance for 1978, Mahalo Acceptance for 1978 and 1979, Candace Acceptance for 1979 and 1980, Delta Acceptance for 1980 and 1981, Avalon Acceptance for 1981 and 1982, Anseth Leasing for 1977 through 1979 and 1981 through 1984, and Escon Leasing for 1977 through 1984. For at least most of these corporations, the deferred amounts were not reported as taxable income in following years. Based upon her experience with a public accounting firm, Ms. Combs believed that a 2-percent bad debt reserve, measured against outstanding receivables, was appropriate for the Kersting corporations. Ms. Akamine had been taught in a bookkeeping *696 class that 1 or 2 percent was an appropriate bad debt reserve figure, although she had no training relating specifically to reserves in the tax shelter area. Kersting told the women that 20 to 25 percent, or higher, was not inappropriate for the corporations. He directed them generally to set up reserves that would offset taxable income not otherwise offset by items such as net operating loss carryforwards. For corporations with taxable years ending as indicated, yearend bad debt reserves as a percentage of accounts receivable were as follows: Fargo Acceptance
1978
30%
Mahalo Acceptance
1978, 1979
25%
Candace Acceptance
1979, 1980
25%
Delta Acceptance
1980, 1981
20%
Universal Leasing
1977
22%
1978
29%
1979
40%
1981
45%
1982
51%
1983
67%
1984
72%
1985
92%
Ms. Combs and Ms. Akamine kept the Kersting records in their office, which was at a different location than the Kersting offices. As detailed in Dixon v. Commissioner, 90 T.C. 237 (1988), Kersting was under criminal investigation when the IRS executed a search warrant at his offices on January 22, 1981, and seized voluminous records. The IRS did not, however, take any Kersting records from *697 the bookkeepers. Their work was therefore largely unaffected, except occasionally when the Kersting offices informed one of them that the documents she was requesting had been taken by the IRS. Neither woman ever thought that anything she requested from the Kersting offices was intentionally withheld. Kersting sent a form letter to clients dated February 15, 1981, in which he began: Here at last are the tax reporting notices which we would have mailed to you in January had it not been for the IRS raid at our offices. I regret very much the delay by which these notices will be received by you. The IRS accomplished only a temporary disruption of our operations. We are back today to almost normal workings, but the shock and distaste will last for a while.
In a May 30, 1981, form letter devoted largely to this IRS "raid," Kersting wrote: Over the weeks which have elapsed since the Raid, all of the Promissory Notes which are our most valuable asset have been returned to us. We have made copies of all of our records which we need to keep track of our accounts receivable and -payable. It has allowed us to return to normalcy of operations. * * *
The IRS returned *698 the bulk of the seized Kersting records beginning in late 1985 or early 1986. Ms. Akamine prepared only one return for a Kersting corporation in which she reported significant net taxable income. This was the Fargo Acceptance initial return for the short taxable year from March 17, 1977, through June 30, 1977, with reported interest income of $ 91,200 and no deductions. On the Schedule L balance sheet, she recorded $ 91,200 as an investment in Charter Financial and as unappropriated retained earnings, but she recorded no capital stock amount. No other acceptance corporation reported significant net taxable income in returns corresponding to the years at issue. Unlike the initial return of Fargo Acceptance, other initial returns of acceptance corporations included a bad debt reserve, a Schedule M adjustment for deferred subscription interest, or both. Ms. Akamine generally did not sign the returns she prepared for Kersting because she was not comfortable with some of the things he asked the women to do. In anticipation of selling her bookkeeping business, she prepared many returns for Kersting corporations during 1984. She sold her business in 1985 in part because Kersting *699 was considering some transactions that she did not feel comfortable recording. One such transaction was a consolidation of several corporations. Kersting was prompted to consider these transactions because the bad debt reserves intended to offset income were so high compared to outstanding accounts receivable. By letter dated December 2, 1981, and addressed to an IRS revenue agent who had sought certain corporate tax returns, Kersting wrote: We have held back over the years the Tax Returns for the Acceptance Companies and some of the Leasing Companies as we expect that the decision Judge Drennen of the United States Tax Court is to render will have a material effect on all of these companies. You will recall that Norwick Acceptance Company was at issue in the US Tax Court proceedings and to some extent Universal Leasing Corporation.
G. Collection Litigation
For lending and leasing matters originating during the years at issue but not relating directly to the Kersting investment programs, Kersting corporations sometimes sought relief in Hawaii State court. Delta Acceptance filed a complaint on March 16, 1983, based upon an $ 8,000 promissory note with a 1982 date, *700 and obtained a default judgment in November 1983. Fargo Acceptance filed a complaint on May 12, 1986, based upon a $ 7,560 promissory note with a 1982 date. The court dismissed this case in January 1987 for lack of valid service on the defendant. Universal Leasing filed a complaint on May 20, 1982, based upon alleged unpaid lease obligations, and the court granted its motion for summary judgment in September 1984. Escon Leasing filed a complaint on June 23, 1983, based upon alleged unpaid lease obligations, and obtained a default judgment in December 1983. Anseth Leasing filed complaints on July 6, 1983, and June 4, 1986, also based upon alleged unpaid lease amounts. The court dismissed the first case for want of prosecution in May 1984, and the second resulted in default judgments against the defendants in November 1986. Atlas Funding filed a complaint on June 6, 1983, based upon a $ 13,440 promissory note with a 1980 date in favor of Delta Acceptance. The court entered judgment for Atlas Funding after a hearing in October 1983. As an assignee of Charter Financial, Atlas Funding filed a complaint on March 8, 1984, based upon a $ 22,000 promissory note with a 1981 date in *701 favor of Charter Financial. Atlas Funding alleged that this amount had been lent to Larry Rinaldis to cover a margin call on a brokerage account. III. Kersting Investment Programs
A. Generally
Most of Kersting's investors, or clients, first heard about him and his investment programs by word-of-mouth from those already involved. He sometimes asked satisfied clients to introduce him to friends who might need tax assistance. He also paid a few "contact men," such as pilots Michael Provan and Robert Campbell at Continental Airlines, Inc. (Continental), to tell other pilots about the basic structure of the transactions and to encourage them to call or visit Kersting. Sometimes an accountant, such as Robert Knapp of Memphis, Tennessee, recommended to clients that they contact Kersting about his programs. Kersting was particularly interested in pilots, largely because of their high incomes. Kersting never registered with the Securities and Exchange Commission, the State of Hawaii, or the State of Nevada any of the stock sold through his investment programs. He met with a Securities and Exchange Commission attorney in California in the mid-1970s and also spoke on occasion *702 with the Hawaii Corporations Commissioner, discussing registration requirements with both men. He never took the procedural steps necessary, however, to determine formally whether registration was required under either Federal or State law. Kersting treated the stock as subject to a private offering exemption and never prepared any prospectuses. In a letter dated November 12, 1980, he described factors he considered important to exempt status: As we discussed we are walking on a very fine line separating us from offering securities publicly. We have claimed an exemption from registration over the years on the grounds that we are meeting the tests for offering securites [sic] without registration, i.e. that we are dealing with sophisticated investors, that everyone of our clients has a net worth in excess of $ 75,000.00 and that we do NOT SELL ANYTHING AND DO NOT ASK FOR ANY INVESTMENT, supported by the fact that we do not engage brokers or salespeople to whom sales commissions would be paid. If we were to advertise our services or offer our services by direct mail we would place the above mentioned premise in jeopardy. It is important that we observe that.
Kersting also *703 operated on the premise that registration was not required for shares of a given corporation if those shares were offered to existing shareholders of that corporation. Thus, he sometimes had an acceptance corporation distribute to a shareholder a small amount of stock of a second acceptance corporation, commonly 100 shares, thereby making the investor a shareholder of the second corporation and setting the stage for an "exempt" offering of much more stock of the second corporation during the upcoming year. The stock subscription agreements used by Kersting, discussed in more detail below in connection with the specific investment programs, included representations by the investor that he was acquiring the subscribed stock for investment purposes rather than for resale and not as a representative of someone else. An investor made no such representations, however, for stock purchases not tied to the subscription agreements. Although a potential investor sometimes met with Kersting in his Hawaii offices, the first contact for many was by telephone or letter. Prior to starting someone in one of his programs, Kersting questioned him about his general financial situation. Because *704 of Kersting's largely homogenous client base and the relatively standardized salary scales within an airline, he often knew the prospect's approximate salary even before being told. He rarely if ever asked for an application form or financial statements, and credit checks were also rare or nonexistent. Because he was aware of the grounds for certain IRS audit challenges to his programs, he sometimes informed a prospect that he had to have a profit motive. He never mentioned, however, that there would be ongoing profits in the form of normal corporate dividends. He always discussed anticipated tax benefits and often sent a pilot the documents associated with an investment program so he could examine them before deciding whether to participate. Although Kersting sometimes jotted down some notes while talking to a prospect, he discarded them by the time participation in his programs commenced. For those who agreed to participate in one or more of his programs, Kersting often recommended specific accountants the investors should consider using to prepare their tax returns. These included Gilbert Matsumoto, Earl LeMond, and enrolled agent Philip Scheff. Matsumoto, who had been the *705 accountant for Confidential Finance when Kersting became its president in the early 1970s, had later become the accountant for some of Kersting's subchapter S leasing corporations. The four main types of Kersting investment programs under consideration in these cases will be referred to as a Stock Purchase Plan, a Stock Subscription Plan, a Leasing Corporation Plan, and a CAT-FIT Plan. All involved both "primary" loans and notes and "leverage" loans and notes with Kersting corporations. [16] These notes, along with other investment initiating documents, sometimes bore a date that was long before the date on which the documents were actually executed and even before the date on which the investor informed Kersting he was ready to commence that investment program. *706 A primary loan supplied the funds with which the investor purchased either stock of a Kersting corporation or, in the case of the CAT-FIT Plan, an investment certificate. A leverage loan, almost always made by an acceptance corporation, generally supplied the funds with which the investor paid interest on the primary loan and, if applicable, interest on an unpaid subscription balance. Sometimes leverage loans, in years after the investor's first year in a program, supplied the funds to pay off an outstanding leverage loan. In correspondence with investors and in summary schedules he prepared for their benefit, Kersting often referred to the amount payable as interest on a leverage loan as a "fee" or as a deductible "cost" of interest deductions. Primary notes (and leverage notes used in the Leasing Corporation Plan) were detailed, preprinted forms entitled "Note and Security Agreement" and containing appropriate blanks to be filled in. When completed and executed, these notes did not describe any collateral in the space so designated on the form, nor did they call for interest to be prepaid annually. Kersting considered the loans to be unsecured. Beginning in late 1979, the *707 designated space for a description of collateral usually contained a typed-in statement that the note was nonnegotiable and nonassignable. Leverage loans (except for those used in the Leasing Corporation Plan) were commonly documented with much shorter and simpler promissory note forms that made no mention of collateral, negotiability, or assignability. Both types of notes, primary and leverage, were in form recourse. [17]
The primary lender in a Kersting investment program was, except for the very early years, a different Kersting corporation than the leverage lender. In Battelstein v. Internal Revenue Service, 611 F.2d 1033 (5th Cir. 1980), on rehearing en banc 631 F.2d 1182 (5th Cir. 1980), *708 the court concluded that interest deductions were not allowable to taxpayers who had exchanged checks with their lender in the amount of the interest due. When asked by a concerned client about the implications of the analysis by the Court of Appeals, Kersting replied by letter dated January 11, 1981: There seems to be a fundamental distinction between the moves attributed to the Battlesteins and the leveraged interest deductions which we engender. Namely, where the Battlesteins used "the lenders cash" [sic] in making their interest payments we have always employed an arms-length-lender to create the second layer of debt and to engender the cash to make interest payments. We have studied several Tax Court decisions of related connotation before arriving at the strategy which we follow today. In the early phases of our enterprises we retained a Tax Consultant here in Honolulu, Clyde Lee, who had been a Conferee at the Internal Revenue Service in Honolulu. He pointed out to us at that time the perils which one evokes if "the lenders cash" is being used to make interest payments on the primary loan granted by the same lender. We have purposely and by design circumnavigated over *709 the years the obstacles which the Battlesteins apparently encountered.
To enable Kersting better to control the flow of funds through his investment programs, Kersting corporations issued loan proceeds checks and annual distribution checks that were either unsigned by the drawer corporation or payable jointly to the investor and a Kersting corporation, [18] or both unsigned and payable jointly. A letter preceded or accompanied the first annual cash distribution made by a Kersting corporation, stating that the amount being distributed was not taxable to the shareholder. Subsequent distributions were also represented to be nontaxable. Often the letter characterized the distribution as a nontaxable "return of capital." The stated rationale for the tax-free status varied, sometimes emphasizing a lack of either corporate earnings or an earned surplus account, and other times emphasizing that the corporation charged *710 the distribution on the corporate books to paid-in capital rather than to earnings. [19]
Regardless of how a letter described a distribution, Kersting considered the distribution to be a partial return of the shareholder's investment. He believed that nontaxable treatment was available under applicable law, however, only if the corporation had no current or accumulated earnings and the books of the corporation reflected a charge to paid-in capital. He also believed that the trade-off for a nontaxable return-of-capital distribution was a corresponding reduction of the adjusted basis in the stock, which reduction was subject to "recapture" as a capital gain upon disposition of the stock. The acceptance corporations that sold their stock at $ 10 per share, as described in detail below, *711 generally split contributed capital as described in this Avalon Acceptance form letter: However, so that your company will have the means to pay you later on this year a non-taxable (return of capital type) dividend we have decided to allocate 10% of your [stock acquisition] funds towards the common stock account on your company's books and 90% towards paid-in surplus. The result will be that your company can pay you this year a cash dividend which can be charged against the surplus account without any need to adjust the common stock account.
Kersting did not believe, however, that a paid-in surplus balance was necessary to make a distribution nontaxable. Anseth Leasing, Escon Leasing, and Universal Leasing made distributions represented to be nontaxable even though none of the three ever had a paid-in surplus account during the years at issue. The bookkeepers recorded their distributions as debits to capital (common) stock. The capital stock account for Universal Leasing, which was reported at over $ 11 million in its initial tax return (for its taxable year ending in 1977), was smaller each succeeding year and was less than $ 4 million for its taxable year ending in *712 1984. The capital stock account for Escon Leasing, which was reported at $ 925,000 in its initial return (for its taxable year ending in 1977), was smaller each succeeding year except one. The one increase was from a negative $ 17,360 to over $ 600,000. Kersting wrote a form letter dated October 1, 1979, in which he stated: As we are going today into the last quarter of the current taxation year it seems appropriate that we remind you that only a few days will be available to you (and to us) to record your tax deductions for the year of 1979. We produced earlier this year certain documents which are to generate for you tax deductions which can be applied against your 1979 taxable income. Generally speaking, the tax deductions are to cost you 18% of the taxes retrieved or 9% of the deduction arranged. * * * Tax deductions will be of value to you only, however, if properly documented and recorded. That, in turn, has to be done well before year-end. If you have not already returned to us the documents which were mailed to you earlier this year, we urge you to attend to the matter at your earliest opportunity. On the other hand, if you do not wish to make use of the tax shelter *713 we will appreciate hearing from you to that effect.
Kersting often encouraged his investors to adjust their withholding allowances with their employers. He wrote in a form letter sometime after October of 1979: So that you will gain maximum advantage from the Tax Shelter Plans in which you are involved we strongly suggest to you to file IRS Form W-4 (Employee Witholding [sic] Allowance Certificate) with your employer. * * * Many of our clients have accomplished "wall to wall" protection from taxation. In that case "EXEMPT" could be entered on line 3b of Form W-4. No tax will be witheld [sic]. * * * If you find that you do not have a sufficient amount of tax deductions yet for this year please communicate with us by using attached coupon. We will be glad to make suggestions as to how you could reduce your taxes even further.
B. Stock Purchase Plan
A participant in the Stock Purchase Plan paid $ 40,000 or a multiple thereof for the stock of a Kersting holding company, either Charter Financial or Investors Financial. The holding company issued a stock certificate in the investor's name for the number of shares corresponding to a per-share price of $ 10.50. *714 The stock certificate, as in all of the Kersting investment programs, was usually unnumbered. By means of a primary loan, the investor borrowed the funds from Federated Finance, at an annual interest rate of 18 percent, to acquire the stock of the holding company. The primary note was by its terms payable on demand or in 3 years if not demanded earlier. Federated Finance supplied the loan proceeds in the form of a two-party check made payable to the investor and the holding company, which, like all of the loan proceeds checks used in the investment programs, the investor was instructed to endorse and return. The investor also borrowed funds from an acceptance corporation, by means of a leverage loan with a 9-percent annual interest rate, to prepay the first year of interest on the primary loan. The leverage note was by its terms payable in 1 year. [20] The acceptance corporation, like Federated Finance, issued a two-party check for the loan proceeds, this time payable to the investor and Federated Finance. The investor had the option of paying the interest on the leverage loan in a lump sum or in six monthly installments. Leverage lenders in this and the other investment programs *715 frequently provided coupon payment books to those borrowers who preferred to make installment payments. The stock certificate, the primary note, the leverage note, and the checks representing loan proceeds all bore the same date, which was early in January or early in July. Like the initiating documents in the other investment programs, the investor generally received all of these documents together by mail, to be signed and (except for the stock certificate) returned *716 to the Kersting offices. The holding company issued a distribution check, [21] dated in December, payable to the investor in the amount of the principal balance of the leverage loan. As already noted, a preceding or accompanying letter stated that this amount was nontaxable. The letter also suggested that the investor endorse the check and return it to satisfy his obligation for the principal due on the leverage loan, which, to the best of Kersting's knowledge, invariably happened. The leverage note was then returned to the investor marked "paid." A condensed example of the Stock Purchase Plan is as follows. To make a $ 40,000 investment in the stock of a holding company, an investor borrowed $ 40,000 from Federated Finance (the primary loan) and $ 7,200 from an acceptance corporation (the leverage loan), with the stock certificate, notes, and loan proceeds *717 checks all bearing the same date. He applied the $ 7,200 to prepay the 18-percent annual interest on the primary loan and paid 9-percent annual interest on this borrowed $ 7,200, or $ 648, in either a lump sum or six installments. The holding company issued a $ 7,200 distribution check to the investor, dated in December, which he used to pay off the like principal balance of the leverage loan. By documents dated in early January or early July of the following year, the cycle was repeated. The investor used the proceeds of a new leverage loan from a different acceptance corporation, with the leverage note again providing for a 9-percent annual interest rate and a 1-year term, to prepay another year of interest on the outstanding primary loan. The leverage loan proceeds took the form of a check made payable to the investor. The holding company again issued a distribution check dated in December and payable to the investor, to enable him to satisfy his principal obligation on this new leverage loan. If the investor wished to participate beyond the 3-year term of the original primary note, he in effect renewed or refinanced the primary loan by executing a new note in favor of Federated *718 Finance for another 3-year term. Both Charter Financial and Investors Financial issued distribution checks dated December 15, 1980, for investors on a July annual cycle. C. Stock Subscription Plan
In the Stock Subscription Plan, an investor purchased stock of an acceptance corporation at $ 10 per share, [22] and the acceptance corporation issued a corresponding stock certificate in the investor's name. The investor also subscribed in writing for additional shares at $ 1 per share. The purchase amount and the subscription amount were equal, so a purchase of 6,000 shares, for example, at $ 10 per share accompanied a subscription for 60,000 additional shares at $ 1 per share. The subscription agreement began with a statement in the following form: "I hereby subscribe for and agree to purchase [23] from * * * [a specific acceptance corporation, a specific number of] shares of common stock of $ 1.00 par value at a price of $ 1.00 per share." The agreement, with *719 an express term of 3 years, called for the investor to pay 12-percent annual interest on the unpaid subscription balance. The agreement also contained a provision acknowledging receipt by the acceptance corporation of a specific amount "paid on account" equal to a year of such interest. As Kersting viewed it, the subscription agreement did not give the investor the right to tender payment and thereby become entitled to the additional shares. Instead, Kersting understood the agreement to provide the acceptance corporation with the right at any time to require the investor to purchase the shares. Nonetheless, no acceptance corporation ever attempted to issue the stock or demand payment of the funds called for by a subscription agreement. As with the Stock Purchase Plan, the investor borrowed the funds necessary for the immediate stock purchase by means of a primary loan with an 18-percent annual interest rate. The primary lender was often Federated Finance, *720 but others included Atlas Funding, Ventures Funding, and Windsor Acceptance. The primary note was by its terms payable on demand or in 2 years if not demanded earlier. The primary lender supplied the loan proceeds in the form of a two-party check made payable to the investor and the acceptance corporation. By means of a leverage loan with a 9-percent annual interest rate, [24] the investor borrowed funds from a second acceptance corporation in order to pay a year of interest on the primary loan and a year of interest on the unpaid subscription balance. The leverage note was by its terms payable in 1 year. This lending acceptance corporation issued a check for the loan proceeds made payable to the investor. The investor had the option of paying the interest on the leverage loan in a lump sum or in six monthly installments. In the early years, the investor could opt for 12 monthly payments. The stock certificate, *721 the subscription agreement, the primary note, the leverage note, and the checks representing loan proceeds all bore the same date, which was usually early in January or early in July. At the outset, Kersting instructed those wishing to participate in the Stock Subscription Plan to open a checking account in Hawaii at a specified local bank at which Kersting corporations had accounts. This was generally Hawaii National Bank into 1979 and Liberty Bank from 1979 on. After the investor endorsed the leverage loan proceeds check and returned it with the other initiating documents, he received a form thank-you letter with instructions on how to complete the transaction. [25] In this letter, the investor was requested to send two signed checks drawn on his local account at the specified bank, along with some deposit slips for that account. One check was to be payable to the primary lender in the amount necessary to pay a year of interest on the primary loan. The other check was to be payable to the stock-issuing acceptance corporation in the amount necessary to pay a year of interest on the unpaid subscription balance. The letter also stated that a deposit (meaning the endorsed leverage *722 loan proceeds check) would be made to the investor's account to allow his two checks to clear. The investor wrote his checks on the account designated by Kersting. The stock-issuing acceptance corporation issued a distribution check, dated in December and payable to the investor, in the amount of the principal balance of the leverage loan. As noted, a preceding or accompanying letter stated that this amount was nontaxable. After the investor returned the endorsed check to the Kersting offices, the leverage note was marked "paid" and returned to the investor. An example of the Stock Subscription Plan is as follows. To purchase 6,000 shares of an acceptance corporation, an investor borrowed $ 60,000 from Federated Finance (the *723 primary loan) and signed a subscription agreement for additional shares, also in the amount of $ 60,000. With $ 18,000 borrowed from a second acceptance corporation (the leverage loan), he wrote checks for $ 10,800 to pay the 18-percent annual interest on the primary loan and $ 7,200 to pay the 12-percent annual interest on the unpaid subscription balance. The stock certificate, subscription agreement, notes, and loan proceeds checks all bore the same date. The first acceptance corporation issued a check for $ 18,000 to the investor, dated in December, which he used to pay off the like principal balance of the leverage loan from the second acceptance corporation. He paid 9-percent interest on the $ 18,000 leverage loan, or $ 1,620, in either a lump sum or six installments. Kersting offered the stock of a different acceptance corporation for each calendar year: Norwick Acceptance in 1975, Forbes Acceptance in 1976, Fargo Acceptance in 1977, Mahalo Acceptance in 1978, Candace Acceptance in 1979, Delta Acceptance in 1980, and Avalon Acceptance in 1981. He annually sent participants in the Stock Subscription Plan an order form with which they could select the desired amount of stock *724 for the next acceptance corporation. A common format was: Please arrange for me the purchase and financing of stock of * * * [a specific acceptance corporation] for a unit as indicated below:
Amount of
Tax
Anticipated Tax Refunds
(Federal only)
Shares
Deduction
30% Tax Bracket
40% Bracket
30,000
$ 9,000 $ 2,700
$ 3,600
40,000
12,000
3,600
4,800
50,000
15,000
4,500
6,000
60,000
18,000
5,400
7,200
Sometimes the order form had an additional column labeled "Actual Cost to You," with the listed amounts of $ 810, $ 1,080, $ 1,350, and $ 1,620. There was typically no accompanying specific information about this new acceptance corporation other than that it would have the "same advantages" as the acceptance corporation in which the investor already held stock. An investor named Mil Harr returned to Kersting in January of 1977 executed initiating documents dated August 1, 1976, for a Forbes Acceptance Stock Subscription Plan. In his accompanying letter, which listed the enclosed documents, Harr asked Kersting about his investment: At this point I am sort of wondering what this is all about. I basically recognize all this as a deal where I bought *725 into Forbes Acceptance Corporation and borrowed money to do it (with resulting interest deductions on borrowed money), but where does this deal lead? Is this something you have structured for tax purposes only, or why am I desiring to be buying stock in Forbes Acceptance, other than that?
In his written reply, Kersting stated: "At this time the deal has tax deduction purpose only. I can foresee, however, that the corporation will make a profit in its second year of operation." He further informed Harr that "The deal is self-liquidating as you can retire all of your debt by simple surrender of the stock certificate issued to you." Kersting wrote to another inquiring investor named Willis McComas in February of 1978: When I referred to a "closed deal" I meant to convey the impression that that deal would be available only for one year, such as Fargo Acceptance or this year Mahalo Acceptance Corp. The reason is quickly evident when you recall that Fargo Acceptance Corp. paid you a dividend in 1977 of $ 18,000.00 which was a return of capital. That can not be done the second year as the company is expected to make a profit then. Once there is an earned surplus account *726 all dividends become taxable dividends (unless the Carter Administration accomplishes to change that). It is for this reason that we have organized every year another Acceptance Corporation allowing us to pay the first dividend as a "return of capital." * * * All notes which you have executed are self-sustaining now. The cash dividends which Fargo Acceptance Corp. will pay you from now on will be sufficient to service the debt to which you are a party. As you will be receiving taxable dividends in [the] future you will also have a tax deduction in a like amount. The result will be a washout for taxation purposes.
Sometime before 1977, Kersting wrote a form letter describing the Stock Subscription Plan and sent it to some of his clients, including petitioner Terry D. Owens. The letter began: In line with our policy to facilitate your involvement by arranging the financing we propose to you the following: 1. We will organize an Acceptance Corporation for the purpose of lease financing as you know it. You are invited to acquire equity in the corporation in $ 10,000.00 increments. We will arrange a loan for you for the full amount of the stock you wish to acquire. *727 * * * The advance will be a non-recourse loan confining your liability to the value of the stock to be acquired, none beyond that. * * *
In this letter, Kersting went on to describe both further mechanics of the program, including the subscription agreement and leverage loan, and detailed tax advantages. He also stated that the corporation would pay a dividend early the next year that the investor could use to pay off the principal balance of the leverage loan. Apart from "the purpose of lease financing," Kersting did not mention either the business or the profit potential of the acceptance corporation. Sometime later, Kersting wrote a similar tax-oriented letter entitled "The Acceptance Corporation Plan" that focused specifically on Candace Acceptance, but he did not refer to nonrecourse loans and lack of personal liability. He stated without elaboration that Candace Acceptance was organized for the purpose of "automobile and lease financing" and was "expected to make profits." He further stated that the investor's "actual out-of-pocket expense" and "only expense ever" would be 9 percent of the leverage loan amount. The letter ended with a standard order form for Candace *728 Acceptance stock. Kersting form letters that transmitted initiating documents for the Mahalo Acceptance, Delta Acceptance, and Avalon Acceptance Stock Subscription Plans also stated that the "actual out-of-pocket expense" would amount to 9 percent of the leverage loan. These letters ended with this sentence: "If you feel that you have benefited from our services, please introduce us to your friends who might also need tax assistance." A package of initiating documents sent to prospective investors in 1980 or 1981 contained this paragraph: The funds which will be generated by the promissory note you are about to execute will be applied in full to purchase for your account a certain amount of common stock of Avalon Acceptance Corporation. The stock which you will acquire will be equal in value to the face amount of the promissory note. As we go along the value of your stock is expected to be higher than the price you are paying today.
D. Leasing Corporation Plan
A participant in the Leasing Corporation Plan purchased stock at $ 1 per share from a Kersting leasing corporation (Anseth Leasing, Escon Leasing, or Universal Leasing), and the leasing corporation issued a *729 corresponding stock certificate in the investor's name. The investor also subscribed for additional shares at $ 1 per share. Although a common ratio was a $ 19,000 stock purchase and a $ 55,000 subscription agreement, the ratio was often exactly 1 to 3. The subscription agreement was like that used in the Stock Subscription Plan, including an express term of 3 years, an annual interest rate of 12 percent on the unpaid subscription balance, and an acknowledgment of a year of interest "paid on account." The investor borrowed the funds necessary for the immediate stock purchase by means of a Federated Finance primary loan with an 18-percent annual interest rate. The primary note was by its terms payable on demand or in 2 years if not demanded earlier. Federated Finance supplied the loan proceeds in the form of a two-party check made payable to the investor and the leasing corporation. By means of a leverage loan with a 15-percent annual interest rate, the investor borrowed funds from an acceptance corporation in order to prepay interest on the primary loan and interest on the unpaid subscription balance. The leverage note was by its terms payable on demand or in 1 year if not *730 demanded earlier. The acceptance corporation supplied the loan proceeds in the form of two-party checks, one payable to the investor and Federated Finance and one payable to the investor and the leasing corporation, in amounts equal to a year of interest on the primary loan and a year of interest on the unpaid subscription balance, respectively. The investor generally paid annual interest on the leverage loan in 12 monthly installments. The stock certificate, the subscription agreement, the primary note, the leverage note, and the checks representing loan proceeds all bore the same date, which was usually early in January or early in July. As an example of the Leasing Corporation Plan to this point, an investor borrowed $ 19,000 from Federated Finance at 18-percent annual interest (the primary loan), which he used to purchase 19,000 shares of leasing corporation stock. He subscribed for an additional 55,000 shares at $ 1 per share, agreeing to pay 12-percent annual interest on the unpaid balance of $ 55,000. With $ 10,020 borrowed from an acceptance corporation (the leverage loan), he used $ 3,420 to prepay a year of interest on the primary loan and $ 6,600 to prepay a year of *731 interest on the unpaid subscription balance. All of these documents were dated as of the same date. Each of the leasing corporations had two checking accounts at Liberty Bank, a "general" account and a "special" account. The leasing corporation annually issued a distribution check, with a January date, drawn on its general account and made payable to the investor in the amount of the principal balance of the leverage loan. Sometimes the distribution check was in an amount slightly less than the principal balance of the leverage loan; for example, the Escon Leasing distribution check corresponding to a leverage loan of $ 10,020 was in the amount of $ 9,990. A letter accompanying the distribution check stated that the distribution amount was nontaxable to the investor. This letter also informed the investor that his endorsed distribution check, after return to the Kersting offices, would be deposited to the special account, from which the leasing corporation would disburse funds to establish interest deductions for that year. The checks drawn on the special account, which were dated the same as and accompanied the distribution check, totaled to the amount of the distribution *732 check. One check, in an amount equal to a year of interest on the Federated Finance primary loan, was payable to the investor and Federated Finance. The other check, in an amount equal to a year of interest on the unpaid subscription balance, was payable to the investor and the leasing corporation. For the occasional distribution check that did not equal the leverage loan amount, the check corresponding to subscription interest was less than a year of such interest by the same amount that the distribution check was less than the leverage loan amount. As a continuation of the example begun above, which is a $ 19,000 stock purchase coupled with a $ 55,000 subscription agreement, the leasing corporation sent to the investor the following group of checks: A distribution check from its general account for $ 10,020 payable to the investor; a check from its special account for $ 3,420 payable to the investor and Federated Finance; and a check again from its special account for $ 6,600 payable to the investor and the leasing corporation. Each year the investor signed a new 1-year leverage note in favor of a different acceptance corporation, again with a 15-percent annual interest rate *733 and the same principal amount as the original leverage loan. This was in effect a renewal of the leverage loan because the loan proceeds were applied to the outstanding leverage loan. The loan proceeds took the form of either a check payable to the investor or a two-party check payable to the investor and the acceptance corporation on the expiring leverage note. If an investor wished to participate in the Leasing Corporation Plan beyond the 2-year term of the original primary note, he in effect renewed the primary loan by executing a new note in favor of Federated Finance for another 2-year term. The loan proceeds took the form of either a check payable to the investor or a two-party check payable to the investor and Federated Finance. With documents dated a few days before the end of the 3-year term of the initial subscription agreement, the investor sometimes both borrowed funds to purchase additional stock from the leasing corporation and executed a new subscription agreement. The number of newly purchased shares plus the number of newly subscribed shares equaled the number of shares originally subscribed. Thus, if the original subscription agreement covered 55,000 shares, *734 an investor who borrowed $ 36,000 to purchase 36,000 new shares also executed a new subscription agreement for 19,000 shares at $ 1 per share. The new stock acquisition note, in favor of an acceptance corporation, provided for 12-percent annual interest and payment on demand or in 3 years if not demanded earlier. The new subscription agreement, with a term of 3 years and an annual interest rate of 12 percent, acknowledged receipt of an amount "paid on account" equal to a year of subscription interest. In connection with this new stock purchase and subscription agreement, the leasing corporation again issued a January distribution check from its general account made payable to the investor in the amount of the outstanding leverage loan, except that again there was sometimes a slight difference in amount. The leasing corporation also issued three checks from its special account that together equaled the amount of the outstanding leverage loan. One check was payable to the investor and Federated Finance and equal to a year of interest on the renewed primary note, one check was payable to the investor and the leasing corporation and equal to a year of interest on the new subscription *735 agreement, and one check was payable to the investor and the new acceptance corporation and equal to a year of interest on the new stock acquisition loan. The sale and leaseback of an automobile was sometimes a part of the Leasing Corporation Plan. [26] In a common scenario, a pilot purchased an automobile outside of the Kersting organization, financing it through an airline credit union. The pilot then sold the automobile to a Kersting leasing corporation, which took subject to the credit union loan, and became a shareholder of the leasing corporation. Thereafter, as the pilot made lease payments to the leasing corporation, the leasing corporation made loan payments to the credit union. In a January 1980 letter to a potential client who was considering the purchase of a new automobile, Kersting urged him to consider the sale-leaseback benefits associated with the Leasing Corporation Plan: "The tax retrievals which this plan is scheduled to generate *736 for you will fully pay for all lease payments and other fees you sustain in the program. The result of this will be that you will be driving the car entirely free of any cost to you." A pamphlet entitled "The Universal Plan," which Kersting authored or at least authorized, describes an early version of the Leasing Corporation Plan with emphasis on the mechanics and the tax advantages. The cover lists Kersting and Ms. Pang as sources of further information. Although the pamphlet mentions an "investment opportunity," there is no reference to either the business of "Universal Corp." outside of this program or its profit potential. The investment opportunity is described not in terms of dividends or stock appreciation, but in terms of a tax savings return on the ultimate cash outlay: "A taxpayer in the 20% bracket would be entitled to a tax refund of $ 1485. In other words on an investment of $ 756 [for leverage loan interest] a return of $ 1485 can be obtained. This equals a percentage return of 196% which is entirely free of tax. An undated form letter to automobile lessees that included petitioner Terry D. Owens described, in addition to tax advantages, the economic benefits *737 available to shareholders in a Leasing Corporation Plan: As the leasing concept gains popularity, investment opportunities will become available comparable to the early stages of growth industries * * * Profits in leasing are essentially generated from two sources: lease revenues and realization of residual values inherent in automobiles or equipment. Profits are, for all practical purposes, untaxed as they can be sheltered by generous depreciation allowances and investment credits. As a consequence, an accumulation of intrinsic values takes place at a faster rate than generally attainable if a portion of profits must be shared with the government. As profits go untaxed per share earnings will increase and additions to book value (or shareholders equity) will rise. This, in turn, will sooner or later be recognized in the market place if the stock of the company which we have organized shall be offered to the public.
Following a description of the stock purchase, the letter stated that the purchaser "would be an investor only. He may expect, however, capital [sic] appreciation and dividend income as the years go by." In another undated form letter received by petitioner *738 Terry D. Owens, this one transmitting initiating documents for Universal Leasing, Kersting emphasized the tax aspects but also wrote: All of your debt, except your monthly payment obligation, can be discharged at any time at your option by surrender of the stock certificate which will be issued to you after we have received the executed documents from you. As a shareholder of this corporation you will have access to capital gains prospects which we intend to develop. If our judgment is secure and if we are successful in creating a public market for the stock of this company it is reasonable to assume that the stock of this company will eventually sell at an earnings multiplier well in excess of the price which you are paying today. We are convinced of this to the point where we are willing to accept your stock in settlement of your indebtedness.
Kersting also wrote a form letter, as president of Anseth Leasing, marking the first anniversary of the recipients' participation in the Leasing Corporation Plan. He encouraged the shareholders to renew their outstanding leverage notes by executing new ones, and added that "you do have the continuing option to retire the existing *739 notes by a sale to your corporation of the stock which you have acquired." E. CAT-FIT Plan
[27]
Kersting made the CAT-FIT Plan available to those interested clients with children, generally at a participation level of $ 17,000 per child. The parent borrowed $ 17,000 from Windsor Acceptance by means of a primary loan with an annual interest rate of 12 percent. The primary note was by its terms payable on demand or in 2 or sometimes 3 years if not demanded earlier. Windsor Acceptance supplied the loan proceeds in the form of a check payable to the parent, and Atlas Guarantee issued a $ 17,000 "investment certificate" in the name of the child. The investment certificate stated that Atlas Guarantee would pay interest to the child at an annual rate of 12 percent. The parent usually borrowed funds from an acceptance corporation by means of a leverage loan, $ 2,040 for each child, to pay the annual interest *740 to the primary lender, Windsor Acceptance. The leverage note, with a 9-percent annual interest rate, [28] was by its terms payable in 1 year. The parent endorsed the loan proceeds check, which was payable to the parent, and, with the other initiating documents, sent it back to the Kersting offices. The parent usually paid interest on the leverage loan in a lump sum. The investment certificate, the primary note, the leverage note (if applicable), and the checks representing loan proceeds all bore the same date, which was early in January or early in July. As with the Stock Subscription Plan, Kersting at the outset instructed those wishing to participate in the leverage loan version of the CAT-FIT Plan to open a checking account in Hawaii at a specified local bank at which Kersting corporations had accounts. This was either Liberty Bank or Hawaii National Bank into 1979 and Liberty Bank *741 from 1979 on. After the parent endorsed the proceeds check from the leverage loan and returned the initiating documents to Kersting, Atlas Guarantee sent a form letter with instructions on how to complete the transaction. [29] In this letter, Atlas Guarantee asked the parent to send a signed check drawn on his local account at the specified bank and made payable to Windsor Acceptance in the amount of a year of interest on the primary loan. The letter stated that an appropriate deposit (meaning the endorsed leverage loan proceeds check) would be made to the parent's account to allow his check to clear. Atlas Guarantee paid interest on the investment certificates semi-annually, with checks made payable to the child and dated in June or *742 July and December or January. By an accompanying letter or otherwise, the parent was requested to obtain the child's endorsement or endorse for the child, and then to return the check so that Atlas Guarantee could add the check amount to the face amount of the investment certificate. The parent usually agreed to this procedure, but some parents arranged to receive signed and negotiable interest checks. Kersting told these parents not to use the child's earnings from the investment certificate to discharge their normal parental obligations, such as the provision of food, shelter, and clothing. Otherwise, Kersting believed, the earnings belonged to the parents for income tax purposes. For the second and each succeeding year of the CAT-FIT Plan, the parent participating in the leverage loan version borrowed funds by means of a new leverage loan in order to pay another year of interest to Windsor Acceptance. The new leverage note, again with a 1-year term and a 9-percent interest rate, was in favor of a different acceptance corporation than the original leverage lender. The loan proceeds, in the amount of the annual interest payable to Windsor Acceptance, took the form of a check *743 payable to the parent. The parent again wrote a check to Windsor Acceptance drawn on his local account in an amount equal to a year of interest on the primary loan. If a parent wished to participate in the CAT-FIT Plan beyond the term of the original primary note, he in effect renewed or refinanced the primary loan by executing a new note in favor of Windsor Acceptance, again at an annual interest rate of 12 percent. Kersting at some point authored this description of the CAT-FIT Plan: Under existing tax regulations each parent * * * can make a TAX FREE gift of $ 3,000.00 per year to each of their children. Furthermore, they have a lifetime allowance of $ 30,000 of TAX FREE gifts to their children. No gift tax will be payable on either the annual gifts in the amount of $ 3,000 or the once-in-a-lifetime gift of $ 30,000. The object of the plan is to shift income from parents to their children. Children can be taxpayers in their own right and are permitted to earn as much as $ 2,300 per year before they begin to pay taxes. Although children under the CAT FIT PLAN become taxpayers by reason of the income they might earn, their parents will not loose [sic] the exemption, presently *744 $ 1,000 [per] child, if they contribute more than 50% of their children's annual support. The implementation of the plan requires a few simple steps: 1. Each parent will make a gift in the amount of $ 17,000 to any one or all of their children. A certificate savings account in the amount of $ 17,000 will be opened with Atlas Guarantee Corp. in the name of the child. The account will earn interest at the rate of 12% per year. The earnings will accrue to the child. 2. If the lifetime allowance or any part thereof is used, the savings account can be increased accordingly. 3. One of our subsidiary acceptance corporations will make a loan to the parents in the amount of $ 17,000 or whatever the savings account in the child's name should amount to. We will charge interest at the rate of 12% per year on that loan. The interest payment becomes a deduction for federal and state tax purposes to the parents. The effect of the above-described transaction will be that the children will earn a return on the savings account in their names which will be free of income tax to the point where they reach $ 2,300 and the parents will have a tax deduction in the amount of $ 2,040 *745 * * * The actual net return to parents and children, will depend upon the tax brackets of the parents * * *
In an undated form letter that accompanied initiating documents received by petitioner Terry D. Owens, Kersting wrote: Enclosed please find the promissory note (issued to our Acceptance Corporation) by which you will engender the funds needed to create the educational [sic] fund for your children. Please sign white copy of note and endorse the attached check. Return both to us. * * * Upon receipt of your executed promissory note and check we will issue to your children Thrift Certificates as per enclosed sample copy. Your children will earn as of the date of the Thrift Certificate 12% interest on the face amount of the Certificate. For every $ 17,000.00 of Thrift Certificates your children will earn $ 2,040.00 per year. * * *
When a parent decided to discontinue participation in the CAT-FIT Plan, he sent the investment certificate back to Kersting to be redeemed. The redemption check sent to the child was endorsed, returned, and then used to pay off the primary loan. F. Flow of Funds
1. Generally
The "waltz" was what Kersting called the procedure *746 he used to guide checks through the bank checking accounts of several corporations and investors on the same date. All of the Kersting corporations involved in a given waltz had checking accounts at the same local bank in Hawaii, either Hawaii National Bank or Liberty Bank. These waltzes were not always perfect in terms of same-day timing and identical amounts flowing between accounts, but both types of discrepancies were relatively few and insignificant. The Kersting corporations conducted banking transactions at Hawaii National Bank during the 1970s. Kersting himself made deposits to the accounts of the various Kersting corporations and to the accounts of various investors who had opened accounts at the bank. He often provided a schematic drawing to a bank employee and explained that the funds were moving from one party to the next in a circular fashion. Because there were usually negligible balances in the accounts affected by the circular transactions, the bank processed checks as a simultaneous transaction, in effect depositing and paying checks at the same time so that payment of a check from an account was covered by a deposit to that account of a like amount. Eventually, *747 Hawaii National Bank became concerned about the nature of these transactions, specifically the possibility of check-kiting, [30] and informed Kersting that all accounts would be closed, which occurred in March of 1979. There had been no possibility of check-kiting up to this time because all of the affected accounts were within Hawaii National Bank. Nonetheless, Kersting was involving more and more accounts, and the Hawaii National Bank administrators, who began to track drawing-on-same-day-deposit reports, decided that the transactions should cease. Several Kersting corporations *748 had checking accounts at Liberty Bank even before closing of the accounts at Hawaii National Bank. At least from 1978 through 1983, either Kersting or women who worked in his offices would go to the Kahala Mall branch of Liberty Bank to conduct banking transactions. Several checks would usually be deposited, most or all of which were drawn on Liberty Bank. The total deposited amount was sometimes large enough to make the deposit volume for the branch on that day seem unusually high. Checks associated with Kersting's investment programs usually cleared the bank, Hawaii National Bank or Liberty Bank, at least several weeks after their dates, and sometimes the date difference was over a year. In addition, Kersting generally waltzed funds associated with primary loans separately from those funds associated with leverage loans, at least for the Stock Subscription Plan. These factors sometimes affected the work of the bookkeepers, who relied on bank statements and canceled checks. For example, as already noted, Fargo Acceptance in its initial income tax return for the period ending June 30, 1977, reported interest income of $ 91,200, but indicated no capital stock on the Schedule *749 L balance sheet. Kersting had waltzed leverage loan funds for a Fargo Acceptance Stock Subscription Plan on June 15, 1977, which included interest on subscription agreements of $ 91,200. He did not waltz the primary loan funds with which the investors purchased the Fargo Acceptance stock until July 29, 1977. Kersting's intercorporate fund transfers as part of a waltz were at least sometimes documented as loans or deposits (by means of notes or other evidences of indebtedness) or as stock purchases. 2. Stock Purchase Plan
The holding companies that participated in the Stock Purchase Plan, Charter Financial and Investors Financial, periodically transferred the funds received from new shareholders to Federated Finance. On February 8, 1980, Liberty Bank recorded 20 checks issued by Charter Financial in amounts of either $ 14,400 or $ 21,600. Among the deposits recorded on the same date were two for $ 151,200 each. The account balance was the same at both the beginning and end of the day, $ 1,399.36. For Candace Acceptance on the same date, Liberty Bank recorded three deposits totaling $ 302,400 (among other smaller deposits), with each of the three evenly divisible by $ 7,200. *750 Among the issued checks recorded on the same date were two for $ 151,200 each. The ending account balance for the day differed by less than $ 50 from the beginning balance. On May 22, 1980, Liberty Bank recorded 37 checks issued by Charter Financial in amounts of $ 7,200, $ 14,400, and $ 21,600. Among the deposits recorded on the same date was one for $ 597,600. The account balance was the same at both the beginning and end of the day, $ 780.53. For Candace Acceptance on the same date, Liberty Bank recorded four deposits evenly divisible by $ 7,200 (among others not so divisible), and these four totaled $ 597,600. Among the issued checks recorded on the same date was one for $ 597,600. The ending account balance for the day, which was less than $ 900, differed by less than $ 30 from the beginning balance. 3. Stock Subscription Plan
For the Stock Subscription Plan, the waltz of primary loan funds typically occurred several months after the date on the initiating documents. After several investors had endorsed and returned to Kersting the two-party loan proceeds checks from their primary loans, the bank processed the following check transactions (paying a check *751 from the drawer's account and depositing it to the payee's account) on the same date: (1) The loan proceeds checks were paid from the account of the primary lender and deposited as a group to the account of the second payee named on the checks, which was the acceptance corporation selling its stock; (2) this acceptance corporation issued a check, equal to the amount deposited to its account, to Federated Finance; and (3) Federated Finance, if the primary lender was other than Federated Finance, issued a check in the same amount to the primary lender. Although the amount flowing from point to point in a waltz of this type often exceeded $ 500,000, it was not uncommon for the account balances of the primary lender and the acceptance corporation, immediately before and after the waltz, to equal a small fraction of the circulating amount. The waltz of leverage loan funds for the Stock Subscription Plan also typically occurred several months after the date on the initiating documents. This waltz incorporated the investor's checking account at the same bank into the loop. As part of the leverage loan transaction, the investor returned one check to Kersting and sent two of his own. *752 More specifically, he endorsed and returned the leverage loan proceeds check and also sent two signed checks drawn on his account (for primary loan interest and subscription interest) that taken together equaled the amount of the proceeds check. After several investors had returned this three-check package, the bank processed the following check transactions on the same date: (1) The loan proceeds checks were paid from the account of the leverage lender and deposited separately to the account of each investor; (2) the check for subscription interest was paid from the account of each investor, and these checks were deposited as a group to the account of the acceptance corporation selling its stock; (3) the check for primary loan interest was paid from the account of each investor, and these checks were deposited as a group to the account of the primary lender; (4) the stock-issuing acceptance corporation and the primary lender issued checks, each equal to the amount deposited to its account, to Charter Financial or Federated Finance; and (5) Charter Financial or Federated Finance issued a check, equal to the amount deposited to its account, to the leverage lender. The amounts flowing *753 into and out of the accounts of the stock-issuing acceptance corporation and the primary lender usually exceeded $ 100,000. The amounts flowing into and out of the accounts of the leverage lender and Charter Financial usually exceeded $ 200,000. It was not uncommon, however, for each of these account balances, immediately before and after the waltz, to equal less than $ 1,000. 4. Leasing Corporation Plan
The leasing corporations that sold their stock under the Leasing Corporation Plan, like the holding companies in the Stock Purchase Plan, periodically transferred the funds received from new shareholders to Federated Finance. On July 22, 1981, Liberty Bank recorded deposits of $ 28,800 and $ 82,000 in the general account of Anseth Leasing. [31] The $ 28,800 consisted of checks from four individuals, three for $ 6,600 each and one for $ 9,000. The $ 82,000 consisted of checks from the same individuals, three for $ 19,000 and one for $ 25,000. As recorded on the same date, Anseth Leasing issued checks from this account that included one for $ 28,800 and another for $ 82,000. *754 Also on July 22, 1981, Liberty Bank recorded deposits of $ 14,520 and $ 41,000 in the general account of Escon Leasing. The $ 14,520 consisted of checks from two individuals, one for $ 6,600 and one for $ 7,920. The $ 41,000 consisted of checks from the same individuals, one for $ 19,000 and one for $ 22,000. As recorded on the same date, Escon Leasing issued checks from this account that included one for $ 14,520 and another for $ 41,000. On April 27, 1978, Liberty Bank recorded the following activity in the Escon Leasing general account: 10 checks issued in the amount of $ 9,990, 5 of $ 6,480, 3 of $ 5,400, 2 each of $ 10,800, $ 8,640, $ 7,560, and $ 3,240, and 1 each of $ 8,100, $ 2,970, and $ 1,620, for a total of $ 221,670, and deposits of $ 143,730, $ 78,000, and $ 2,000. The recorded special account activity for the same date was a single deposit of $ 221,670 and 58 issued checks: 10 each of $ 6,570 and $ 3,420, 7 of $ 2,160, 5 each of $ 4,320 and $ 3,600, 3 each of $ 1,800 and $ 1,080, 2 each of $ 7,200, $ 5,760, $ 5,040, $ 2,880, and $ 2,520, and 1 each of $ 5,400, $ 2,700, $ 1,530, $ 1,440, and $ 540. The ending special account balance for the day was the same as *755 the beginning balance, $ 100. On November 8, 1978, Liberty Bank recorded the following activity in the Escon Leasing general account: 5 checks issued in the amount of $ 9,990 and 1 each of $ 8,640, $ 6,480, and $ 3,240, for a total of $ 68,310, and deposits of $ 45,090 and $ 23,000. The recorded special account activity for the same date was a single deposit of $ 68,310 and 16 issued checks: 5 each of $ 6,570 and $ 3,420, 2 of $ 2,160, and 1 each of $ 5,760, $ 4,320, $ 2,880, and $ 1,080. The ending special account balance for the day was the same as the beginning balance, $ 88.77. On August 6, 1979, Liberty Bank recorded the following activity in the Anseth Leasing general account: 4 checks issued in the amount of $ 10,020 and 2 of $ 9,748.80, for a total of $ 59,577.60, and a deposit of $ 39,417.60. The recorded special account activity for the same date was a single deposit of $ 59,577.60 and 12 issued checks: 4 each of $ 6,600 and $ 3,420, and 2 each of $ 6,508.80 and $ 3,240. The ending special account balance for the day was the same as the beginning balance, $ 78.90. On August 16, 1979, Liberty Bank recorded the following activity in the Anseth Leasing general account: *756 15 checks issued in the amount of $ 10,020, 6 of $ 9,748.80, 3 of $ 6,499.20, and 1 each of $ 5,416 and $ 4,062, for a total of $ 237,768.40, and deposits of $ 156,948.40 and $ 81,000. The recorded special account activity for the same date was a single deposit of $ 237,768.40 and 52 issued checks: 15 each of $ 6,600 and $ 3,420, 6 each of $ 6,508.80 and $ 3,240, 3 each of $ 4,339.20 and $ 2,160, 2 of $ 1,800, and 1 each of $ 3,616 and $ 2,262. The ending special account balance for the day was the same as the beginning balance, $ 78.90. 5. CAT-FIT Plan
During 1979 and 1980, Liberty Bank recorded the following amounts in the accounts of Atlas Guarantee and Windsor Acceptance: [32]
Atlas Guarantee
Windsor Acceptance
Date
Checks Issued
Deposits
8/30/79 $ 500,000; $ 510,000
$ 500,000; $ 510,000
9/24/79 85,000   85,000   10/30/79
408,000  408,000  11/29/79
391,000  391,000  1/25/80 102,000  102,000  2/22/80 17,000; 17,000   34,000   3/ 7/80 17,000   17,000   3/18/80 17,000   17,000   4/18/80 339,000; 374,000  339,000; 374,000  7/24/80 459,000  459,000  8/ 8/80 17,000; 17,000   34,000   8/13/80 306,000  306,000  8/21/80 17,000; 17,000   34,000   11/19/80
306,000  306,000  *757 On all of these dates, the deposits to the Atlas Guarantee account exactly offset Atlas Guarantee checks, and the checks paid from the Windsor Acceptance account (most of which were either $ 17,000 or a multiple thereof) exactly offset Windsor Acceptance deposits. Thus, the beginning and ending account balances for the day were equal. The Atlas Guarantee beginning and ending account balances never exceeded $ 100 on these dates, and the Windsor Acceptance account balances, with the exception of January 25, 1980, did not exceed $ 5,000. The waltz of leverage loan funds for the CAT-FIT Plan, like the Stock Subscription Plan waltzes, typically occurred several months after the date on the initiating documents. Like the waltz of Stock Subscription Plan leverage loan funds, this waltz incorporated the parent's checking account into *758 the loop. As part of the leverage loan version of the CAT-FIT Plan, the parent endorsed and returned the leverage loan proceeds check and also sent a signed check drawn on his account (for primary loan interest) that equaled the amount of the proceeds check. After several parents had sent both of these checks to Kersting, the bank processed the following check transactions on the same date: (1) The loan proceeds checks were paid from the account of the leverage lender and deposited separately to the account of each parent; (2) the parent's check for primary loan interest was paid from the account of each parent, and these checks were deposited as a group to the account of the primary lender, Windsor Acceptance; (3) Windsor Acceptance issued a check, equal to the amount deposited to its account, to Federated Finance; and (4) Federated Finance issued a check, equal to the amount deposited to its account, to the leverage lender. The amounts flowing into and out of the accounts of Windsor Acceptance and the leverage lender usually exceeded $ 50,000 for this type of waltz. It was not uncommon, however, for each of their account balances, immediately before and after the waltz, to equal *759 less than $ 500. G. Termination of Stock Programs
Before someone began a stock investment program, Kersting assured him that he could surrender the purchased stock at any time in full payment of the corresponding primary loan. For those relatively few who insisted on written documentation of this policy, which did not include any of petitioners, Kersting obliged them. In effect, he agreed with the investor to repurchase the shares at the price for which they were issued. As a mechanical matter, the investor generally returned an endorsed stock certificate in exchange for a check, which he endorsed and returned to pay off the outstanding primary loan. Although Kersting sometimes provided written assurances of the termination policy after an investor began participating, the letters in such instances merely confirmed the understanding reached before participation began. As an example of a letter confirming an earlier understanding, Kersting wrote to a new participant on July 28, 1977: We received today your executed note #420 of which I will be enclosing a copy for identification. This is to confirm that you have a continuing option to offset any obligation arising from *760 execution of this note by surrender of the Fargo Acceptance Corp. stock certificate which was issued to you (Certificate #39, 30,000 shares of stock).
Similarly, on August 18, 1977, Kersting wrote to someone else: This is to confirm our verbal understanding that you will have a perpetual option to offset any obligation arising from execution of your note in the amount of $ 30,000.00 (copy attached for identification) by surrender of the stock certificate issued to you by Fargo Acceptance Corp. of which a copy is enclosed with this letter.
Kersting sometimes represented that surrendered stock would satisfy all outstanding debt, which would include outstanding leverage loans. On January 18, 1978, he wrote to a prospective investor on behalf of Forbes Acceptance, Fargo Acceptance, Federated Finance, Federal Finance & Mortgage, Mahalo Acceptance, and Atlas Funding: "This is to confirm our verbal assurance that you will be permitted to offset any of the promissory notes which you might execute at one time or another to any of our lending companies by surrender of the stock certificates which will be issued to you in that connection." In some correspondence, Kersting disclosed *761 why he was reluctant to provide written assurance to all participants as a matter of course. A letter he wrote to a prospect on July 21, 1977, explained: there is, of course, no problem to reassure you of the self-sustaining and self-liquidating aspects of the transaction. We would, in fact, issue a letter to every participant in the deal outlining that understanding if it would not weaken YOUR position with the IRS. IRS wants to see you "at risk" and not on a non-recourse basis. The fact is, if they would determine that you are on a non-recourse basis you would likely lose your deduction.
His February 1978 letter to Willis McComas similarly stated: As to the obligation under the promissory notes and subscription agreements there is no ongoing obligation as far as we are concerned. We will always repurchase the stock issued at a price sufficient to allow a borrower to discharge all of his debt. That, unfortunately, can not be stated before the Revenue Service. The Tax Reform Act of 1976 has essentially eliminated non-risk or non-recourse notes. Your deductions would be materially weakened if we would admit to an offset arrangment [sic] as to notes and stock *762 certificates. I wish I could be more explicit in writing.
In a letter serving as a credit reference to a third party on December 10, 1980, Kersting described a specific client's typical investments: "His liabilities at * * * [the time of the stock purchases] and from there on would be equal to the assets acquired. His debt can be cancelled at any time of his choice by the sale of the assets in his possession. We maintain a stable and assured market for these securities." The letter also included this summation: "The results of this sort of investment planning have been considerable tax retrievals * * * at a nominal cost and negligible risk." Kersting did not always provide an original of a termination assurance letter directly to the concerned prospect or participant. In some instances, with the approval of the concerned party, he gave the original to a mutual acquaintance such as Michael Provan or Robert Campbell for safekeeping. In one instance, Kersting sent the original to a mutual acquaintance and attached a letter that read: "Be sure this never gets to the IRS. It would be most damaging to all of us." Although Kersting sometimes described the stock surrender part *763 of the transaction to a prospect as a stock redemption by the corporate issuer, he also sometimes characterized it as a direct sale to another buyer with Kersting acting in the role of a broker. Regardless of how Kersting characterized the transaction, the prospect understood that his surrender of stock would relieve him of liability on at least the principal balance of the primary loan. Kersting also assured all participants that if they conformed to the investment programs as set up and operated, they would not be liable for the principal amounts of their leverage loans. A participant in the Stock Purchase Plan or the Stock Subscription Plan understood from the beginning that annual distributions from the corporation would satisfy his principal balance obligation on the outstanding leverage loan. Kersting personnel processed terminations of these programs as of the end of the calendar year so that December distribution checks could be applied to pay off the last leverage loan. A participant in the Leasing Corporation Plan was assured that an outstanding leverage loan would be refinanced annually with a new leverage loan. At termination, the annual distribution check from the *764 leasing corporation satisfied the investor's obligation on the principal balance of the then outstanding leverage loan. H. Collection Activities
Kersting wrote a letter dated September 25, 1980, to over 30 clients, which read in part: We have sent you several reminders, most of them friendly, now to encourage you to discharge the debt to which you are a party for some time. As it appears that our reminders had no bearing on you, we * * * alert you now to the prospect that your tax deductions which we have generated for you might evaporate. It is not reasonable to expect us to deliver and not be compensated for it in return. Please be advised that we will reverse on our records your tax deductions for which we have not been paid and as referenced above if we do not receive payment in full by not later than October 10, 1980. * * *
The programs involved were the Stock Subscription Plan, the Leasing Corporation Plan, and the CAT-FIT Plan. Of the various amounts sought from these people, none was over $ 4,000 and several coincided with the annual interest on a leverage loan for a typical Stock Subscription Plan or Leasing Corporation Plan. The Kersting corporations *765 sometimes engaged attorneys, including Kersting's son-in-law, Roger Moseley (Moseley), to pursue missed payments from those who participated in the investment programs during the years at issue. Some investors stopped making payments to Kersting after hearing of the IRS search and seizure activities on January 22, 1981. Collection activities were more vigorous after 1982 than before, and Kersting first engaged Moseley after 1983. At the time of trial, Moseley had been used for fewer than 10 debtors, with most of their cases involving more than one note. Generally, Moseley first sent a demand letter and then, if he received either no response or an unacceptable response, he took action to commence a lawsuit. Attorney Thomas Dunn filed a complaint in Hawaii State court in 1983 on behalf of Atlas Funding. Atlas Funding sought to collect $ 46,200 as the payee on a stock subscription plan renewal primary note dated June 1, 1979, with Continental pilot Steven Hane the maker. (A lower-case reference to a "stock purchase plan," "stock subscription plan," "leasing corporation plan," or "CAT-FIT plan" relates to a specific participant and indicates a program that, based on information *766 available in the record, is not materially inconsistent with its upper-case namesake described in part III (B), (C), (D), or (E), above.) The principal amount of the note was $ 30,000, and 3 years of 18-percent annual interest equaled $ 16,200. The court entered a default judgment in October 1983, but Atlas Funding voluntarily dismissed the case the next month. Carl Mott, a pilot with American Airlines, Inc., was the defendant in lawsuits commenced in Hawaii State court in 1985 by Aztec Acceptance, Avalon Acceptance, Delta Acceptance, Lombard Acceptance, and Candace Acceptance. Moseley filed the five complaints, which involved 15 leverage notes dated between January 1982 and January 1984, inclusive. Each corporation sought a year of interest on the note or notes attached to its complaint. The court entered default judgments in all five suits in February 1986, and Moseley with some success took steps to collect the judgments. In 1985, Moseley also filed lawsuits in Hawaii State court on behalf of Candace Acceptance and Mahalo Acceptance against George Vermef, another Continental pilot. Candace Acceptance sought to collect $ 38,700 on two stock purchase plan leverage notes, both *767 dated July 1, 1980. The principal amounts of the notes were $ 21,600 and $ 14,400. Mahalo Acceptance sought to collect $ 23,430 on two leverage notes, one, with a principal amount of $ 18,000, that related to a stock subscription plan, and the other, with a principal amount of $ 4,080, that related to a CAT-FIT plan. Both of these notes were dated July 1, 1980. The court entered default judgments for both Candace Acceptance and Mahalo Acceptance in April 1986. The court later vacated the judgments, after salary garnishment had begun, when the parties agreed to settle the cases. In 1986, Moseley filed a complaint in Hawaii State court on behalf of Delta Acceptance against Robert Peterson, a pilot for Delta Airlines. Delta Acceptance sought to collect $ 27,219 on two leverage notes, one, with a principal amount of $ 14,400, that related to a stock purchase plan, and the other, a renewal leverage note with a principal amount of $ 10,020, that related to a leasing corporation plan. The $ 14,400 note was dated July 1, 1980, and the $ 10,020 note was dated July 1, 1982. The $ 27,219 sought by Delta Acceptance equaled the sum of the principal amounts of the notes and one year of *768 interest on each. The court entered a default judgment for Delta Acceptance in June 1986, after which salary garnishment began, but later the court granted the defendant's motion to set aside the default and relieve him from judgment. I. Notices of Deficiency
The Commissioner determined that specified amounts claimed as interest deductions in connection with the Kersting investment programs are not allowable because: (1) The transactions that gave rise to the claimed deductions were shams; (2) petitioners did not establish that they paid or properly accrued the interest claimed as deductions in the years claimed; and (3) the underlying transactions did not give rise to bona fide indebtedness or enforceable and bona fide obligations to pay compensation for the use or forbearance of money. The Commissioner further determined that, to the extent the claimed interest deductions are otherwise allowable, the amounts constitute investment interest the deductibility of which is subject to limitation under section 163(d), and petitioners failed to report properly the income received in the same transactions. IV. Petitioners
A. Jerry R. and Patricia A. Dixon
Petitioners *769 Jerry R. Dixon (Dixon) and Patricia A. Dixon (Mrs. Dixon) resided in El Paso, Texas, when they filed their petition and throughout their years at issue, 1977 through 1981. They filed a joint Federal income tax return for each of these years with the Internal Revenue Service Center at Austin, Texas. Dixon, 56 years old at the time of trial, is a high school graduate with over 3 years of a college education in business administration. He served 4 years in the military, where he received pilot training from the Navy, before an honorable discharge in 1958. He has been employed by Continental continuously since 1959, except for a 3-year break in service after the years at issue attributable to Continental's bankruptcy and associated pilot strike. Mrs. Dixon was not employed during the years at issue. Dixon first heard of Kersting in about 1972 when fellow pilots were discussing the possibility of leasing an automobile from him for their use during layovers. By 1976, when Dixon decided he should try to shelter his income, he and Kersting were exchanging correspondence about Kersting's investment programs. Dixon had discussed these programs with other Continental pilots who were *770 already involved, the most influential of whom were Michael Provan and Leon Lipsky. In Dixon's first letter to Kersting, in which he informed Kersting that he was a Continental pilot, he referred at the top to "CAT-FIT and Stock Sub-Program" and wrote: "I will gross about $ 50,000.00 this year and need some help if it is not too late. I would like to know about how much tax dollar return [there would be] per dollar spent on the two programs above." Dixon did not inquire about corporate profitability or stock appreciation potential in this letter. Later, in a letter with which he included a completed stock subscription form of some sort, he stated that he would like to participate in the CAT-FIT Plan "to the maximum extent" and to begin an "auto leasing program" as of January 1, 1977. He also asked Kersting for the name and address of the "tax man" Kersting used in southern California. In Kersting's reply letter dated November 20, 1976, he instructed Dixon to fill out a form to open an account at Hawaii National Bank. Dixon's first investments with Kersting were for 1977. Prior to this time, Dixon had been involved with one tax-favorable investment, an apartment building limited *771 partnership in El Paso. The largest amount the Dixons had borrowed was about $ 50,000 for the purchase of a home. Before investing in a Kersting program, Dixon did not receive printed material, such as a prospectus, nor did he receive financial statements or earnings histories of the participating corporations. He did, however, routinely receive written statements describing the tax benefits he might expect from particular Kersting investments. At the time of his investments, he knew that the leasing corporations in which he invested leased automobiles, and he thought that the other Kersting corporations in which he invested, including Investors Financial and Charter Financial, were in the business of making loans. He did not, however, know the number of shareholders of any of these Kersting corporations. By letter dated March 17, 1977, Gabriele Kersting, as vice president of Atlas Funding, apologized to Dixon for being "somewhat negligent in our correspondence." The rest of the letter read: If you are still interested in our Stock Subscription Agreement and CAT-FIT (gifts to children) programs, we would certainly like to have you participate. The SSA program would engender *772 a $ 9,000.00 deduction for you and CAT-FIT would generate a $ 6,120.00 deduction. If you are in the 30% tax bracket, these deductions would retrieve $ 4,536.00 for you for 1977, notwithstanding any deductions you may generate on your own. If you are interested, please notify me at your early convenience and I will see that the appropriate documents are sent to you immediately.
With initiating documents dated January 2, 1977, the Dixons entered into CAT-FIT plans for three children, with each investment certificate in the face amount of $ 17,000. [33] As Dixon understood it, the CAT-FIT Plan was meant to facilitate tax-free transfers of up to $ 3,000 annually per child. The Dixon CAT-FIT plans differ from the CAT-FIT Plan in several respects. First, both Dixon and Mrs. Dixon were makers of separate primary notes by the terms of which Dixon promised to pay $ 25,500 and Mrs. Dixon promised to pay $ 21,000, for a total of $ 46,500. [34] Second, both Dixon and Mrs. Dixon were makers of separate renewal primary notes dated January 2, 1979, each of which included a promise to pay $ 25,500. Third, each of the third and fourth leverage notes, dated January 2, 1979, and January 2, 1980, *773 was signed by both Dixon and Mrs. Dixon, and each of the leverage loan proceeds checks was payable to both. Kersting used Hawaii National Bank to waltz leverage *774 loan funds for the Dixon CAT-FIT plans on August 31, 1977, and June 9, 1978. The check that Dixon wrote for primary loan interest and that Kersting waltzed on August 31, 1977, was dated May 2, 1977. The similar check that Kersting waltzed on June 9, 1978, was dated May 24, 1978. By form letter dated January 1, 1980, Windsor Acceptance informed Dixon that, among other things, he could terminate his CAT-FIT plans by returning renewal documents unsigned along with the investment certificates. In 1980 or shortly thereafter, Dixon terminated the CAT-FIT plans by returning the investment certificates to Kersting. With initiating documents dated January 2, 1977, Dixon entered into a leasing corporation plan involving Escon Leasing ($ 19,000 purchase and $ 55,000 subscription), in connection with which he leased automobiles by means of sale-leaseback transactions throughout the years at issue. He had originally purchased the automobiles with financing from Conair Federal Credit Union or Coronado Bank, neither of which was associated with Kersting. This leasing corporation plan differs from the Leasing Corporation Plan in that Dixon's Escon Leasing stock certificate was dated July 1, *775 1977, unlike the other initiating documents. With initiating documents dated January 2, 1977, January 3, 1978, January 3, 1979, and January 3, 1980, Dixon entered into stock subscription plans involving, respectively, Fargo Acceptance ($ 30,000 purchase and $ 30,000 subscription), Mahalo Acceptance ($ 60,000 purchase and $ 60,000 subscription), Candace Acceptance ($ 60,000 purchase and $ 60,000 subscription), and Delta Acceptance ($ 60,000 purchase and $ 60,000 subscription). He had started with Mahalo Acceptance by checking the box next to "60,000" shares on the standard acceptance corporation order form. He had responded the same way to a similar form for Candace Acceptance. His Fargo Acceptance stock subscription plan differs from the Stock Subscription Plan in that the primary note had a 1-year term rather than 2. For this Fargo Acceptance stock subscription plan, Kersting used Hawaii National Bank to waltz primary loan funds on July 29, 1977, and leverage loan funds on June 15, 1977. The checks Dixon wrote for primary loan interest and subscription interest were dated May 23, 1977. For Dixon's Mahalo Acceptance stock subscription plan, Kersting used Hawaii National Bank *776 to waltz leverage loan funds on May 12, 1978. The checks Dixon wrote for primary loan interest and subscription interest were dated April 20, 1978. For Dixon's Candace Acceptance stock subscription plan, Kersting used Liberty Bank to waltz primary loan funds on April 10, 1979, and leverage loan funds on May 2, 1979. The checks Dixon wrote for primary loan interest and subscription interest were dated April 15, 1979. Sometime after January 3, 1980, Kersting wrote Dixon that he had gone over Dixon's accounts and defined "the need for additional shelter" based in part on Dixon's response to a questionnaire. This letter continued: You will find that you will have total deductions of $ 84,901.80 for this year. All of it can be claimed as the meter started running for you on the 3rd day of January of 1980. Please return to us all documents called for by the additional deductions (Charter Fin. Corp. and Investors Fin. Corp.) at your early convenience so that we can put the checks through the Bank.
With initiating documents dated January 3, 1980, Dixon entered into stock purchase plans involving Investors Financial ($ 120,000 purchase) and Charter Financial ($ 120,000 purchase). *777 Although the Dixons had checking and savings accounts outside of Hawaii, Dixon had opened a checking account at Hawaii National Bank in 1977, which he used in dealings with Kersting. In early 1979, he closed this account and began to use another Hawaii bank account, a joint account with Mrs. Dixon at Liberty Bank. Kersting, through Atlas Funding, set up the Liberty Bank account for the Dixons by making an initial deposit of $ 100. Dixon was unusual among Kersting's investors in that he paid interest on leverage loans with checks drawn on Hawaii National Bank and Liberty Bank. Dixon became aware of the IRS search of the Kersting offices shortly after it occurred. Although he was still participating in Kersting investment programs during 1984 and 1985 in the sense that he continued to pay interest on some leverage notes, he and Mrs. Dixon no longer claimed interest deductions relating to those programs. This was due in part to the advice of their return preparer, an attorney and certified public accountant named Mary Mangrum who suggested waiting until any Tax Court controversy was resolved, and in part to Continental's 1983 bankruptcy, which resulted in lower pay to Dixon and *778 less need for deductions. Delta Acceptance sent Dixon a form letter dated August 28, 1985, which stated: Enclosed you will find the necessary checks to terminate any and all participation you have in our programs. Please endorse the backs of the checks as per instructions on each ticket stapled to the checks. Then, return them to us at your earliest convenience. We will use these funds to cancel your notes all of which will be sent to you upon their cancellation marked "PAID." Please refer now to any items marked below which may pertain to you. If you are requested to return any further documents, please include them along with the enclosed checks. * * * XX Please return your Charter Financial * * * stock certificate for cancellation. PLEASE SIGN OFF ON BACK OF (EACH) CERTIFICATE! !
This letter contained similar unchecked "cancellation" lines for leasing corporation stock certificates, acceptance corporation stock certificates, and CAT-FIT investment certificates. The Dixons reported adjusted gross income for the years 1977 through 1981 in the respective amounts of $ 61,964, $ 68,911, $ 91,535, $ 100,121, and $ 105,538. They reported no capital gains or losses *779 relating to Kersting corporations during these years and reported $ 117 of dividend income for 1978. For their taxable year 1977, the Dixons' return was prepared by a certified public accountant with the Haskins & Sells firm in El Paso. An acquaintance of Dixon's, whom Dixon knew to be involved in Kersting's investments, had recommended this accountant. Philip Scheff prepared the Dixons' 1978 and 1979 returns, and Earl LeMond, whom Kersting had recommended to Dixon, prepared their 1980 and 1981 returns. Among the information Dixon provided to the return preparers were yearend statements of interest paid that Kersting corporations had sent to him. In his notice of deficiency, the Commissioner disallowed claimed interest deductions as follows: Payee
1977
1978
1979
1980
1981
Federated Finance
$ 3,420
$ 3,420
$ 3,420
$ 47,520
$ 46,620
Escon Leasing
6,600
6,600
6,600
2,280
2,280
Windsor Acceptance
6,120
6,120
6,120
6,120
-- Fargo Acceptance
3,600
1,503
1,745
551
-- Forbes Acceptance
2,028
1,688
-- 428
-- Atlas Funding
5,400
10,800
-- -- -- Norwick Acceptance
428
-- -- -- -- Mahalo Acceptance
-- 7,200
1,253
6,191
4,320
Candace Acceptance
-- -- 7,200
1,503
3,888
Ventures Funding
-- -- 10,800
-- -- Delta Acceptance
-- -- -- 600
1,503
$ 27,596
$ 37,331
$ 37,138
$ 65,193
$ 58,611
*780 B. John R. and E. Maria Cravens
Petitioners John R. Cravens (Cravens) and E. Maria Cravens (Mrs. Cravens) resided in Laguna Niguel, California, when they filed their petitions and throughout their years at issue, 1979 and 1980. They filed a joint Federal income tax return for each of these years with the Internal Revenue Service Center at Fresno, California. During these years, Cravens was a pilot with American Airlines. Mrs. Cravens was not employed during 1979 and worked as a flight attendant for American Airlines during 1980. After hearing about Kersting and his programs from several other pilots, Cravens, who was seeking a tax shelter, telephoned him to discuss possible investments. With initiating documents dated July 1, 1979, Cravens entered into a stock subscription plan involving Candace Acceptance ($ 60,000 purchase and $ 60,000 subscription), for which the primary lender was Ventures Funding and the leverage lender was Fargo Acceptance. Kersting used Liberty Bank to waltz primary loan funds on October 5, 1979, and leverage loan funds on October 26, 1979. Cravens had opened a checking account at Liberty Bank in September of 1979, and the checks he wrote for *781 primary loan interest and subscription interest were dated October 1, 1979. For the next year, with initiating documents dated July 1, 1980, he entered into a stock subscription plan involving Delta Acceptance ($ 60,000 purchase and $ 60,000 subscription). He never did anything with a check issued by Candace Acceptance or Delta Acceptance except endorse and return it. Consistent with his understanding that he could terminate his participation in these programs at any time by selling his stock back to the corporation, Cravens did so for both stock subscription plans. He was very unusual among Kersting's clients in being content to report a capital gain after remaining in a program for only a year. By letter dated September 10, 1980, Candace Acceptance informed Cravens that an enclosed check represented the "repurchase of stock" of the corporation. The unsigned check, dated July 1, 1980, was payable to Cravens in the amount of $ 60,000. The letter asked him to endorse the check and return it to Candace Acceptance. He had earlier mailed his endorsed Candace Acceptance stock certificate to the Kersting offices and in exchange received the Ventures Funding primary note marked "paid." *782 Along with his Candace Acceptance stock certificate, he had sent a handwritten letter stating in part: "I'm looking forward to receiving my $ 60,000 note and the paperwork for the 6,000 shares of Delta Corp." Cravens terminated his Delta Acceptance stock subscription plan in 1981, exchanging his stock certificate for a "paid" primary note and reporting a capital gain on the 1981 return. The Cravenses reported adjusted gross income for 1979 and 1980 of $ 64,694 and $ 75,394, respectively. In their 1980 return, they reported a Schedule D long-term capital gain of $ 18,000 on the Candace Acceptance stock, derived from a reported adjusted basis of $ 42,000 on the reported selling date, August 1, 1980. Because of a 60-percent capital gains deduction, they reported $ 7,200 as taxable income from this stock sale. They reported no other Schedule D transactions in either year. Neither the 1979 nor the 1980 return includes the name or signature of a paid preparer. In his notices of deficiency, the Commissioner disallowed claimed interest deductions as follows: Payee
1979
1980
Ventures Funding
$ 5,400
$ 5,400
Candace Acceptance
3,600
3,600
Fargo Acceptance
810
810
Federated Finance
-- 5,400
Delta Acceptance
-- 3,600
Mahalo Acceptance
-- 810
$ 9,810
$ 19,620
*783 The disallowed amounts for Ventures Funding, Candace Acceptance, and Fargo Acceptance all related to the Candace Acceptance stock subscription plan. The disallowed amounts for the other three corporations related to the Delta Acceptance stock subscription plan. The Commissioner also increased the Cravenses' 1980 income by $ 18,000, which they had reported as a Schedule B nontaxable dividend distribution by Candace Acceptance. C. Ralph J. Rina
Petitioner Ralph J. Rina (Rina) resided in Sunset Beach, California, when he filed his petition and throughout his years at issue, 1979 and 1980. He filed a Federal income tax return for each of these years with the Internal Revenue Service Center at Fresno, California. Rina completed high school and 3 years of college before he began to pilot aircraft full-time. He served 6 years in the Marine Corps reserve program beginning in 1964, and he has been employed as a pilot by Continental since 1966. Rina first learned of Kersting in 1978 or 1979 from pilots who had invested in his programs. Before this time, he had not been involved with tax shelters because he did not believe his salary warranted such investments. His annual salary *784 of $ 85,350 in 1979 was approximately 50 percent higher than his 1977 salary. He eventually met with Kersting in Kersting's Hawaii offices to discuss the programs. Kersting later sent Rina a letter dated November 7, 1979, which made no mention of profit potential for any Kersting corporation: I have structured the enclosed shelter program for you. You will find that you could have a total of $ 62,535.00 of total interest deductions this year, if you wish. However, due to the fact that interest must be apportioned from date of origination of a promissory note through year-end only 50% of the deductions could be claimed this year, i.e. $ 31,267.50. The remaining 50% can be claimed in 1980. If you want us to go ahead and produce the necessary documents, please call me upon receipt of this letter. * * * I will be enclosing forms to open a bank account here in Hawaii which we will need to facilitate clearing of tax deduction checks through your bank account before year-end.
During a telephone conversation with Kersting on November 10, 1979, Rina gave his approval to document these deductions. In a short letter to Rina on November 12, 1979, Kersting wrote: "Candace Acceptance *785 Corp. documents still to come. We did not have sufficient time this weekend to complete all documentation. You can count on this deduction, however." Rina opened a checking account with Liberty Bank in November of 1979 by making an initial deposit of $ 100. Although he wrote checks drawn on this account, he never personally made another deposit, leaving that activity to Kersting, and he never used the account for anything other than Kersting-related transactions. He also had an account with Continental Federal Credit Union in 1979 and 1980, which he used to pay interest on his leverage loans. With initiating documents dated July 1, 1979, Rina entered into stock purchase plans involving Charter Financial ($ 80,000 purchase) and Investors Financial ($ 80,000 purchase), a stock subscription plan involving Candace Acceptance ($ 60,000 purchase and $ 60,000 subscription), and a leasing corporation plan involving Anseth Leasing ($ 19,000 purchase and $ 55,000 subscription). He did not lease an automobile as part of his leasing corporation plan, nor did he purchase additional stock under the subscription agreement. For his Candace Acceptance stock subscription plan, Kersting used *786 Liberty Bank to waltz primary loan funds on December 11, 1979, and leverage loan funds on December 17, 1979. The checks Rina wrote for primary loan interest and subscription interest were dated November 28, 1979. At the time of Rina's investments in Charter Financial, Investors Financial, and Candace Acceptance, he thought that they were lending institutions of some sort, but he did not have an idea of the specific types of loans they made. He knew of several pilots who were Charter Financial shareholders, but he did not know how many shareholders there were in total. He also did not know how long Charter Financial and Investors Financial had been in existence at the time he purchased their stock. He had heard from Kersting and participants in leasing corporation plans that Anseth Leasing owned automobiles. Kersting also told him that Anseth Leasing might enter into a leasing transaction with Rina for aircraft that neither Rina nor Anseth Leasing then owned, but which Rina was interested in acquiring. Whatever information Rina had about the businesses of any of the Kersting corporations in which he invested was obtained from other participating pilots or Kersting himself. *787 He believed that at least some of the corporations had access to lendable funds that were available for purposes other than Kersting's investment programs. One of Rina's fellow pilots and acquaintances at Continental was Matt Bomis. Rina received an undated letter from Kersting that read in part: "Matt Bomis asked us this week to produce an additional $ 35,000.00 of tax deductions for you which we have done and which is summarized on enclosed sheet. You will have now a total of $ 81,906.00 in tax offsets." The enclosed sheet, which lacked any information meaningful to Rina except tax information, included three investments that were to be dated January 3, 1980: Charter Financial, Delta Acceptance, and Escon Leasing. Later, with initiating documents dated January 3, 1980, Rina entered into a stock purchase plan involving Charter Financial ($ 40,000 purchase) and a stock subscription plan involving Delta Acceptance ($ 60,000 purchase and $ 60,000 subscription). This stock subscription plan differs from the Stock Subscription Plan in that the Delta Acceptance stock certificate had a January 1983 date rather than a January 1980 date. Rina decided not to enter into the Escon Leasing *788 leasing corporation plan and mailed that package of documents back to Kersting unsigned. Rina did nothing with any check received from a Kersting corporation except endorse and return it, as instructed. He did not think it unusual that Kersting corporations issued two-party checks as loan proceeds. To him this was a reasonable procedure to assure the lender that the loan proceeds would be used consistently with the purpose of the loan. Prior to entering a Kersting investment program, Rina never received a prospectus, a projection of income for the corporations participating, or a written indication of anticipated appreciation in stock value. He did, however, sometimes receive written projected summaries of the annual interest deductions he could expect from specific Kersting investments. Even after entering a program, he never received a financial statement from a Kersting corporation or otherwise acquired any meaningful firsthand knowledge about whether the corporations ever had profits. He sometimes received requests for proxies and notices of shareholders meetings, but he did not attend. Acting upon assurances by Kersting that he would never have any trouble selling his *789 stock, Rina did so by returning the endorsed stock certificate to Kersting, a procedure that Rina thought was comparable to using a broker. On at least one occasion, Kersting told him that he was matching him as seller with a specific buyer. Rina and Kersting had no prearranged understanding on valuing stock that was inconsistent with Kersting's treating its value as equal to its original issuance price. For his Charter Financial stock, Rina received in return the primary note marked "paid" and nothing else. He has not attempted to sell his Investors Financial stock. He also still has his Delta Acceptance stock, and Kersting has not demanded payment of the principal balance of the associated primary loan. Rina and Kersting agreed to await the outcome of litigation and IRS investigations concerning the investment programs. Rina reported adjusted gross income for 1979 and 1980 of $ 80,647 and $ 121,938, respectively. He reported no capital gains or losses relating to Kersting corporations for either year. His return preparer for 1979 was Philip Scheff and for 1980 was Earl LeMond. He did not tell his return preparers how to report the annual distributions received from Kersting *790 corporations. In his notice of deficiency, the Commissioner disallowed claimed interest deductions as follows: Payee
1979
1980
Federated Finance
$ 16,110
$ 49,806
Candace Acceptance
3,600
6,192
Anseth Leasing
3,300
3,300
Ventures Funding
5,400
5,400
Fargo Acceptance
-- 3,123
Delta Acceptance
-- 8,496
Mahalo Acceptance
-- 1,620
$ 28,410
$ 77,937
D. John R. and Maydee L. Thompson
Petitioners John R. Thompson (Thompson) and Maydee L. Thompson (Mrs. Thompson) resided in Camarillo, California, when they filed their petitions. They filed a joint Federal income tax return for 1979 with the Internal Revenue Service Center at Fresno, California. They also filed joint returns for their other years at issue, 1980 and 1981. Throughout most of the years at issue, the Thompsons resided in Hawaii, returning to California in 1982. Thompson had a high school education but no college when he entered the Army Air Corps in 1942 at age 19. Except for military service during the Korean War, he worked for Continental from 1946 until his retirement in October of 1982. Mrs. Thompson was not employed during the years at issue. From 1946 to 1980, Thompson had *791 some technical training and courses both in and out of the military, but he never received any formal instruction in business or accounting. When involved in business transactions, he sometimes relied on other people, including professionals, for guidance. Thompson first heard of Kersting in mid-1977 from Michael Provan when the two pilots were discussing ways to lessen and avoid income taxes. Thompson began a Kersting investment in that year, but the accounting firm that prepared the Thompsons' 1977 return refused to include the associated deductions because it wanted nothing to do with the Kersting programs. Provan also told Thompson about an investment opportunity concerning First Savings (described in part II (B), above), in which Thompson invested $ 20,000 cash. He knew that Kersting was promoting this investment to pilots, and First Savings appeared to him to be a healthy business when he visited and observed the premises. Sometime after 1979, Kersting returned Thompson's $ 20,000 investment by making a deposit to the Thompsons' Liberty Bank account. Kersting at some point also arranged for the Thompsons to finance a Hawaii home purchase through a savings/mortgage program *792 that had a below-market interest rate on the mortgage. They lost several thousand dollars in this program. By 1979, the Thompsons' first year at issue, Thompson was already participating in a leasing corporation plan involving Escon Leasing ($ 19,000 purchase and $ 55,000 subscription), in connection with which he leased an automobile. With initiating documents dated January 3, 1980, Thompson entered into stock purchase plans involving Investors Financial ($ 80,000 purchase) and Charter Financial ($ 120,000 purchase), and a stock subscription plan involving Delta Acceptance ($ 60,000 purchase and $ 60,000 subscription). Kersting had sent him a letter that, without mentioning anything else about the corporations, listed the annual interest deductions from these "tax shelter" investments. The letter also stated: "While this might not yet make you a zero taxpayer it will get you close to the zero line." Thompson knew nothing about the businesses of Charter Financial, Investors Financial, and Delta Acceptance, or who the other shareholders were, when he bought their stock. He also did not receive prospectuses, which he thought always accompanied stock transactions of this sort. *793 Thompson did not own stock in the corporations that made the primary and leverage loans for his investments. He made interest payments on leverage loans for 1980 with checks drawn on the Thompsons' account at Liberty Bank, which was the only account they had at the time. Thompson quit participating in Kersting's programs beginning in 1982 when he received a notice from the IRS regarding the Thompsons' 1978 taxes. He immediately telephoned Kersting, who said he would take care of the problem. Thompson was not satisfied with Kersting's assistance, so he eventually sought out tax lawyers and settled the dispute with the IRS. When Thompson had originally begun participating in the Kersting programs, Kersting had assured him that he could return his stock certificates at any time in exchange for the notes used to acquire the shares. Nonetheless, when Thompson twice tendered his stock certificates after 1982, they were not accepted. He has not received back canceled or "paid" promissory notes. Kersting sent Thompson a letter dated March 31, 1986, which, in addition to showing a "total amount owing" of $ 11,844, read: "As we are trying to terminate your accounts I find that there *794 are some unattended bills on our books of which you might not be aware. All of the bills reflect interest on leverage notes which, as you know, produce the funds to pay interest on the primary notes." By letter dated August 23, 1986, Kersting informed the Thompsons that he had turned their file over to attorney Moseley, and added: Since the odds * * * are in favor of imminent litigation I consider it to be my obligation to point out to you the consequences: The day after you have allowed your attorneys to file suit I will declare all notes which you have executed to our companies in default and begin collection proceedings. We will make an effort to collect from you not only the $ 11,844.00 of interest on promissory notes of which we have sent you billings several times[,] we will also file suit to collect the principal of all notes which we hold. The aggregate sum is well in excess of $ 250,000.00, as you know.
At the time of trial, Kersting was still not committed to taking the litigation initiative to pursue Thompson's outstanding principal amounts. The Thompsons reported adjusted gross income for 1979 through 1981 in the respective amounts of $ 86,158, $ 89,571, *795 and $ 113,711. They reported no capital gains or losses relating to Kersting corporations for these years. Their return preparer for 1979 was Philip Scheff and for 1981 was Earl LeMond. Their 1980 return does not include the name or signature of a paid preparer. In his notices of deficiency, the Commissioner disallowed claimed interest deductions as follows: Payee
1979
1980
1981
Ventures Funding
$ 10,800
--  --  Candace Acceptance
7,200
--  --  Fargo Acceptance
2,124
--  --  Escon Leasing
6,600
$ 2,280
--  Federated Finance
11,250
57,420
--  Mahalo Acceptance
1,503
5,940
--  Delta Acceptance
--  7,200
--  Unidentified
--  --  $ 89,782
$ 39,477
$ 72,840
$ 89,782
E. Hoyt W. and Barbara D. Young
Petitioners Hoyt W. Young (Young), also known as Wayne Young, and Barbara D. Young (Mrs. Young) resided in Cordova, Tennessee, when they filed their petitions. They also resided in Tennessee throughout their years at issue, 1979 through 1983. They filed joint Federal income tax returns for 1979 and 1980 with the Internal Revenue Service Center at Memphis, Tennessee, and also filed joint returns for 1981, 1982, and 1983. Young, *796 50 years old at the time of trial, earned a college degree in business administration in 1961. He then served in the Marine Corps for 10 years, toward the beginning of which he learned to pilot aircraft at Naval Flight School, and was honorably discharged in 1971. In that year he became a registered representative for Waddell & Reed, selling mostly mutual funds and term insurance. During the years at issue, he was a pilot for Federal Express Corp., where he had worked since 1972. Mrs. Young was not employed during 1979, 1980, and 1983, but on the 1981 and 1982 returns, each of which includes a Schedule C relating to Amway products, she reported a "sales" occupation. Young first learned of Kersting and his investment programs in about 1978 from a former Federal Express employee, Gary Humphries. Because of his increasing income, Young was interested in possible tax shelters. Humphries explained the tax advantages of the Kersting programs with reference to interest deductions. Prior to making his Kersting investments, Young had some finance company borrowing experience, but the most money he had ever borrowed at one time related to the purchase of an automobile. He had never *797 leased an automobile. He had previously owned common stock, with mixed results. Young did not fill out a loan application or submit financial statements prior to borrowing funds from Kersting corporations, but Kersting was aware of his occupation. Although Young understood what a prospectus was, he neither requested nor received any relating to Kersting investments. He received written projections of tax benefits for Kersting programs and annual statements reflecting interest he had paid during the year, but he did not receive profit or income projections for any Kersting corporation. Although he had no firsthand knowledge of the business operations of the corporations in which he invested, Kersting and other participants told him that they engaged in lending and automobile leasing. With initiating documents dated July 1, 1979, Young entered into stock purchase plans involving Charter Financial ($ 120,000 purchase) and Investors Financial ($ 120,000 purchase), and a stock subscription plan involving Candace Acceptance ($ 60,000 purchase and $ 60,000 subscription). He also entered into a leasing corporation plan as of the same date involving Anseth Leasing ($ 19,000 purchase *798 and $ 55,000 subscription), in connection with which he neither leased an automobile nor executed a subsequent subscription agreement. He received other documents dated July 1, 1979, relating to a CAT-FIT plan, but he did not participate. The form letters that accompanied Young's 1979 and 1980 annual distributions from Charter Financial included this sentence: "We recommend to you * * * to remain a shareholder so that you will participate in the progress of your company in the future." Each of the letters that accompanied his 1979 annual distribution from Candace Acceptance and his 1980 annual distribution from Delta Acceptance included a similar sentence and also stated: "The investment funds of your company * * * are primarily employed in lending and lease financing." At the request of Kersting, Young opened a Liberty Bank checking account in 1979. He made an opening deposit of $ 100 with a check drawn on his account at First Tennessee Bank and dated December 22, 1979. Kersting or persons associated with Kersting corporations made all subsequent deposits to this Liberty Bank account. Young did not pay interest on leverage loans from the Liberty Bank account, making those payments *799 instead from his account at First Tennessee Bank. At least some of the acceptance corporations that served as his leverage lenders provided him with payment coupon books for the payment of interest on the leverage loans. With initiating documents dated January 3, 1980, Young entered into a stock subscription plan involving Delta Acceptance ($ 60,000 purchase and $ 60,000 subscription). He informed Kersting of his desire to start this program by checking the box (and filling in the blanks) next to this statement on a Kersting order form: "Last year, I had the 60/60 plan which generated for me a tax deduction of $ 18,000. I would like the same plan." Later, on January 8, 1980, he telephoned Kersting and asked him to hold this stock subscription plan until he decided whether he needed the deduction. Kersting sent Young a list of investments, including initiating dates and amounts of deductions, accompanied by a short letter stating in part: "These are the deductions you have for the year of 1980. Total of $ 78,231.00. It should afford you freedom from taxes for all practical purposes." Young did not visit the Kersting offices until 1983 or 1984 when he and Mrs. Young *800 vacationed in Hawaii. Before that time, he transacted his business with Kersting by mail. He was somewhat concerned about sending large checks with his endorsement through the mail, but he realized that he had no practical alternative if he wanted to participate, plus he assumed that the endorsement of the second party, a corporation, on two-party checks would be difficult to forge. As Young understood them, the subscription agreements gave him the right and the obligation to purchase additional shares at $ 1 per share if the corporations "called" the subscription agreements. Despite believing that he had the right to tender payment on his own initiative and receive the additional shares, he never attempted to exercise this perceived right, nor did he seek an outside appraisal or other information as to the value of his Candace Acceptance or Anseth Leasing shares. He knew nothing about the change in value of his Anseth Leasing stock, if any, from July 1, 1979, to July 1, 1982. Young disposed of all of his stock in Kersting corporations prior to trial by returning the stock certificates to the Kersting offices by certified or registered mail. He received back his primary notes *801 marked "paid." The Youngs reported adjusted gross income for 1979 through 1983 in the respective amounts of $ 72,955, $ 83,214, $ 92,303, $ 87,908, and $ 78,360. They did not report capital gains or losses relating to Kersting corporations for any of these years. For each of 1980 and 1981, they reported nontaxable dividend distributions of $ 21,600 from Investors Financial, $ 21,600 from Charter Financial, $ 18,000 from Delta Acceptance, and $ 10,020 from Anseth Leasing. For 1982, they reported these same amounts as nontaxable dividend distributions from Investors Financial, Charter Financial, and Anseth Leasing, but reported nothing for Delta Acceptance. Their return preparers were Philip Scheff for 1979 and Robert Knapp for 1980 through 1983. In his notices of deficiency, the Commissioner disallowed claimed interest deductions as follows: Payee
1979
1980
1981
[35]1982 1983
Federated Finance
$ 23,310
$ 57,420
$ 57,420
$ 46,620.00
--   Candace Acceptance
4,896
2,592
-- 1,252.50
--   Anseth Leasing
3,300
6,600
2,280
2,280.00
--   Fargo Acceptance
540
2,458
-- --   --   Ventures Funding
5,400
-- -- --   --   Delta Acceptance
-- 10,440
-- 375.75
$ 1,127.25
Mahalo Acceptance
-- 1,871
-- 4,320.00
--   Aztec Acceptance
-- -- -- 3,888.00
--   Avalon Acceptance
-- -- -- 648.00
375.75
Lombard Acceptance
-- -- -- --   3,888.00
Avalon, Delta, Fargo
-- -- 12,833
--   --   Mahalo, Candace
-- -- 5,823
--   --   $ 37,446
$ 81,381
$ 78,356
$ 59,384.25
$ 5,391.00
*802 In addition, for 1980 and 1981 the Commissioner disallowed claimed sales tax deductions of $ 138 and $ 56, respectively. For 1981 he disallowed $ 4,352 claimed as business deductions on Schedule C and $ 880 claimed as an insurance deduction on Schedule A. For 1982 he disallowed $ 960 deducted as insurance on Schedule A. F. Robert L. and Carolyn S. DuFresne
Petitioners Robert L. DuFresne (DuFresne) and Carolyn S. DuFresne (Mrs. DuFresne) resided in Memphis, Tennessee, when they filed their petitions and throughout their years at issue, 1980 through 1983. They filed a joint Federal income tax return for each of these years with the Internal Revenue Service Center at Memphis, Tennessee. DuFresne is a high school graduate who at the time of trial was 46 years old and enrolled in a marketing degree program at Memphis State University. He had accumulated over 2 years *803 of a college education at various institutions by that time. Although he had some military experience, from which he was honorably discharged, he learned to pilot aircraft privately and at his own expense in about 1963. During the years at issue, DuFresne was a pilot with Federal Express, as he had been since 1972. His annual salary, which in 1972 was approximately $ 18,000, increased substantially in 1978 because of airline deregulation. Mrs. DuFresne worked as a bookkeeper in 1980. The returns for the other years at issue, each of which includes a Schedule C relating to Amway products, show her occupation as "sales." DuFresne's daughter, Carolyn, lived in his house at the beginning of 1980. DuFresne first heard of Kersting and his investments in about 1980 from a friend and fellow Federal Express employee, petitioner Young, who was already participating in the Kersting programs. Young did not go into much detail with DuFresne other than brief mention of leasing activity and loan and financing companies, but instead provided him with Kersting's telephone number and offered to mention him to Kersting. When DuFresne later telephoned, Kersting already knew who he was. Kersting *804 inquired about his background, including finances, during one or more of their first few conversations, but DuFresne never provided Kersting with a written application or qualification form. Kersting described some of the corporations as leasing corporations and said that most of the corporations dealt with money. DuFresne had heard over the years that financial institutions were often good investments. Prior to 1980, the only stock DuFresne had owned was that of Federal Express, some of which he purchased through a broker, and the only automobile he had leased was a 1974 Pontiac, the lessor of which was not a Kersting corporation. He had borrowed money from and paid interest to financial institutions, with his largest borrowing, a home mortgage loan, amounting to about $ 65,000. He did not have any experience with tax shelters before 1980. At no time was DuFresne provided with a prospectus or other written statement of any of the Kersting programs in which he participated. Nor did he receive any financial statements or projections of net income or stock value appreciation for any of the Kersting corporations. He did, however, hear about the tax advantages before investing. *805 With initiating documents dated January 3, 1980, DuFresne entered into stock purchase plans involving Charter Financial ($ 120,000 purchase) and Investors Financial ($ 80,000 purchase), CAT-FIT plans for three children (each investment certificate with a face amount of $ 17,000), and a stock subscription plan involving Delta Acceptance ($ 60,000 purchase and $ 60,000 subscription). At the time of his investments in Charter Financial and Investors Financial, he assumed their business was that of a lending institution. The DuFresnes opened a checking account at Liberty Bank in May of 1980 at Kersting's suggestion. DuFresne made an initial deposit of $ 100 with a check dated May 8, 1980, and drawn on his account at First Tennessee Bank. He sent the $ 100 check and signature cards to Kersting at the same time he returned executed documents for his Delta Acceptance stock subscription plan. He or Mrs. DuFresne wrote checks drawn on First Tennessee Bank to pay interest on his leverage loans. DuFresne's understanding of the legal effect of the Delta Acceptance subscription agreement coincided with that of Kersting. He did not think it unusual that someone else made deposits to his *806 account in the course of these transactions, in part because his employer, Federal Express, had been doing it for years. DuFresne understood from Kersting that there would be no problem in selling his stock when he wanted to dispose of it. Although DuFresne would have been deeply concerned if his salary had been his only source for paying back his Kersting loans, he assumed that disposition of the underlying stock would serve that purpose. After he decided to terminate his participation in the CAT-FIT plans, he returned the originals of the investment certificates to Kersting in January of 1981, receiving back his primary note marked "paid." He disposed of his Charter Financial and Investors Financial stock, sometime after the years at issue, by first talking to Kersting about liquidating his investments and then returning the stock certificates to Kersting. On the disposition of the Charter Financial stock, the DuFresnes reported a capital gain attributable to reduced basis rather than increased value. DuFresne sent two letters to Kersting dated June 22, 1984. In the handwritten one he wrote: The enclosed letter is for the benefit of our friends at the IRS and the courts. *807 I have retained a copy for my files and I believe the wording will justify the sale and the reinvestment. I strongly suggest that the actual transfer of funds take place to be able to prove later that a financial transaction did in fact take place. They'll be looking for a shuffling of paper, so we want to be sure to dot all of our 'Is' and to cross all of our 'Ts.' * * * I would destroy this note, after you have read it.
His second letter, which was typewritten and addressed to Charter Financial, stated: Per our conversation, I am returning my stock certificate for 11,429 shares of Charter Financial Corporation. These shares which I purchased in January, 1980 for approximately $ 10.50 per share should yeild [sic] $ 12.25 or a total return of $ 140,000.00. It's unfortunate that this only represents a yeild [sic] of about 5% per annum. I had certainly hoped for a higher return on my investment. Rather than return any of the above funds directly to me; I would like to request, if convenient with you, that you make one check payable to Federated Finance Company in the amount of $ 120,000.00 (One Hundred and Twenty Thousand Dollars) to clear IN FULL my 'Demand Loan' *808 that is outstanding with that company. Secondly, make a second check payable to Federal Finance Company in the amount of $ 20,000.00 (Twenty Thousand Dollars), the capital gain on the above mentioned stock. This monies [sic] will be deposited in their savings system at 16%. Needless to say, a much better growth potential than with your company.
The DuFresnes reported adjusted gross income for 1980 through 1983 in the respective amounts of $ 95,885, $ 93,800, $ 86,774, and $ 96,326. They reported no capital gains or losses relating to Kersting corporations for any of these years. For each of 1981, 1982, and 1983, they reported nontaxable dividend distributions of $ 21,600 from Charter Financial and $ 14,400 from Investors Financial. They also reported dividend income for 1981 from First Union Bancorp and for 1982 and 1983 from Centerre Bancorporation. Their return preparer for 1980 was Earl LeMond, for 1981 and 1982 was Robert Knapp, and for 1983 was William Lenahan. In his notices of deficiency, the Commissioner disallowed claimed interest deductions as follows: Payee
1980
1981
1982
1983
Federated Finance
$ 46,800
$ 36,000
$ 36,000
--  Delta Acceptance
10,440
--  --  --  Windsor Acceptance
6,120
--  --  --  Mahalo Acceptance
2,171
--  --  --  Avalon Acceptance
--  3,240
--  --  Aztec Acceptance
--  --  3,240
--  Lombard Acceptance
--  --  --  $ 3,240
Charter Financial
--  --  --  21,600
Investors Financial
--  --  --  14,400
$ 65,531
$ 39,240
$ 39,240
$ 39,240
*809 For 1980 the Commissioner also disallowed a dependency exemption for DuFresne's daughter, Carolyn. For 1981 he disallowed a claimed Schedule C loss of $ 5,012 and decreased a Schedule A sales tax deduction by $ 30, both of which have been conceded by the DuFresnes. G. Terry D. and Gloria K. Owens
Petitioners Terry D. Owens (Owens) and Gloria K. Owens (Mrs. Owens) resided in Kailua, Hawaii, when they filed their petition. They filed a joint Federal income tax return for each of their years at issue, 1975 through 1978, with the Internal Revenue Service Center at Fresno, California. They filed an amended 1975 return in 1976, and amended 1978 returns in 1982 and again in 1983. Owens, 51 years old at the time of trial, is a high school graduate with over 3 years of college spent pursuing a medical degree. After college, he began military service in 1958, went through Naval Flight School, and continued to fly in the military until his honorable discharge in 1966. Since July of 1966 he has been employed by Continental, first as a pilot and since 1978 as a management pilot. Mrs. Owens was not employed during the years at issue. Except for a short 1978 stint in Houston, Texas, *810 Owens lived in Honolulu, Hawaii, from 1970 until 1982. He first learned of Kersting in about 1971 from a fellow Continental pilot who did not go into much detail. Owens later participated in a group meeting with Kersting. Kersting's offices at the time were in a different Hawaii location than presently. Owens visited the Kersting offices many times over the years and discussed business there with Kersting. He also met Gabriele Kersting at these offices. In the early 1970s, the Owenses opened a checking account at Hawaii National Bank, which remains open, and Owens used this account for personal purposes as well as Kersting-related transactions. They also had an account at Bank of Hawaii during the years at issue, which Owens usually used to write checks to Kersting corporations. Mrs. Owens also sometimes wrote checks on this Bank of Hawaii account to Kersting corporations. Owens used the Hawaii National Bank account, however, to pay interest on the primary loan for his CAT-FIT plans and to pay primary loan interest and subscription interest for his stock subscription plans. Owens often bought and sold exchange-listed securities, beginning before the years at issue. His *811 first tax-advantaged investment and first investment with Kersting was a mortgage funding program (described in part I, above), which he began in 1971 or 1972. Shortly before or after beginning this program, Owens saw a copy of a favorable Dun & Bradstreet report on Kersting. In connection with this program and by means of a Note and Security Agreement dated April 1, 1974, he borrowed $ 4,000 at 18-percent annual interest from Confidential Finance in a refinancing transaction of some sort. His second tax-advantaged investment was a CAT-FIT plan, which he began in about 1973, followed by some sort of automobile leasing program. Beginning in about 1973, he occasionally borrowed funds from, and paid interest to, Confidential Finance for things like his children's private school expenses. During 1975 and 1976, he continued his participation in the mortgage funding program. From the investment account of this program he withdrew $ 2,700 to satisfy an IRS judgment, which amount he reported as a long-term capital gain on the 1975 return. He wrote a check for $ 500 drawn on his account at Hawaii National Bank and dated December 15, 1975, that was payable to First Atlas Funding and included *812 the notation "Inv. Advisory Fee." With initiating documents dated January 2, 1975, Owens entered into CAT-FIT plans for two children, with each investment certificate in the face amount of $ 17,000. On April 20, 1977, after having been the subject of several IRS audits, he informed Kersting that he would not claim CAT-FIT deductions on the Owenses' 1976 return. Kersting used Hawaii National Bank to waltz leverage loan funds for the Owens CAT-FIT plans on August 8, 1978. The check Owens wrote for primary loan interest was dated August 2, 1978. With initiating documents dated August 10, 1975, Owens entered into a stock subscription plan involving Norwick Acceptance ($ 20,000 purchase and $ 20,000 subscription), which differs from the Stock Subscription Plan in the following respects: The primary loan proceeds check was not a two-party check, but was payable to Norwick Acceptance alone; Owens was provided with a copy of the stock certificate, but Windsor Acceptance kept the original as collateral for its primary loan; the subscription agreement did not have an expiration date; the leverage note was on its face a demand note; the leverage lender was First Atlas Funding rather than *813 an acceptance corporation; and the date on the leverage note was December 1, 1975, rather than the August date of the other initiating documents. Sometime around August of 1977, Owens received a form letter asking him to renew the primary note. This letter concluded: Norwick Acceptance Corp. will pay you once a year from now on a dividend in an amount equal to the interest required to service the note to Mahalo Acceptance Corporation. The result will be that there will be no further cost to you. You can anticipate, as time goes by, capital appreciation and perhaps cash dividends out of your investment in Norwick Acceptance Corp. stock. In the meanwhile, you can be at ease knowing that the transaction is self-sustaining.
During 1975, Owens was one of 10 shareholders of the subchapter S leasing corporation named Maurier Leasing. He leased at least one automobile himself from Maurier Leasing. The 1976 Form 1120S for Maurier Leasing indicates that he was the owner of 7,000 shares from January 1, 1975, to January 1, 1976. Owens received a "Summary of Tax Deductions, Tax Losses and Tax Refunds" dated July 28, 1975, that listed $ 6,143.25 as the purchase price of an automobile, *814 7,000 as the shares of stock in a "Leasing Co.," $ 105 as monthly interest payments ($ 1,260 per year), and $ 138 as monthly lease payments ($ 1,656 per year). This statement also listed anticipated tax refunds of from $ 1,652 to $ 4,130, depending on the applicable tax bracket. By the terms of a Note and Security Agreement (#1573) dated July 28, 1975, Owens promised to pay Confidential Finance $ 7,000 on July 28, 1977, if not demanded earlier, with interest payable monthly at an annual rate of 18 percent. According to this document, associated loan proceeds would be in the form of checks issued to Owens and Maurier Leasing. Confidential Finance issued a check for $ 7,000, dated July 28, 1975, payable to Owens and Maurier Leasing. By the terms of another Note and Security Agreement (#1574) dated July 28, 1975, Owens promised to pay Confidential Finance $ 2,916 on May 15, 1976, with interest payable monthly at an annual rate of 18 percent. According to this document, associated loan proceeds would be in the form of checks issued to Owens and Confidential Finance for $ 1,260 and to Owens and Maurier Leasing for $ 1,656. Confidential Finance issued two conforming checks dated *815 July 28, 1975, and also issued a receipt to Owens dated August 8, 1975, for $ 1,260 of interest attributable to loan number 1573. By letter dated October 15, 1975, Kersting informed Owens that because of a 4-percent gross income tax imposed by the State of Hawaii, his monthly lease payment beginning in January of 1976 would be $ 143.52, an increase of $ 5.52 per month over the tax summary sheet amount. Kersting also requested $ 27.60 (which is $ 5.52 multiplied by 5) by December of 1975 to adjust lease payments already made. By the terms of a Note and Security Agreement dated May 19, 1976, Owens promised to pay Confidential Finance $ 2,982.24 on May 19, 1977, if not demanded earlier, with interest payable monthly at an annual rate of 18 percent. According to this document, associated loan proceeds would be in the form of checks issued to Owens and Confidential Finance for $ 1,260, to Owens and Maurier Leasing for $ 1,656, and again to Owens and Maurier Leasing for $ 66.24 (which is $ 5.52 multiplied by 12) for excise tax. In 1976, Owens was a first officer earning between $ 30,000 and $ 40,000 annually. Because he worked under a contract based on an hourly rate, he could project *816 his salary in advance for a year covered by the contract. With initiating documents dated September 1, 1976, Owens entered into a leasing corporation plan involving Universal Leasing ($ 14,000 purchase and $ 42,000 subscription), in connection with which he leased an automobile. A "Summary Sheet of Expenses and Deductions" dated September 1, 1976, listed monthly lease payments of $ 130 on an automobile costing $ 4,500 ($ 1,560 per year) and monthly State sales tax payments of $ 5.20 ($ 62.40 per year). Most of this sheet was devoted to projected interest deductions and Federal and State tax refunds. Universal Leasing later sent Owens a letter that stated near the top, "Interest paid to Universal Leasing $ 5,040" and "Interest paid to Federated Finance Co. $ 2,520," and further stated: You will be pleased to know that we have recorded for you the above listed interest deductions which can be claimed against your 1976 income. These deductions pertain only to your involvement in Universal Leasing Corp. They do not include the interest deductions which you will be able to claim as a shareholder of one of our SubChapter S companies or as a result of any other investment you may *817 have made with us. Those deductions will be reported to you in due course. As you are a shareholder now of Universal Leasing Corporation we have terminated your participation in the SubChapter S Leasing Company. Please return to us your stock certificate (if one had been issued to you) so that we can cancel the note which corresponded with it. No further obligation on your part exists with respect to the old program, except your monthly charges if your account is not current at this time. A full accounting will be prepared shortly and you will receive either a rebate or a billing. So that we can begin the New Year with a clean slate we would like you to remit your monthly payment from now on as called for in the summary sheet which was mailed to you with the documents reflecting your entry into Universal Leasing Corp. To refresh your memory, your monthly payments were scheduled as follows: $ 114.00 to Federal Finance & Mortg. Co. $ 135.20 to Universal Corporation
Owens' leasing corporation plan with Universal Leasing differs from the Leasing Corporation Plan in the following respects: The subscription agreement had no expiration date; the leverage lender was Federal *818 Finance & Mortgage rather than an acceptance corporation; the leverage note had a 2-year term rather than 1; and the leverage note indicated that the loan proceeds would include an additional check made payable to Owens and Universal Leasing in the amount of $ 1,560, which was to prepay automobile lease amounts. With initiating documents dated October 10, 1976, Owens entered into a stock subscription plan involving Forbes Acceptance ($ 30,000 purchase and $ 30,000 subscription), which differs from the Stock Subscription Plan in that the primary note was payable on March 1, 1978, if not demanded earlier, in contrast to the standard 2-year term. The form letter that transmitted the initiating documents, which was signed by Gabriele Kersting, advised the investor to "Keep the [stock] certificate in a safe place as you will need it later to retire the $ 30,000.00 note." With initiating documents dated April 1, 1978, Owens entered into a stock subscription plan involving Mahalo Acceptance ($ 30,000 purchase and $ 30,000 subscription). Kersting used Hawaii National Bank to waltz primary loan funds on September 18, 1978, and leverage loan funds on September 19, 1978. The checks Owens *819 wrote for primary loan interest and subscription interest were dated September 8, 1978. Owens understood his subscription agreements to give him the right and the obligation to purchase the additional shares at $ 1 per share if called upon by the corporation. He never purchased additional shares pursuant to these agreements. He did not receive a prospectus for any of his Kersting investments, nor a written description of anticipated net income or stock value appreciation. He did, however, routinely receive written statements about anticipated tax benefits. He occasionally received a proxy statement from Kersting and at least once signed and returned it. He did not ever vote his shares in person. Owens did not participate in Kersting investment programs after 1978 primarily because of the IRS audits that his Kersting investments attracted. At some point he received a "paid" primary note in exchange for his Norwick Acceptance stock. The Owenses reported adjusted gross income for 1975 through 1978 in the respective amounts of $ 24,582 ($ 28,364 in the amended return), $ 41,770, $ 48,466, and $ 59,962. The only capital gains or losses relating to Kersting corporations that they *820 reported for these years were a $ 2,700 long-term capital gain for 1975, which was from the investment account of the mortgage funding program, and a $ 1,100 long-term capital gain for 1976, both relating to First Atlas Funding. They reported no dividend income for 1977 or 1978. For 1975, 1977, and 1978, their returns, including amended returns, were prepared by Gilbert Matsumoto or someone else at the accounting firm with which he was affiliated, Matsumoto & Murakami. Matsumoto was Owens' tax adviser from 1971 through the years at issue. In his notice of deficiency, the Commissioner disallowed claimed interest deductions as follows: Payee
1975
1976
1977
1978
Windsor Acceptance
$ 3,600
$ 360
$ 180
-- Norwick Acceptance
2,400
-- -- -- First Atlas Funding
2,231
-- -- -- Confidential Finance
1,840
3,122
-- -- Atlas Funding
-- 1,800
-- -- Forbes Acceptance
-- 840
798
$ 652
Federated Finance
-- 840
240
-- Universal Leasing
-- 840
-- -- $ 10,071
$ 7,802
$ 1,218
$ 652
The Commissioner disallowed subchapter S losses of $ 7,207 from Maurier Leasing in 1975 and $ 67 from Aztec Leasing in 1976, and investment expenses *821 of $ 500 for 1975 and $ 600 for 1976. The grounds for disallowance of the subchapter S losses were that the corporations were not "viable tax entities," that they had excessive interest income that caused an automatic termination of subchapter S status, and that they did not file timely subchapter S elections. The Commissioner also disallowed an investment tax credit carryback of $ 11,294 from 1981, which the Owenses claimed in their first amended return for 1978, and education expenses of $ 9,234 for 1978, which they claimed in their second amended return for that year. H. Richard and Fidella Hongsermeier
Petitioners Richard Hongsermeier (Hongsermeier) and Fidella Hongsermeier (Mrs. Hongsermeier) resided in Spring, Texas, when they filed their petition, and in Seal Beach, California, during their years at issue, 1978 through 1980. They filed a joint Federal income tax return for each of these years with the Internal Revenue Service Center at Fresno, California. Hongsermeier completed high school and then attended 1-1/2 years of junior college. Afterwards, he joined the Navy, attended flight school, and flew aircraft in the Navy for 12 years. He started flying for Continental *822 in 1967 and has worked there ever since. He has no formal accounting background. Mrs. Hongsermeier was not employed during the years at issue. Hongsermeier first learned of Kersting and his programs in about 1976 from fellow Continental pilot Michael Provan, who told him about the tax advantages and that Kersting corporations leased automobiles and factored accounts. His first investments with Kersting began in 1977 when his annual salary was approximately $ 35,000, after he sent a letter to Kersting inquiring about mortgage funding and the CAT-FIT Plan. Because of the working contract under which he was employed, he was fairly certain that his income would be increasing. Kersting did not make representations about profit potential or anticipated stock value appreciation for the corporations in which Hongsermeier considered investing. Hongsermeier did receive, however, statements of anticipated tax benefits and summary sheets showing loans, interest, and tax effects. He relied on word-of-mouth from other pilots, who he understood to do the same, for information on the progress of a program. With initiating documents dated January 1, 1977, Hongsermeier entered into a CAT-FIT *823 plan with an investment certificate in the face amount of $ 25,000. In 1977 he felt that his income, savings, and other investments were sufficient to enable him to pay off a $ 25,000 debt. With initiating documents dated January 1, 1978, he entered into a CAT-FIT plan for a second child, again with a $ 25,000 investment certificate. His understanding of his CAT-FIT plans was that he borrowed $ 25,000, on which he paid interest, to be invested in an income-generating certificate for the child. A letter dated March 29, 1977, which was signed by Gabriele Kersting, explained the program to him: Windsor Acceptance Corp. lends you $ 25,000, at 12% per annum. With that $ 25,000, you invest in a thrift certificate with Atlas Guarantee Corp. in your child's name for the exact same amount. Your child will earn 12% per annum on the certificate, so the transaction, in essence, becomes a wash-out. Another lender, Norwick Acceptance Corp., then makes you a loan for $ 3,000, which is one year's interest on the $ 25,000 note. Norwick Acceptance charges you 6% per annum on the $ 3,000, which is your only real expense in the program. (It amounts to $ 180.00 per year.) However, you have *824 sent us $ 250.00, which I imagine, you felt you must pay every month. But as I have stated, you have already paid the $ 3,000, with a loan from Norwick Acceptance Corp. Incidentally, we have not received the original signed copy from you yet.
In addition to the $ 25,000 amounts, the Hongsermeier CAT-FIT plans were unusual because of the absence of a leverage loan. Hongsermeier elected not to borrow funds from Norwick Acceptance to pay interest on the primary loans, deciding instead to remit monthly amounts of $ 250 for each child with checks drawn on Wells Fargo Bank in California. The Hongsermeiers were also unusual in depositing the interest checks they received to the children's savings accounts, which Mrs. Hongsermeier supervised, rather than endorsing and returning them. One interest check issued by Atlas Guarantee in 1977 was returned by the drawee bank for insufficient funds when Hongsermeier tried to cash it. Kersting apologized in a letter dated September 6, 1977, stating that all of his other CAT-FIT clients "receive their interest checks as a credit" to their accounts rather than as cash, and thus there was generally no need to keep funds on deposit for Atlas *825 Guarantee. Windsor Acceptance rather than Atlas Guarantee issued some of the interest checks to the Hongsermeier children. Hongsermeier terminated the CAT-FIT plans sometime after the years at issue, and he received the original of at least one of his primary notes marked "paid." He did not use interest income deposited in the children's savings accounts to pay off the primary loans. With initiating documents dated January 1, 1977, and January 2, 1977, Hongsermeier entered into leasing corporation plans involving, respectively, Universal Leasing ($ 12,000 purchase and $ 36,000 subscription) and Escon Leasing ($ 19,000 purchase and $ 55,000 subscription). In connection with the Universal Leasing plan, he leased at least one automobile. He had originally purchased a Toyota Celica in 1977 from a California dealer unrelated to Kersting, financing the purchase through Continental Federal Credit Union. After he sold the automobile to Universal Leasing in 1977, to which he then made lease payments, Universal Leasing took over his payments to the credit union. He later leased a Toyota Corolla for 2 or 3 years from a Kersting leasing corporation. At the end of the lease term for the *826 Corolla, the vehicle was sold and the proceeds went to the leasing corporation. Hongsermeier's leasing corporation plan with Universal Leasing differs from the Leasing Corporation Plan in these respects: Checks issued by Universal Leasing had a July date rather than January; the subscription agreement had a stated expiration date that coincided with the date of the subscription agreement; and the subsequent stock acquisition note had a term of 2 years rather than 3 years. Hongsermeier's leasing corporation plan with Escon Leasing differs from the Leasing Corporation Plan in that the subsequent stock acquisition note by its terms was a demand note. With initiating documents dated January 3, 1980, Hongsermeier entered into a stock subscription plan involving Delta Acceptance ($ 40,000 purchase and $ 40,000 subscription) and a leasing corporation plan involving Anseth Leasing ($ 19,000 purchase and $ 55,000 subscription), in connection with which he did not lease an automobile. He instructed Kersting to commence the Delta Acceptance program with the standard order form on which he checked "40,000" shares. Hongsermeier transferred the balance of the Hongsermeiers' Hawaii National *827 Bank account to a new account at Liberty Bank in May of 1980. He wrote checks drawn on this new account and dated May 29, 1980, to pay primary loan interest and subscription interest for his Delta Acceptance stock subscription plan. The Hongsermeiers reported adjusted gross income for 1978, 1979, and 1980, in the respective amounts of $ 55,069, $ 67,667, and $ 78,733. They reported no capital gains or losses relating to Kersting corporations for these years. Hongsermeier's tax accountant and adviser during these years was Philip Scheff, who had been recommended to Hongsermeier by someone he knew to be involved in Kersting investments. Scheff prepared the Hongsermeier returns for 1978 and 1979 based in part on statements of interest paid provided to Hongsermeier by Kersting corporations. Earl LeMond prepared the 1980 return. Hongsermeier also provided his accountants with statements he received from Kersting corporations concerning their annual distribution checks. In his notice of deficiency, the Commissioner disallowed claimed interest deductions as follows: Payee
1978
1979
1980
Escon Leasing
$ 6,600
$ 6,600
$ 2,280
Federated Finance
5,580
5,580
14,040
Windsor Acceptance
5,500
6,000
6,000
Universal Leasing
4,320
1,440
-- Fargo Acceptance
2,269
2,475
1,253
Mahalo Acceptance
-- 2,880
5,606
Anseth Leasing
-- -- 6,600
Delta Acceptance
-- -- 4,800
Candace Acceptance
-- -- 1,503
$ 24,269
$ 24,975
$ 42,082
*828 The Commissioner also determined that income averaging was not available for 1979. OPINION As the first of three preliminary matters, we address the filed stipulations of fact in these cases totaling approximately 140 pages and incorporating exhibits of many times that volume. In some instances, stipulated narrative facts are inconsistent with their referenced exhibits. In other instances, narrative facts and exhibits that are not inconsistent with one another inexplicably conflict with other parts of the record. For example, the parties stipulated that specific referenced documents related to the Youngs' "claimed interest deductions arising from their alleged investment" in a July 1979 CAT-FIT plan with Windsor Acceptance. The Youngs' tax return for neither 1979 nor 1980, however, includes a claimed interest deduction for payments to Windsor Acceptance. Furthermore, Young testified that although he received the CAT-FIT documents in question, he did not execute them or otherwise enter into the program. The parties then agreed in their briefs, contrary to the stipulation, that the Youngs did not participate in a CAT-FIT plan. The evidence similarly rebutted a stipulated fact *829 concerning Rina's participation in a leasing corporation plan with Escon Leasing. In view of the questionable reliability of the stipulations, we have not expressly adopted them in our findings of fact. We have instead derived those findings from the record as a whole. The second preliminary matter concerns petitioners' proposed findings, offered in their opening briefs in accordance with Rule 151(e)(3). Although we have considered each proposed finding, many have not survived our scrutiny. Of those that we have not adopted, many are based largely or exclusively on Kersting's testimony. Because of Kersting's central role in the transactions at issue in these cases, his written and spoken words comprise a major portion of the record. Nonetheless, based upon our observations at trial and our review of the record, we have concluded that he lacks credibility, especially on those matters tending to reflect upon the tax viability of his investment programs. Some examples follow. Regarding the filing of Federal income tax returns for the various Kersting corporations, Kersting testified that prior to the IRS seizure of his records in 1981, "I think they were current on all filings." *830 In reality, many returns for taxable years ending before 1981 were not even signed by Kersting before 1985, including returns for Fargo Acceptance, Mahalo Acceptance, Candace Acceptance, Anseth Leasing, and Escon Leasing. Also contradicting his testimony is his letter of December 2, 1981, in which he admitted to a revenue agent that he had intentionally "held back over the years the Tax Returns for the Acceptance Companies and some of the Leasing Companies." According to Kersting, return filings were no longer timely made after seizure of his records because there was "no basis on which to prepare statements or prepare tax returns." This testimony conflicts with Kersting form letters to clients in the months following, in which he referred to "only a temporary disruption" and, by late May of 1981, a "return to normalcy of operations." In addition, the bookkeepers maintained their own records, which the IRS never seized, and Ms. Combs testified credibly that their work was largely unaffected by Kersting's misfortune. Indeed, Ms. Akamine prepared several returns in 1984 while Kersting's records were still in the hands of the IRS. Kersting sought to squeeze even more mileage out *831 of what he termed the IRS "raid" in 1981. He testified that Hawaii National Bank had been "scared" by the raid and so asked him to close his accounts and take his business elsewhere in mid-1981. An employee of the bank, however, testified that the account closings resulted from fear of check-kiting and occurred before 1981. Bank statements in the record support this employee in indicating that five Kersting corporations closed their Hawaii National Bank accounts in March of 1979. The record contains no Hawaii National Bank statement covering a subsequent period for any Kersting corporation. Another straightforward indication of the overall unreliability of Kersting's testimony relates to his daughter, Gabriele, who Kersting said did not actively participate in day-to-day corporate operations. The documentary evidence establishes otherwise, as her signature appears on both personalized letters and form letters concerning both CAT-FIT plans and stock subscription plans. Also, although petitioner Owens could not remember precisely when he met Gabriele Kersting, he did recall that the location was the Kersting offices. As the third preliminary matter, the notices of deficiency *832 in these cases raised several issues that do not relate directly to the Kersting investment programs (not including additions to tax and increased interest). In their briefs, petitioners have neither directed us to specific evidence nor advanced arguments contrary to these adjustments by the Commissioner. We accordingly deem petitioners to have conceded these issues. Issue 1: Validity of Deficiency Notices
As a threshold jurisdictional issue, all petitioners except the Cravenses and the Thompsons challenge the notices of deficiency, citing Scar v. Commissioner, 814 F.2d 1363 (9th Cir. 1987), revg. 81 T.C. 855 (1983). These petitioners contend that the Commissioner failed to audit their returns or request their records before issuing the notices of deficiency, thereby rendering those notices null and void. Earlier in these proceedings, the Hongsermeiers made similar arguments with extensive elaboration in a motion to dismiss for lack of jurisdiction and supplements thereto. The Court denied that motion as without merit. In Scar, the notice of deficiency disallowed a deduction from a partnership with which the taxpayers were not connected. *833 Documents attached to the notice of deficiency indicated that the deficiency was arrived at without an examination of the taxpayers' return. The Court of Appeals, in concluding that this Court lacked jurisdiction, stated that "the Commissioner must consider information that relates to a particular taxpayer before it can be said that the Commissioner has 'determined' a 'deficiency' in respect to that taxpayer." 814 F.2d at 1368. This principle does not override the presumption of a deficiency determination, however, if the notice itself reveals that the deficiency was based on information relating to the taxpayer. Clapp v. Commissioner, 875 F.2d 1396, 1402 (9th Cir. 1989); Campbell v. Commissioner, 90 T.C. 110, 113-114 (1988). Unlike the notice of deficiency in Scar, the notices that petitioners have called into question here bear a discernible connection to the subject tax returns. Not only are specific claimed deductions disallowed in the notices, but the adjusting computational schedules in the notices incorporate other amounts reported by petitioners in those returns. The attempt by petitioners to have us in effect *834 reconsider and reverse our denial of the Hongsermeier motion to dismiss is unavailing. The notices of deficiency are not invalid on the basis of Scar. Issue 2: Section 163(a) Interest Deductions
Section 163(a) allows as a deduction "all interest paid or accrued within the taxable year on indebtedness." The principal substantive issue in these cases is whether petitioners are entitled to deductions for interest corresponding to primary loans, leverage loans, and subscription agreements. Primary loans and leverage loans were integral parts of all four of the main Kersting investment programs, except that a leverage loan was not always a part of the CAT-FIT Plan. Subscription agreements were used in the Stock Subscription Plan and the Leasing Corporation Plan. Respondent contends primarily that the transactions giving rise to the disallowed interest deductions were shams. Before turning to the sham analysis, we address both a general policy argument by petitioners and another example of Kersting's deceptive testimony, which together provide an appropriate introductory overview of the stock transactions. The CAT-FIT Plan, which involves a different type of investment *835 asset, will be considered separately. A. Stock Programs
1. Generally
Petitioners attempt to lay a policy foundation for their position by emphasizing on brief that the Kersting investment programs resulted in "mere" tax deferral until "the moment of reckoning when their stock was sold, deemed to be abandoned, or otherwise disposed of." (We take this to mean that petitioners claimed deductions that they later offset with recognized gains, thereby benefiting solely by virtue of the time value of money.) We do not agree with petitioners' implication that if the only benefit of a series of transactions is tax deferral, then the form of the transactions must be respected. Regardless, petitioners have failed to describe how the transactional and tax reporting details support their "mere" tax deferral characterization, which is not surprising in light of what those details reveal. There is only one Kersting stock investment made by petitioners for which the tax returns in the record clearly document the termination. That investment is Cravens' stock subscription plan with Candace Acceptance, which is illustrative of the Stock Subscription Plan and which the Cravenses appear *836 to have reported in a manner consistent with how Kersting viewed the transactions. During the reported 1-year holding period, which touched on 2 taxable years because of a mid-year initiating date, the Cravenses claimed interest deductions of $ 19,620, consisting of the following: $ 10,800 as 18-percent interest to Ventures Funding on the $ 60,000 primary loan; $ 7,200 as 12-percent interest to Candace Acceptance on the $ 60,000 unpaid subscription balance; and $ 1,620 as 9-percent interest to Fargo Acceptance on the $ 18,000 leverage loan. When they reported the sale of the stock, they subtracted an adjusted basis of $ 42,000 from an amount realized of $ 60,000 for a resulting long-term capital gain of $ 18,000. The $ 18,000 drop in basis from the original cost presumably resulted from what they reported as a Candace Acceptance nontaxable distribution on Schedule B of the return. Such a distribution under the Stock Subscription Plan was applied to pay off the leverage loan. At this point, the Stock Subscription Plan does appear to be largely a tax deferral mechanism. Interest deductions of $ 19,620 are offset by $ 18,000 of gross income. Further, although a $ 1,620 tax deduction *837 escapes offset, the investor actually parts with his own cash in that amount. What we have not yet factored into the analysis, however, is the effect of the capital gains deduction. Section 1202(a) in 1980 provided for a deduction from gross income of 60 percent of an individual's net capital gain, defined in section 1222(11) as the excess of net long-term capital gain over net short-term capital loss. The Cravenses reported only this one capital transaction in 1980, and they therefore included in their taxable income only $ 7,200 of the $ 18,000 gain. The final balancing upon disposition of the stock thus shows claimed interest deductions of $ 19,620 offset by only $ 7,200 of taxable income. Similar differences would result from the Stock Purchase Plan and the Leasing Corporation Plan. Although the capital gains deduction of section 1202(a) was modified in some respects between 1975 and 1983, the period before the Court, it provided a significant tax benefit under the appropriate circumstances in all of these years. Clearly, even assuming that all other petitioners were like Cravens in reporting back-end consequences, these are not situations that warrant characterization *838 as mere tax deferrals. One area of Kersting's testimony serves not only to reinforce our view of his credibility, but also to illustrate indirectly how much the characterization of the annual distributions (as taxable or nontaxable) contributes to the deferral benefits. Kersting was repeatedly asked, at both his pretrial deposition and at trial, why he organized new acceptance corporations so often. He repeatedly replied that he was wary of the "Battelstein" case, which according to Kersting stood for the proposition that an interest deduction was not allowable if the funds used to make the interest payment were provided by the same entity that made the original loan. Kersting was indeed aware of a case called Battelstein v. Internal Revenue Service, 611 F.2d 1033 (5th Cir. 1980), on rehearing en banc 631 F.2d 1182 (5th Cir. 1980), that had such facts and held against the taxpayers. What taints Kersting's credibility is, first, that the Court of Appeals first decided the Battelstein case against the taxpayers in February of 1980, years after Kersting had established a habit of organizing new acceptance corporations. Although a lower court *839 decided the case in 1977, that decision was for the taxpayers on this issue. In re Battelstein, 1977 U.S. Dist. LEXIS 15435, 41 A.F.T.R.2d (RIA) 942, 77-2 U.S. Tax Cas. (CCH) P9516 (Bankr. S.D. Tex. 1977). Second, Kersting's explanation is in actuality a reason for having a leverage lender that differs from the primary lender. It is irrelevant to the annual changing of leverage lenders or the organizing of new acceptance corporations. In fact, in his 1981 letter to an investor who had inquired about the implications of Battelstein, Kersting focused on the danger of using the same lender for both the primary and leverage loans. Kersting offered an altogether different reason for the many acceptance corporations in the letter he wrote to Willis McComas in 1978. In that letter, he indicated that his objective was to ensure the nontaxability of corporate distributions. When asked at trial about this as an explanation, but without specific reference to the letter, he denied it. As Kersting explained it in the McComas letter, the Stock Subscription Plan was a 1-year wonder. Only in the first year of existence of an acceptance corporation would its books show a loss permitting a distribution *840 that was nontaxable to the shareholder. In subsequent years of that existence, the books would show a profit, which would convert what had been a nontaxable distribution in the first year into a taxable dividend in these following years. This taxable dividend would cancel the deduction for primary loan interest and subscription interest. The net tax effect in the subsequent years would be a deduction merely for out-of-pocket interest payments on the leverage loan. Accordingly, the perpetual organizing of new acceptance corporations with first-year losses on their books would benefit those investors seeking large deductions year after year. As appealing as this is as an alternative to Kersting's "Battelstein" rationale, the other evidence does not clearly support the Kersting explanation in the McComas letter. Dixon entered into a 1977 Fargo Acceptance stock subscription plan, but he and Mrs. Dixon reported only $ 117 of dividend income for the second year, 1978, instead of the $ 9,000 suggested by the McComas letter. Owens entered into 1975 and 1976 stock subscription plans with Norwick Acceptance and Forbes Acceptance, respectively, yet he and Mrs. Owens reported no dividend *841 income at all for 1977 and 1978. The evidence does not establish that any of these three programs terminated before the end of its second year. Moreover, the problem was not with unwitting return preparers. The Dixons used Philip Scheff for 1978 and the Owenses used Gilbert Matsumoto for 1977 and 1978, both of whom were familiar with Kersting programs. On the other hand, perhaps the return preparers netted the interest deductions and taxable dividends before preparing the returns, reporting neither rather than both, thus conforming at least to the spirit of the McComas letter. In any event, with its conservative view of the tax consequences, that letter (the rationale of which, as noted, Kersting did not adopt at trial) serves as a contrasting reference point to the consequences of perpetual "nontaxable" distributions. By inflating bad debt reserves and deferring subscription agreement interest (or by simply not filing corporate tax returns), Kersting could indefinitely extend the corporate loss years beyond the first. In addition to the obvious benefit of avoiding corporate tax liability, these loss years would provide him with a foundation for characterizing the annual distributions *842 as nontaxable returns of capital, which would result in large interest deductions without income offset year after year in the same program. Because these returns of capital would reduce the investor's adjusted basis in his stock, a gain would theoretically result upon termination of the program, as illustrated above by Cravens' Candace Acceptance stock subscription plan. Kersting's conversion into returns of capital of what under the McComas explanation would be taxable dividends, in effect would change current ordinary income into deferred capital gains with no compensating reduction in ongoing interest deductions. 2. Sham Analysis
Taxpayers are generally free to structure their business transactions as they please, even if motivated by tax avoidance considerations. Gregory v. Helvering, 293 U.S. 465, 469, 79 L. Ed. 596, 55 S. Ct. 266 (1935); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 196 (1983), affd. in part, revd. in part, and remanded 752 F.2d 89 (4th Cir. 1985). Nonetheless, to be accorded recognition for tax purposes, a transaction should generally have "economic substance which is compelled or encouraged by business or regulatory *843 realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." Frank Lyon Co. v. United States, 435 U.S. 561, 583-584, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978). The substance of a transaction and not its form will control the tax consequences. Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 196. In deciding whether a transaction is a sham to be disregarded for tax purposes, as respondent here contends, the courts often analyze generally whether the transaction has any practical economic effects other than the creation of income tax losses. E.g., Bryant v. Commissioner, 928 F.2d 745, 748 (6th Cir. 1991), affg. in part, revg. in part, and revg. and remanding in part a Memorandum Opinion of this Court; Karr v. Commissioner, 924 F.2d 1018, 1022-1023 (11th Cir. 1991), affg. Smith v. Commissioner, 91 T.C. 733 (1988); Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), affg. in part, revg. and remanding in part Larsen v. Commissioner, 89 T.C. 1229 (1987), and affg. Memorandum Opinions *844 of this Court; James v. Commissioner, 899 F.2d 905, 908-909 (10th Cir. 1990), affg. 87 T.C. 905 (1986); Friedman v. Commissioner, 869 F.2d 785, 792 (4th Cir. 1989), affg. Glass v. Commissioner, 87 T.C. 1087 (1986); Rose v. Commissioner, 868 F.2d 851, 853-854 (6th Cir. 1989), affg. 88 T.C. 386 (1987); see, e.g., Jacobson v. Commissioner, 915 F.2d 832, 837 (2d Cir. 1990), affg. in part, revg. and remanding in part a Memorandum Opinion of this Court; Shriver v. Commissioner, 899 F.2d 724, 727 (8th Cir. 1990), affg. a Memorandum Opinion of this Court. More precise considerations in this analysis, both of which we find relevant here, are: (1) Whether the taxpayer is motivated in entering the transaction by a business purpose other than obtaining tax benefits, and (2) whether the transaction has economic substance. Casebeer v. Commissioner, 909 F.2d at 1363; James v. Commissioner, 899 F.2d at 908-909; Rose v. Commissioner, 868 F.2d at 853; Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 at 91-92. *845 A transaction imbued with economic substance will be recognized for tax purposes by this Court even in the absence of a business purpose. Larsen v. Commissioner, 89 T.C. 1229, 1253 (1987), affd. in part, revd. and remanded in part sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990). On the other hand, the existence of a subjective business purpose does not mandate the recognition of a transaction lacking economic substance. Kirchman v. Commissioner, 862 F.2d 1486, 1492 (11th Cir. 1989), affg. Glass v. Commissioner, 87 T.C. 1087 (1986); Cherin v. Commissioner, 89 T.C. 986, 993 (1987). Petitioners contend, in more than one context, that the Kersting corporations involved in these cases were viable entities that engaged in business activities apart from the investment programs challenged by respondent. According to petitioners, these corporations were "bona fide entities engaging in substantive and substantial business transactions with an economic purpose motivated by the pursuit of profit." Petitioners' support for this proposition is primarily Kersting's uncorroborated *846 testimony on various topics, including whether or not the leasing corporations had a line of credit with GMAC for their use in purchasing automobiles directly from dealers. Respondent argues on brief that the Kersting corporations did nothing but occupy office space and generate paperwork for the investment programs, and we have already noted that we attach little credence to Kersting's testimony in areas such as this. Nonetheless, in view of scattered reliable evidence, we are confident that at least some of these corporations engaged in business unrelated to the Kersting programs. One resulting inference, petitioners maintain, is that the challenged transactions were not shams. We do not doubt that the viability and activities of the Kersting corporations are relevant considerations. As defined in rule 401 of the Federal Rules of Evidence, relevant evidence has a tendency to make the existence of a consequential fact more or less probable than without the evidence. A fictional or sham "corporation" is more likely to be a part of a transaction that should be disregarded for tax purposes than is a viable operating entity. We are not required to find that the Kersting corporations *847 were themselves shams, however, in order to uphold the Commissioner's determinations. The notices of deficiency focus on the sham nature of the transactions rather than the sham nature of the corporations. Under the subjective business purpose test, we must decide whether petitioners have shown that they had a business purpose for engaging in the transactions other than tax avoidance. Casebeer v. Commissioner, 909 F.2d at 1363; Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 92; Packard v. Commissioner, 85 T.C. 397, 417 (1985). The only business purpose offered by petitioners is the pursuit of profits. Although one common means of profiting from a stock investment is through receipt of cash dividends, [36] potential dividends are not a factor we need dwell upon for these cases. Kersting testified that he never told investors there would be "current profit like high dividends or things of that type," and no petitioner testified specifically that he expected to profit from dividends. Furthermore, there was no profit potential inherent in the annual distributions that were a part of the investment programs. These *848 amounts were not retained by the investors, but were instead recycled into the programs to be applied either to the principal balances of outstanding leverage loans or, for ongoing Leasing Corporation Plans, to fund interest payments on primary loans and subscription agreements. Finally, no petitioner claimed to have entered into a transaction expecting to profit by diverting distributions to his personal use. Absent some compensating adjustment or transaction, such a diversion of funds from the Stock Purchase Plan or the Stock Subscription Plan would not have been ultimately profitable in any event, because the investor would still have been obligated for the principal amount of a leverage loan. Apart from cash dividends, the other common way to profit from a stock investment is to sell the stock after it increases in value. The testifying petitioners, except Cravens, generally articulated *849 their profit motivations in terms of expectations of stock value appreciation. In light of the self-serving nature of this testimony, we have looked beyond naked assertions for corroboration and explanation. Ideally in this regard, a stock investor would show that he knew details about the corporation in terms of, among other things, history, management, financial condition, products offered, markets served, and growth potential. He would also demonstrate that he was familiar with the industries involved and general economic conditions. Building on this foundation, he would establish why he expected the corporation to be profitable and why he expected his stock to increase in value. Admittedly, an investor with a legitimate profit motive could fall well short of this ideal, one example being someone who knows little about the corporation but much about the industry and economy. Another example is an investor who relies on an informed recommendation from a knowledgeable source. We note initially that each of the testifying petitioners was at least a high school graduate engaged in an occupation, the piloting of aircraft, that demands clear thinking and reasoned judgments. [37] *850 At the time of investing with Kersting, each had been employed by a major airline for several years, thus demonstrating that he had satisfactorily exhibited these professional qualifications over time. [38] Given this educational and professional background, coupled with our observations at trial, we do not believe that any of these men was so lacking in intelligence or common sense as to believe that stock, solely by virtue of being stock, had an inherent propensity to appreciate rather than decline in value. There are several factors common to all of the testifying petitioners that, taken together, weigh heavily against them in their quest to persuade us that they were motivated by stock appreciation profits in entering into these transactions. As to their knowledge of the business activities of the corporations in which they invested, none of them could have *851 learned anything from a prospectus or something comparable because Kersting never prepared one. Nor did anyone establish that, at the time of investment, he knew much, if anything, other than that a corporation engaged in lending or automobile leasing. Although Owens had firsthand knowledge about the outside lending activities of at least one Kersting corporation in which he did not invest, no one claimed to have had such knowledge about a corporation from which he acquired stock. As to industry knowledge, although some petitioners had borrowed money or leased an automobile prior to investing in Kersting corporations, no one exhibited or professed to have a background in or specialized knowledge about the lending and leasing industries. As to the economy, other than an occasional mention of high interest rates, no petitioner testified about how the prevailing economic conditions affected his investment decisions with Kersting. Despite this apparent lack of knowledge about the Kersting corporations, the industries, and the economy, no petitioner claimed that he relied on or even had access to an independent adviser with such expertise. Petitioners offered very little testimony, *852 and virtually none that was specific, about reliance upon Kersting correspondence for their purported business purpose. This is understandable in view of the typical shortcomings of those letters in this regard. Most Kersting letters mailed specifically to petitioners or generally to investors stressed tax benefits and sometimes transaction mechanics, without even mentioning corporate profitability or stock value appreciation. In most of those letters in which Kersting did mention such things, he still weighted the discussion disproportionately toward tax consequences. Such was the case with a transmittal letter for Universal Leasing documents sent to Owens and others. In another tax-oriented form letter that described a Candace Acceptance Stock Subscription Plan, Kersting wrote without further detail that Candace Acceptance was organized for the purpose of "automobile and lease financing" and was "expected to make profits." Kersting sent other form letters not so slanted toward tax consequences stating that the stock of a corporation had increased in value or could be expected to increase in value, or that a corporation was profitable. Often, however, these were for investors *853 who had already purchased or committed to purchase the stock and thus could not have been influenced in forming an initial business purpose. An example is Kersting's post-1981 form letter to acceptance corporation shareholders concerning the proposed exchange of their stock for the stock of a new holding company. This letter informed the shareholders at this late date that the acceptance corporations "were structured to make a profit." Mil Harr, similarly, was not informed about potential corporate profits until after he returned executed initiating documents. Also similar is the Avalon Acceptance package of initiating documents sent out in 1980 or 1981, part of which informed recipients that the stock they were about to purchase was expected to increase in value. By this time, however, the recipients presumably had already committed to the transaction, as is evident by the reference to the promissory note "you are about to execute." Despite the insistence of the testifying petitioners that they anticipated increases in the value of their stock, not one established how he determined that the initial purchase price was reasonable and appropriate. Young testified on the subject, *854 but his testimony was essentially that the stock was worth $ x per share because $ x per share is what he paid for it. This one-sided, seller valuation is also apparent from the Avalon Acceptance document package, which assured investors that "The stock which you will acquire will be equal in value to the face amount of the promissory note." When DuFresne was asked at trial what he considered the value of his Investors Financial stock to be, he did not address the value at purchase, but instead described vaguely how he assumed the value was increasing as he held it. We are not disposed to believe a petitioner's claim that he intended to cash in on appreciating stock when he fails to show that the purchase price in his mind was something other than arbitrary. Petitioners are mistaken in arguing that respondent bears the burden of overcoming a presumption of "reasonable" values arrived at in the ordinary course of business. Even if that were true, however, respondent would have met his burden. The evidence convinces us that petitioners were indifferent to the actual value of their stock. Each of the testifying petitioners except Owens entered into at least one stock subscription *855 plan that, by the face of the initiating documents, involved a purchase of stock at $ 10 per share and a subscription for 10 times as many shares at one-tenth the price, $ 1 per share. Kersting attempted to explain the discrepancy at trial, insisting that the investors actually made the initial purchase at $ 1 per share because on the books of the corporation the $ 10 price was allocated $ 1 to the capital stock account and $ 9 to the paid-in surplus account. In essence, according to Kersting, the investors purchased their initial shares at $ 1 per share and simultaneously purchased a paid-in surplus fund from which their nontaxable distributions would be paid in the future. No testifying petitioner confirmed, however, that this was how he viewed the transaction. Another indication that petitioners were indifferent to the value of their purchased stock is that Kersting failed to explain clearly, consistently, or credibly at trial how he determined that value. If he could not sensibly explain in the courtroom how he valued the stock, we have no basis for believing that he had a legitimate valuation method or, going a step further, that he communicated a method that made sense *856 to petitioners. The Court and Kersting engaged in the following exchange regarding Charter Financial stock: THE COURT: I'd like to ask a question at this point. How did you decide on $ 10.50 a share? KERSTING: I think we applied a book value measure. THE COURT: When? KERSTING: Somewhere in '76, '75. Around that time. THE COURT: You mean the first time you sold some of Charter stock to a pilot it had a book value of [$ ] 10.50? KERSTING: Let me think for a minute. I'm inclined to think we went by a book value -- valuation. But it might have been that we added to it some premium for the fact that it was a going concern by that time, and the companies were prospering. So it might have been a premium over book value. THE COURT: But then you never checked the book value for any later sales of the stock. KERSTING: No. The price stayed constant. Counsel for the Thompsons pursued the rationale for the constant price: DE CASTRO: In your opinion, was Charter Financial worth more in 1981 as a company than it was in 1976? KERSTING: It would have been worth more to the public, for sure. DE CASTRO: No, was it, as a company, worth more in 1981 than it was in 1976? KERSTING: *857 It's hard to determine. There was no market for it. * * * DE CASTRO: Well, wasn't increasing the number of shareholders also increasing its capital base? KERSTING: True. But as more shareholders participate in the same base, the value doesn't go up. DE CASTRO: Well, but it's using its base to produce a profit, is it not? KERSTING: Sure. DE CASTRO: Well, if it's using its base to produce a profit, there's a residue over the base. KERSTING: True. DE CASTRO: And that residue over the base should have produced a profit that would make the company worth more. KERSTING: True. DE CASTRO: Is that true? KERSTING: I agree with you. DE CASTRO: That the company was worth more? KERSTING: I agree with you. But there was no public market for the company, so how do you determine value, if you don't have a public bid?
As final general points on petitioners' asserted business purpose, we note that there is no reliable evidence here that any petitioner ever profited from these transactions in the sense of selling stock for more than the original purchase price. More importantly, no one testified that he was surprised or dismayed not to profit in this sense. Further, no one claimed *858 that he ever attended a shareholders meeting for a Kersting corporation. Finally, although some petitioners other than Thompson still hold Kersting stock, we do not interpret that as suggesting a profit motive. Rather, we believe that they are merely waiting for the audit and litigation dust to settle, as Rina and Kersting had agreed for Rina's stock. Turning now to specific testimony and circumstances regarding profits, we consider first what Kersting may have told potential investors about his programs. In his deposition prior to trial, Kersting testified that he always discussed profit expectations ahead of time in terms of a necessary profit motive for the investor and the "prospect" for profits. He also stated that he told people they could expect an annual 10- to 15-percent increase in the value of their purchased stock. We have found as a fact, based upon his own testimony, that because Kersting was aware of the grounds for certain IRS challenges to his programs, he at least sometimes informed a potential client of the need to have a profit motive. Hearing that the IRS wanted to see a profit motive would not alone, of course, create that motive. Moreover, we do not *859 believe that Kersting told prospects to expect an annual 10- to 15-percent increase in stock value, in part because only one petitioner came close to corroborating this testimony. For each of the testifying petitioners, we have carefully considered, as summarized below, his relevant testimony and individual circumstances not already mentioned. None has persuaded us that he had any motivation in entering into these transactions other than tax avoidance. Cravens, who testified only briefly, stated that his purpose in entering these transactions was "mainly" for tax shelter, but he offered no other purpose. He terminated his Candace Acceptance stock subscription plan without economic profit but with a significant tax benefit after just 1 year. He entered into a second stock subscription plan, in the same amount but with a different acceptance corporation, knowing that the first had yielded no economic profit. Indeed, despite the economic results of his Candace Acceptance investment, he informed Kersting at termination that he was "looking forward" to the Delta Acceptance paperwork. He terminated his Delta Acceptance stock subscription plan again after just 1 year. Dixon's initial *860 letter to Kersting inquired only about tax savings and made no reference to profit potential. He received no financial statements or earnings histories for Kersting corporations, and he used the standard Kersting order form, containing four choices for number of shares and three columns of corresponding tax consequences, to arrange purchases of Mahalo Acceptance and Candace Acceptance stock. His 1980 investments in Investors Financial and Charter Financial began after Kersting determined a "need for additional shelter." When questioned at trial about whether he expected a return on his stock purchases, Dixon, with a college background in business administration, answered that he "hoped" his stock would either hold its value or increase in value. He admitted that what he knew about the Kersting corporations at the time he invested in 1977 was "not a great deal." He described the businesses of Candace Acceptance, Mahalo Acceptance, Investors Financial, and Charter Financial as making loans, even though the latter two were holding companies, and he did not know the number of shareholders of any corporation in which he invested. When asked how he kept up with how the lending business *861 of Mahalo Acceptance progressed after his investment, he replied that he did not keep up and did not attend shareholders meetings. Rina, also with a college background, testified that he expected to earn a return on his Charter Financial stock because "it was a new investment firm that would be increasing profitability" and that he "was getting in on the ground floor in buying stock." He further testified that his purpose in buying Anseth Leasing stock was to invest in the growth of the corporation. He invested in Investors Financial purportedly for "The same reason as I wanted stock in the other corporations, the belief that I was getting in on the ground floor, and that the stock would increase in value." Contrary to his "ground floor" rationale, however, he admitted on cross-examination that at the time of his investments he did not know how long Charter Financial and Investors Financial had been operating. He also admitted that he did not know the number of Charter Financial shareholders. He then shifted his emphasis away from the "ground floor" idea to an incompatible one, the potential increases in size and value attributable to ongoing activity by fellow pilots of whom *862 he was aware. Rina also stated that, at the time of his investments, lending in an environment of fairly high interest rates appeared to be the way to make money. However, despite this purported attraction to the prosperous lending industry, he did not describe any such non-Kersting investments he entered into or even considered during this time. When asked how he knew that the corporations in which he invested made money, he replied that he "assumed" they did based upon his knowledge of other pilots involved and his own opportunities to borrow funds from the corporations. These opportunities led him to believe there were funds available to lend. Obviously, as Rina was intelligent enough to know, the presence of other investors indicates nothing about profitability, and the existence at a given time of relatively small amounts available for lending is little better. Kersting's letter of November 7, 1979, described Rina's first investments as a "shelter program" and failed to mention profit potential for any of the Kersting corporations. Kersting later started him in 1980 investments with Charter Financial and Delta Acceptance after hearing from a mutual acquaintance that Rina *863 wanted an additional $ 35,000 of deductions. Prior to investing, he received neither income projections for the corporations nor stock value projections. He never attended a shareholders meeting, for which he occasionally received notice, never received a financial statement, and never acquired meaningful firsthand knowledge of corporate profitability. At one point, Thompson testified that he expected to make a profit on some of his stock investments, but later spoke in terms of a "profitability possibility" and the "possibility of a gain." Still later, when asked if he felt that there could be a substantial gain from holding the stock for a long time, he replied: "It's hard for me to explain the feeling that I had. The feeling was that I could anticipate some profitability, return in a capital gains sense, from these investments." He undercut his own vague testimony when he stated that at the time of his investments, at least for Charter Financial, Investors Financial, and Delta Acceptance, he did not even know the business of the corporations or the names of other shareholders. Although he thought that prospectuses always accompanied stock purchase transactions of this sort, *864 he, like all of the other investors, never received one. The Thompsons argue on brief that they had come to rely on Kersting for business and investment advice and thus became innocent victims of his complicated scheming. They contend specifically that Thompson's previous investment in First Savings, which he had personally visited on occasion and therefore knew to be a viable operating entity, contributed to his profit motive for the later Kersting investments that are at issue here. We do not believe, however, that mere observation of an apparently healthy First Savings created a profit motive in Thompson's mind for other Kersting investments, especially since he had already encountered accountants who had communicated to him serious misgivings about Kersting investments. In addition, the First Savings deal, which involved a $ 20,000 initial cash outlay coupled with a pledge of the stock to First Hawaiian Bank, was structured not at all like the Thompson investments at issue here. Young's testimony was top-heavy in the sense that he stated in several variations that he expected to profit, but provided little in the way of a foundation for those expectations. Although like *865 Thompson he understood what a prospectus was, he never even requested one. He did not receive income projections for any Kersting corporation, and his knowledge of business activities was vague and secondhand. He started his Delta Acceptance stock subscription plan by checking an order form box for the "same plan" as "last year." He then held up the transaction temporarily while he decided whether he needed the associated deduction. Although he received annual distribution transmittal letters either recommending that he remain a shareholder to participate in the progress of the corporation or informing him that the business of the corporation was lending and lease financing, these after-the-fact statements could not have affected his business purpose initially. Young first heard of the Kersting programs from a former Federal Express employee. He testified that this friend described the program as having "some subsequent tax advantages, as well as potential for profit." He later testified that "the primary purpose of the program was to obtain stock in a private enterprise, private corporations, with the hope that these corporations would expand and grow and be profitable, and someday *866 go public, maybe." When questioned specifically about his motives in purchasing Anseth Leasing stock, he replied simply, "Profit." We do not believe this testimony, largely because these statements sound purposely and unrealistically slanted toward profits and away from tax sheltering. Also, Young's credibility suffered when he stated that he probably would have exercised his perceived rights under the Anseth Leasing subscription agreement if the value of the stock had increased. When later asked what he knew about the value of the stock during the 3 years following the purchase date, he replied, "Nothing." When asked to elaborate about where a profit would come from with respect to the Anseth Leasing stock, Young testified: "Stock, in the hopes that it would inflate there, increase in value, appreciate -- sell it, realize the capital gain, and realize the profit." On cross-examination, he was asked on what specifically he based his profit expectation, to which he replied: "Common sense. If you buy a share of stock, you hope that it appreciates." He also described his feelings as "A dream, a hope." This is a man who had earned a college degree in business administration, worked *867 in the financial services industry, and previously owned stock with mixed results. DuFresne testified that "along the years, somebody has said to me that any time I could invest in banks and lending institutions, that it was a good investment." He testified that he felt there was growth potential in financial institutions, especially with the high interest rates in the early 1980s. Because the DuFresnes reported dividend income for 1981 from First Union Bancorp and for 1982 and 1983 from Centerre Bancorporation, we found as a fact that DuFresne had heard that financial institutions were often good investments. However, contrary to the implication of his testimony, we do not believe that he thought every financial institution, including those he knew virtually nothing about, was a good investment. He did not testify specifically about what led to the investments in First Union Bancorp and Centerre Bancorporation, so we have no way of knowing how those decision processes compared to those preceding his Kersting investments. DuFresne also testified that petitioner Young informed him that Kersting's investments "had the potential for some growth, stock growth, and also would afford *868 some realistic tax mileage." After acknowledging that most of the stock he buys decreases in value, DuFresne added that "you hope it will go up." He also claimed that he assumed from conversations with Kersting that his Investors Financial and Charter Financial shares were increasing in value. He did not, however, receive financial statements or projections of net income or stock value appreciation for any of the Kersting corporations. Although he testified that he thought Kersting sent him written information on the "universal plan" and "something about the leasing corporations," he did not produce copies at trial. Even assuming that he had received "The Universal Plan" pamphlet, we see nothing in there that would have prompted his asserted business purpose. Finally, DuFresne's demonstrated willingness to manufacture documents "for the benefit of our friends at the IRS and the courts," as revealed by his correspondence dated June 22, 1984, is sufficient grounds for us not to believe his testimony concerning his profit motivations. Indeed, his testimony about the transaction covered in the typed letter, the disposition of his Charter Financial stock, was inconsistent with that *869 letter. Whereas the letter indicated an amount realized that exceeded the original cost by $ 20,000, DuFresne testified that at the time of disposition "The stock had devalued itself back down to its original value" and that the capital gain he reported on the transaction was attributable to a change in adjusted basis. Owens testified about his knowledge of the businesses for only a few of the corporations in which he invested, and even for those few, leasing automobiles and lending money were the most detailed activities he mentioned. He testified that he could not remember whether he had asked his accountant, Gilbert Matsumoto, to review the operations of the corporations in which he invested. He answered with a simple "yes," however, when asked whether one of his motivations in entering into the transactions was making a profit. Although he had seen a favorable Dun & Bradstreet report on Kersting personally, he did not receive a written description of anticipated net income or stock value appreciation for the corporations. He received notices of shareholders meetings occasionally, but he did not claim to have attended. The stipulated exhibits relating to the Owens investments *870 include more Kersting correspondence than the exhibits relating to any of the other petitioners. Owens did not establish, however, that these letters gave rise to a business purpose of making a profit. In a pre-1977 form letter describing the Stock Subscription Plan to Owens, Kersting stated that an unnamed acceptance corporation would be organized "for the purpose of lease financing," but he mentioned nothing else about the business or the profit potential. Owens also received a 1977 form letter telling him he could anticipate "capital appreciation and perhaps cash dividends" from Norwick Acceptance. This letter arrived, however, 2 years after his investment commenced. At least two undated form letters received by Owens included information that possibly would have caused a reader to enter an investment believing that economic profits were on the horizon. Both related to the Leasing Corporation Plan, the first discussing profit sources in leasing, "accumulation of intrinsic values," and increasing book value. The second, pertaining to Universal Leasing, spoke of "access to capital gains prospects" and stock selling at a future increased "earnings multiplier." When asked whether *871 he relied on Kersting memoranda for advice, however, Owens answered in terms of after-the-fact progress reports: "Yes, I did. Usually it was a 'how goes it' in the progress of the corporation, or 'how goes it' with the investments that I'd made." He gave this response while testifying about the Universal Leasing letter. He then testified about the more general Leasing Corporation Plan letter, but he did not refer to the profits discussion or how it influenced him. Hongsermeier also offered no detailed testimony as to the business activities of those Kersting corporations in which he invested. He mentioned "factoring" several times, but demonstrated that he meant nothing different by that term than an ordinary loan to a business borrower. Concerning the income potential of the various corporations, his testimony was, in part, that lending and leasing activities by their nature generate revenue. He also claimed that he had heard from other people, mainly pilots already involved, that these corporations were prosperous and successful. He did not name any of these individuals. His vague testimony about what he expected to get out of his purchase of Delta Acceptance stock was as *872 follows: "I thought I would own stock in the company and I'd receive benefits from the income from the company, whatever -- if the company progressed or didn't, that type of operation, where -- just like buying stock anywhere." He admitted that Kersting did not make representations about profit potential or anticipated stock value appreciation for the corporations in which he considered investing. To satisfy the economic substance portion of the sham analysis, petitioners must show that the transactions had economic substance beyond the creation of tax benefits. Casebeer v. Commissioner, 909 F.2d 1360, 1363, 1365 (9th Cir. 1990), affg. in part, revg. and remanding in part Larsen v. Commissioner, 89 T.C. 1229 (1987), and affg. Memorandum Opinions of this Court; Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1549 (9th Cir. 1987), affg. a Memorandum Opinion of this Court. The economic substance inquiry typically involves an objective determination of whether a reasonable possibility of profit existed. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 94 (4th Cir. 1985), affg. *873 in part, revg. in part, and remanding 81 T.C. 184 (1983); Packard v. Commissioner, 85 T.C. 397, 417 (1985). For a speculative investment, economic substance depends upon whether the taxpayer made a bona fide investment or whether he merely purchased tax deductions. Bryant v. Commissioner, 928 F.2d 745 (6th Cir. 1991), affg. in part, revg. in part, and revg. and remanding in part a Memorandum Opinion of this Court. We dispense first with petitioners' arguments on brief that they viewed their Kersting stock purchases as speculative investments. Although petitioners presumably seek a relaxing of our scrutiny of the profit possibilities, their post-trial positions do not square with the evidence. Petitioners did not testify that they viewed these investments as higher-than-normal risk. A fortiori, they did not testify that they foresaw opportunities for higher-than-normal returns that would offset the higher risk. On the contrary, they seemed to go to great lengths to depict their purchases as garden-variety stock investments. Kersting also did not claim that this was a high-risk, high-return type of investment. We therefore *874 reject petitioners' "speculative" characterization. Fundamentally, a realistic profit possibility for a shareholder depends to a large extent upon profitability at the corporate level. A profitable corporation, compared to an unprofitable one, is more likely to generate cash dividends for the shareholders, and its stock is more likely to increase in value. Petitioners argue again, but in this different context, that the Kersting corporations carried on substantial business activities, lending and leasing, that were unrelated to the Kersting investment programs. The inference petitioners would have us draw is that these were viable, dynamic enterprises with profit potential at the corporate level. Although we have acknowledged that at least some of the Kersting corporations engaged in business activities unrelated to the challenged investment programs, this is not enough for us to infer corporate profit potential. Petitioners have not shown that these other activities were more than insignificant relative to the Kersting programs, nor that they were (or the extent they were) ever profitable. The Thompsons contend that the most telling evidence of a reasonable profit possibility *875 from the transactions is that the corporations in which Thompson invested were in fact profitable. Although the corporate tax returns in evidence (with one exception of any significance) show no taxable income, the Thompsons argue that Kersting's testimony "established that there was a profit for the various companies and that it was only by making certain write-offs for bad debt reserves that he was able to accomplish the result of having no taxable earnings." We will not dwell upon the value of Kersting's testimony in this regard, but the tax returns warrant some consideration. Admittedly, Kersting seems to have undertaken the reporting adjustments of which we are aware, including the deferral of subscription interest income, to eliminate what otherwise would have been reported income. On this record, however, we are not prepared to accept all other parts of the returns as accurate and complete. One of the return preparers, Ms. Akamine, declined to sign returns she prepared because she was not comfortable with some of the things Kersting asked her to do. Her testimony did not expressly limit these things to bad debt additions and deferred subscription interest adjustments. *876 Even if we were to accept the returns (after adjusting for deferred subscription interest and inflated bad debt reserves) as accurate reflections of recognized financial accounting principles, we would not adopt the results as indicative of corporate profitability for purposes of our economic substance analysis. The reported income of the acceptance corporations, for example, would consist largely or entirely of interest on unpaid subscription balances and outstanding leverage loans. We conclude below that the so-called subscription interest is not truly interest and that the investors did not actually pay those amounts. Thus, the subscription interest does not contribute to corporate profitability. The Thompsons in effect beg the question by asking us to use corporate profitability (after adjusting for deferred subscription interest and inflated bad debt reserves) as an input to the economic substance analysis, when the degree of profitability is also one of the outputs. [39]
*877 Another shortcoming of the Thompsons' analysis is its presumed equivalence between corporate and shareholder profitability. The link between a profit at the corporate level and a profit at the shareholder level is not automatic. A profitable corporation may elect not to distribute dividends, for example, because of a cash shortage or a capital expansion plan. Accordingly, even assuming petitioners had persuaded us that there was a reasonable possibility of corporate profitability, they would also have to clear the additional hurdle of showing that corporate profitability would translate into shareholder profitability. This they have failed to do. Specifically, petitioners have not shown that any of the Kersting corporations in which petitioners held stock had the resources to make dividend-like distributions that were not intended to be immediately returned to Kersting as part of his investment programs. Petitioners also have not shown that the per-share stock value of any Kersting corporation fluctuated with the corporation's profitability or with anything else. These values as reflected in prices offered to new participants were constant (except for a change in the early *878 years of the Stock Subscription Plan) over the years at issue: Charter Financial and Investors Financial stock always sold at $ 10.50 per share; acceptance corporation stock, regardless of the corporation, sold at $ 10 per share with an accompanying subscription agreement at $ 1 per share; and leasing corporation stock sold at $ 1 per share with an accompanying subscription agreement also at $ 1 per share. Kersting's quoted testimony above about how he determined the value of Charter Financial stock also suggests that corporate profitability had no effect on stock value. Even assuming petitioners had persuaded us that there was a reasonable possibility of corporate profitability and that corporate profitability would lead to increased value of the stock held by shareholders, they would confront another obstacle. For the shareholders to have profited from their investments, there must have been a means to sell their stock at the increased value. Kersting or the issuing corporation was always available as a buyer, but petitioners have not shown that this transaction ever resulted in cash beyond what was necessary to pay off outstanding loans related to the stock. Even Kersting *879 did not claim that an investor ever received excess cash. On this point, although Kersting testified that his corporate files contained the DuFresne letters of June 22, 1984, in which DuFresne referred to a $ 20,000 cash return on his Charter Financial investment, Kersting did not testify about the contents of those letters. Nonetheless, the existence of this option on the part of petitioners to return their stock to Kersting does not by itself mean that they had no other way to dispose of their stock and possibly earn a profit. In fact, Kersting testified that he intended at some point to take these corporations public and thereby "realize the retail value of the securities." He claimed that he told this to investors, and a few form letters quoted in our findings contain references to going public. We do not believe, however, that Kersting ever gave serious consideration to going public with his corporations. In his post-1981 letter to acceptance corporation shareholders, which proposed an exchange of their stock for that of a new holding company, we believe his reference to going public was meant only to provide shareholders (or the IRS) with a justification for his creation *880 of a holding company structure. The actual reason for that proposed restructuring was apparently to facilitate favorable tax reporting, as suggested by Ms. Akamine's testimony. In addition, although Kersting claimed that he had talked to underwriters several times over the years about the possibility of going public, his testimony was vague and uncorroborated. The one investigation and negotiation he described in detail supposedly began in 1985 or 1986, after the years at issue and many years after the IRS had begun to question his investment programs. Further, throughout the years at issue he was never involved in a public offering, even before his reputation had supposedly become tarnished in the eyes of underwriters by the IRS criminal investigation. Petitioners have failed at each step of the way (corporate profitability, increased stock value, and a means to realize the increased value) to establish that from an objective standpoint there existed a possibility of a profit. We are left to conclude, as fully analyzed in our discussion of the primary loans, below, that neither Kersting nor petitioners ever contemplated that petitioners would transfer their stock anywhere other *881 than back to Kersting and for consideration other than its original purchase price. Because petitioners had one way and one way only to dispose of their stock, and for a constant amount, they had no reason to care about what its actual value relative to the price might be. That being the case, the initial "value" of the stock (i.e., the primary loan amount) could be anything Kersting decided. A further indication of the lack of economic substance here is the unusual relationship between the price of the stock, which was constant, and the annual corporate distributions. Once a year the investor received a distribution equal to 18 percent or more of the original total cost of his stock, which Kersting considered a return of capital that reduced the investor's adjusted basis in the stock. This type of transaction from a corporate accounting standpoint normally reduces both sides of the balance sheet, as a debit to capital stock and a credit to cash. From an economic standpoint, similarly, this transaction ordinarily shrinks the corporate asset base because of the cash outflow with no compensating inflow. Neither Kersting nor petitioners have explained how under these circumstances *882 the actual economic value of the investor's stock could remain unchanged. In contrast to the expected correlation between returns of capital and stock value, the Kersting programs in operation demonstrated no correlation whatsoever. Thus, while the capital stock account of Universal Leasing plummeted by over 60 percent from 1977 to 1984 and while the capital stock account of Escon Leasing fell by almost $ 1 million and went negative (both drops attributable to Leasing Corporation Plan returns of capital), the stock price to new participants and the selling price for ongoing shareholders never changed from $ 1 per share. Also consistent with a lack of economic substance is Kersting's disregard of standard corporate business practices. For corporations such as Charter Financial (Hawaii), Federated Finance (Hawaii), and Windsor Acceptance (Hawaii), he simply reincorporated them in Nevada by filing the appropriate papers with that State. He had no apparent concern with dissolving or liquidating the Hawaii corporation or effecting a formal transfer of assets. As far as Kersting was concerned, the corporations continued to operate out of the same Hawaii offices and to engage in the *883 same activities, so legal formalities other than simple incorporation were unnecessary. The stock certificates provided to investors were generally unnumbered, and records of shares and shareholders were available to the Kersting corporations if at all only from bookkeeping accounts not intended for that purpose. Whether or not Kersting was technically in violation of State or Federal securities laws, there can be no doubt that stock without substance is much easier to manipulate when "exempt" than when subject to the formal oversight of registration. Another specific offshoot of Kersting's disregard of standard business practices is unreasonable timing, as exemplified by the extended period of typically several months between the date on the Stock Subscription Plan initiating documents and Kersting's waltzing of the primary loan funds. Either it was not important to Kersting promptly to consummate the stock acquisition transaction with transferred funds or he backdated the initiating documents. Both explanations cut against underlying economic substance. As to the former, a corporation engaging in genuine stock transactions would not ordinarily wait patiently for several months *884 to receive sales proceeds of this magnitude unenhanced by interest. As to the latter, a corporation engaging in genuine stock transactions would not normally treat someone as a shareholder retroactive to a time before that person had even decided to become one. A particularly revealing example is the Stock Subscription Plan for the stock of Fargo Acceptance. Although Dixon's initiating documents were dated January 2, 1977, the initial tax return for Fargo Acceptance, for the period ending June 30, 1977, shows absolutely no issued capital stock on the ending balance sheet. The reason is that the bookkeepers recorded transactions based on canceled checks and bank statements, and Kersting did not waltz primary loan funds for Dixon and others until July 29, 1977. Dixon, then, was supposedly a Fargo Acceptance shareholder long before the corporation even acknowledged his existence in its books and tax return. Although the record does not disclose when the Fargo Acceptance return was prepared, there would have been no apparent need to prepare it before a bank statement appeared covering July 29, 1977. In any event, Kersting did not sign the return until 1985. That the return adheres *885 to the waltz date rather than the date on Dixon's initiating documents demonstrates that the tail (bookkeeping) was wagging the dog (stock ownership). Moreover, Dixon was supposedly a shareholder of Fargo Acceptance before the corporation even existed. The Certificate of Incorporation was not filed with the State of Nevada until March 17, 1977, and the incorporators executed it less than a week before that date. Similarly, Dixon and Hongsermeier supposedly purchased stock from Escon Leasing with initiating documents dated January 2, 1977, even though the incorporators did not execute the Certificate of Incorporation until over a month later, on February 4, 1977. In the totality of these circumstances, we conclude that petitioners' stock investments as part of a Stock Purchase Plan, a Stock Subscription Plan, or a Leasing Corporation Plan were devoid of economic substance. When we couple this lack of economic substance with both our earlier conclusion that petitioners had no motivations other than tax avoidance in entering into these transactions and our failure to see any practical economic effects, these stock transactions must be characterized as shams. A finding that an underlying *886 purchase transaction is a sham does not mean that all of the purported indebtedness associated with that transaction is not genuine and may be disregarded for tax purposes. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 95-96 (4th Cir. 1985), revg. on this issue 81 T.C. 184 (1983); see Jacobson v. Commissioner, 915 F.2d 832, 840 (2d Cir. 1990), affg. in part, revg. and remanding in part a Memorandum Opinion of this Court. The requirement of a profit objective is not one of the limitations in section 163 on the deduction of interest actually paid. Rose v. Commissioner, 88 T.C. 386, 423 (1987), affd. 868 F.2d 851 (6th Cir. 1989); Stanton v. Commissioner, 34 T.C. 1, 7 (1960). If there is actual payment of interest attributable to the use or forebearance of amounts due on genuine indebtedness, then that interest is deductible. Rose v. Commissioner, 88 T.C. at 423-424. Accordingly, we cannot disregard in its entirety a transaction involving the use of loans to fund a tax avoidance scheme unless we separately examine the substance of the loans. *887 Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1548-1549 (9th Cir. 1987), affg. a Memorandum Opinion of this Court. 3. Subscription Agreements
We begin our examination of the loans by considering the stock subscription agreements used in the Stock Subscription Plan and the Leasing Corporation Plan. Petitioners maintain that they paid interest on the unpaid subscription balances and thus are entitled to deductions under section 163(a) for those payments. Interest has been defined as the amount one has contracted to pay for the use of borrowed money, Old Colony Railroad Co. v. Commissioner, 284 U.S. 552, 560, 76 L. Ed. 484, 52 S. Ct. 211 (1932), and as compensation for the use or forbearance of money. Deputy v. du Pont, 308 U.S. 488, 498, 84 L. Ed. 416, 60 S. Ct. 363 (1940). This Court has described interest as a payment for the use of money that the lender had the legal right to possess, prior to relinquishing possession rights to the debtor. Albertson's, Inc. v. Commissioner, 95 T.C. 415, 421 (1990). To be deductible under section 163(a), amounts paid as interest must be paid on indebtedness in substance and not merely in form. *888 Knetsch v. United States, 364 U.S. 361, 365-366, 5 L. Ed. 2d 128, 81 S. Ct. 132 (1960); Estate of Franklin v. Commissioner, 544 F.2d 1045, 1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975). An indebtedness is an existing, unconditional, and legally enforceable obligation for the payment of a principal sum. Howlett v. Commissioner, 56 T.C. 951, 960 (1971). A typical subscription agreement contained this operative provision: "I hereby subscribe for and agree to purchase from * * * [a specific acceptance corporation or leasing corporation, a specific number of] shares of common stock of $ 1.00 par value at a price of $ 1.00 per share." The agreement called for the investor to pay 12-percent annual interest on the unpaid subscription balance and contained a provision acknowledging receipt of a specific amount "paid on account" equal to a year of such interest. The corporation did not advance funds to the investor pursuant to the subscription agreement, nor did it issue subscribed stock as of the date on the agreement. Kersting interpreted the agreement to give the corporation the right at any time to require the investor to purchase the subscribed *889 shares. The agreement did not, in Kersting's view, give the investor the right to tender payment and request the issuance of the shares. Some petitioners testified about their understandings of the legal effects of the subscription agreements, though not altogether clearly, and there was some disagreement with Kersting's interpretation. This Court considered subscription agreement interest for similar Kersting investment programs in Pike v. Commissioner, 78 T.C. 822 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). Although petitioners here argue that they purchased a valuable intangible right to acquire stock at the agreed price, this description is not at odds with what we stated in Pike: We are somewhat mystified why the payments to Norwick under the stock subscription agreements were classified as "interest" in any event. The agreements simply stated that the participants agreed to buy X number of shares from Y company for $ 1 per share. No date for performance was specified. Interest on the unpaid balance of the agreement was to be 1 percent per month. It is stipulated that the agreements were never called *890 by Norwick, and petitioners did not buy any stock under the agreements. Hence, they presumably owed nothing under the agreement for which "interest" would accrue. At best, the amounts paid would be some sort of a fee for an option to purchase. [Pike v. Commissioner, 78 T.C. at 850 n.54; emphasis supplied.]
Petitioners also contend that upon signing their subscription agreements, they became absolutely and unconditionally liable to pay interest on the unpaid subscription balances. Our attention is not diverted by this argument from the more appropriate threshold inquiry suggested by Pike: whether the subscription agreements created an unconditional "obligation for the payment of a principal sum." Howlett v. Commissioner, supra at 960. In these circumstances, until the corporation either advanced funds or issued stock, any debt obligation was not yet unconditional. The acceptance corporations, for their part, never sought to consummate the stock purchases called for in their subscription agreements. Kersting testified, however, that a leasing corporation sometimes exercised its perceived right to require an investor to purchase *891 subscribed shares. The documentary evidence does not conclusively support this testimony, but the evidence does reveal that under the Leasing Corporation Plan, the investor sometimes purchased additional stock from the leasing corporation and executed a new subscription agreement. Because the sum of the newly purchased shares and the newly subscribed shares equaled the subscribed shares under the original subscription agreement, this could have been intended as a partial consummation of the original subscription agreement. For present purposes, we assume without deciding that it was so intended. Although the unpaid subscription balance as of the date of the original subscription agreement was not an unconditional obligation, this is not by itself always a fatal shortcoming. The courts have sometimes permitted an interest deduction for a period before a debt obligation existed or became unconditional. In Dunlap v. Commissioner, 74 T.C. 1377 (1980), revd. on other grounds 670 F.2d 785 (8th Cir. 1982), the taxpayer entered into an agreement on July 1, 1971, to purchase the stock of a savings bank. Part of the purchase price was in the form of *892 promissory notes bearing interest at 9-1/2 percent from that date. Closing of the transaction was contingent upon approval by the Federal Reserve Board, and after that approval the parties to the agreement closed the transaction on July 12, 1972. On that date, the taxpayer paid to the sellers an amount designated as interest for the period from July 1, 1971, to June 30, 1972, computed at 9-1/2 percent of the principal amount of the notes. We decided that the indebtedness did not become unconditional until the closing date, but we held that the interest was deductible based upon Monon Railroad v. Commissioner, 55 T.C. 345 (1970). In Monon Railroad, a corporate taxpayer issued 6-percent debentures on April 1, 1958, in exchange for shares of its outstanding class A common stock. Although the taxpayer did not even invite the shareholders to participate in the exchange until January of 1958, it dated the debentures January 1, 1957. We concluded that the taxpayer paid deductible interest for the 15-month period prior to the issuance of the debentures, relying upon Commissioner v. Philadelphia Transportation Co., 174 F.2d 255 (3d Cir. 1949), *893 affg. 9 T.C. 1018 (1947), affd. per curiam 338 U.S. 883 (1949). Part of the rationale of both Monon Railroad and Philadelphia Transportation Co. was that the taxpayer could have achieved the same effect without using a preissue date by providing for a correspondingly higher postissue interest rate. Commissioner v. Philadelphia Transportation Co., 174 F.2d at 256; Monon Railroad v. Commissioner, supra at 362-363. We recently considered these cases and related others in Midkiff v. Commissioner, 96 T.C. 724 (1991), which concerned an eminent domain action in Hawaii for acquisition by lessees of a residential lot they occupied. In settlement of the action, the lessees paid the lessor the value of the lot as of the date the Hawaii Housing Authority designated the lot for acquisition, plus "blight of summons damages," at the annual rate of 5 percent of the designated value, from the date of designation to the date of closing. We held that this additional amount was not paid on indebtedness within the meaning of section 163(a) and thus was not deductible as interest. The instant *894 cases are distinguishable from cases such as Dunlap v. Commissioner, supra, and Monon Railroad v. Commissioner, supra, because the Kersting investor's obligation for the purported indebtedness (the cost of the subscribed stock) never became unconditional. When the investor purchased new leasing corporation stock, which purchase we have assumed was pursuant to the subscription agreement, he borrowed the acquisition funds for the newly purchased shares from an acceptance corporation, thus extinguishing his obligation to the leasing corporation for a principal amount at the same time that it unconditionally arose. As we stated in Midkiff v. Commissioner, supra at 742-743: In the instant case, the asserted purpose of the disputed "interest" amount was to compensate the estate for delay in payment from the date of designation to the date of closing; that "interest" related solely to the period prior to the date of closing. Thus, the situation is not one where * * * [the lessees] could have provided for a higher rate of interest for the period after the obligation rose to the level of an indebtedness within the *895 meaning of section 163(a); on that date, they simultaneously extinguished the entire indebtedness. * * *
Petitioners cite two cases in support of their position concerning the deductibility of subscription interest, one of which is Unitex Industries, Inc. v. Commissioner, 30 T.C. 468 (1958), affd. per curiam 267 F.2d 40 (5th Cir. 1959). Although the case indeed involves unpaid stock subscriptions, that similarity is the total extent of the meaningful common facts. We there considered whether the subscribers were properly characterized as shareholders receiving dividends or as creditors receiving interest payments, ultimately concluding the former. The party seeking the interest deduction was the corporation, not the stock subscribers. Petitioners here are on the other end of the purported loan transactions, as debtors. Petitioners' other cited case, United States v. Title Guarantee & Trust Co., 133 F.2d 990 (6th Cir. 1943), is likewise inapposite. Again, the court there considered whether amounts paid by a corporation to shareholders were dividends or interest. Respondent emphasizes the circular flow of funds in a *896 Kersting waltz as a reason to disallow petitioners' claimed interest deductions. Before turning to that position in the context of subscription interest, we review the state of the record regarding waltzes. In general, the waltz was a circular flow of checks among Kersting corporations and investors at the same bank on the same day. Although the funds in one sense flowed step-by-step from one entity to another, the banks processed check transactions on a daily basis, thereby collapsing the step-by-step flow into a closed circle without a definitive beginning or end. Our findings include step-by-step summaries of only two Kersting waltzes affecting stock investment programs, primary loan funds for the Stock Subscription Plan and leverage loan funds also for the Stock Subscription Plan and leverage loan funds also for the Stock Subscription Plan. The evidence that provides the detail for these two waltzes includes connections to specific petitioners and transactions. There are several other potential waltz situations, however, including primary loans, leverage loans, and annual distributions for the Stock Purchase Plan; annual distributions for the Stock Purchase Plan; annual *897 distributions for the Stock Subscription Plan; and primary loans, leverage loans, and annual distributions for the Leasing Corporation Plan. Respondent in his opening brief proposed as a fact that waltzes were parts of essentially all Kersting stock transactions. Petitioners objected that this proposed finding was misleading and contrary to the evidence. In view of this dispute, we examined the incomplete bank records and included in our findings detailed bank account activity that, as we discuss hereinafter, suggests the existence of these other waltzes. In contrast, despite petitioners' objection to respondent's proposed finding, they have failed to direct us to any evidence tending to prove that these other waltzes did not exist. Generally, a circular flow of funds among related persons suggests that a transaction lacks economic substance. Merryman v. Commissioner, 873 F.2d 879, 882 (5th Cir. 1989), affg. a Memorandum Opinion of this Court; Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1549 (9th Cir. 1987), affg. a Memorandum Opinion of this Court. For loans, the specific analysis may vary depending upon whether *898 the taxpayer uses borrowed funds to pay interest.[40] A comparison of Karme v. Commissioner, 73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982), and Beck v. Commissioner, 74 T.C. 1534 (1980), affd. 678 F.2d 818 (9th Cir. 1982), highlights the analytical distinction.
In Karme, which like the instant cases involved a stock purchase entirely financed with borrowed funds, we ultimately denied a section 163(a) interest deduction because there was no genuine debt obligation and the loan transaction was a sham. Among the factors we considered important to this conclusion were the terms and *899 circumstances of the purported loan. Among those circumstances was the fact that the loan proceeds, which were invested in a speculative stock venture, traveled in a circle among entities that (except for the bank) the taxpayers' tax planner effectively controlled. A similar circular funds flow occurred, this time in reverse, when the stock purchase was canceled. In Beck, we concluded that interest was not "paid" within the meaning of section 163(a) when limited partnerships used borrowed funds to pay interest points that completed a check circle back to the lender. We there relied upon United States v. Clardy, 612 F.2d 1139 (9th Cir. 1980), in which the essence of the transactions, in our words, was that "the so-called loan providing funds for the interest payment was made from a fictitious bank balance created by a deposit of the interest itself." Beck v. Commissioner, 74 T.C. at 1563. We further stated: The instant case fits within the Clardy mold. The payment construct * * * was nothing more than an illusory facade constructed by means of check swapping. There was no payment of interest here because no money nor bankable *900 funds were employed or were even available. To paraphrase the Ninth Circuit in Clardy, since no financial resources were required, there was no limit to the amount that could be paid using this technique: $ 3 million could have been paid as easily as the approximately $ 300,000 that was paid. United States v. Clardy, 612 F.2d at 1152. The section 163(a) payment provision requires substantially greater substance and reality than either the facts of Clardy or this case demonstrate. [Beck v. Commissioner, 74 T.C. at 1564.]
Of the two stock program waltzes summarized step-by-step in our findings, the Stock Subscription Plan leverage loan waltz is factually similar, in terms of a circular flow, to the loans in both Karme and Beck. The borrower used the leverage loan amount to pay interest on other loans, specifically on primary loans and unpaid subscription balances, and the Beck rationale suggests that this borrowed amount was not truly "paid." Karme suggests that even if the leverage loan borrower did not use the funds to pay interest on other obligations, the borrowed amount was not a genuine debt obligation to *901 which interest could attach. In contrast to the Stock Subscription Plan leverage loan waltz, the primary loan waltz does not implicate Beck directly. A borrower used the primary loan only to purchase stock, not to pay interest on other loans. The Commissioner's notices of deficiency provide as one ground for disallowance of interest deductions that petitioners did not establish that they paid or properly accrued interest in the years for which they claimed deductions. [41] The notices of deficiency provide as another ground that the underlying transactions did not give rise to bona fide indebtedness. Accordingly, the issues we considered in both Karme and Beck are properly before us in the instant cases. *902 Subscription interest arose under both the Stock Subscription Plan and the Leasing Corporation Plan. In the Stock Subscription Plan, the investor borrowed funds by means of a leverage loan to pay a year of interest on the primary loan and a year of interest on the unpaid subscription balance. The leverage loan proceeds check was not a two-party check, but was instead payable to the investor alone. The investor wrote two of his own checks, one for primary loan interest and one for subscription interest. On the day of the waltz, as summarized in our findings, the funds flowed from the leverage lender to the investor, where they split and went to the primary lender and the stock-issuing acceptance corporation, after which they reconverged and flowed to the leverage lender. In essence, the deposit to the leverage lender's account consisted of the same funds that it lent to investors as leverage loan proceeds on the same day. The closed circle, with all participants being investors or Kersting corporations having accounts at this same bank, enabled Kersting to transact a Stock Subscription Plan leverage loan (a part of which was subscription interest) entirely on paper without any *903 actual cash involved. We see no meaningful distinction from the "illusory facade" in Beck. Petitioners did not "pay" interest on unpaid subscription balances in the Stock Subscription Plan, even assuming there were principal obligations to which interest could attach. As noted, the record does not provide clear and complete transactional detail on the flow of subscription interest funds under the Leasing Corporation Plan. The evidence suggests, however, that Kersting waltzed such subscription interest. We have considered both ways in which an investor paid subscription interest in the Leasing Corporation Plan. For the first year, which was similar in this respect to the Stock Subscription Plan, a leverage loan from an acceptance corporation supplied the funds for the payment of that interest. For checks deposited to the Liberty Bank general accounts of Anseth Leasing and Escon Leasing on July 22, 1981, four different individuals appeared on the deposit slips for a two-check set of deposits in the amounts of $ 19,000 and $ 6,600. These check amounts coincide with a typical stock purchase under the Leasing Corporation Plan of $ 19,000, which typically accompanied a $ 55,000 *904 subscription agreement calling for $ 6,600 of subscription interest. The checks for the other two individuals exhibit a similar pattern, with one two-check set of deposits consisting of $ 22,000 and $ 7,920, and the other consisting of $ 25,000 and $ 9,000. Dividing $ 7,920 by the standard 12-percent subscription interest rate gives $ 66,000, which is exactly three times $ 22,000, again a typical ratio for the Leasing Corporation Plan. Similarly, dividing $ 9,000 by the standard 12-percent subscription interest rate gives $ 75,000, which is exactly three times $ 25,000. In short, these bank accounts for July 22, 1981, have activity corresponding to three standard size variations of the Leasing Corporation Plan: A $ 19,000 stock purchase and $ 55,000 subscription, a $ 22,000 purchase and $ 66,000 subscription, and a $ 25,000 purchase and $ 75,000 subscription. For present purposes, the important point is that the apparent subscription interest amounts of $ 6,600, $ 7,920, and $ 9,000 entered and exited the account on the same day, just as subscription interest did in the Stock Subscription Plan leverage loan waltz. The source of subscription interest for subsequent years of the *905 Leasing Corporation Plan was the annual distribution check from the leasing corporation general account. Bank statements for Escon Leasing covering April 27, 1978, and November 8, 1978, appear to illustrate that the bank paid an annual distribution check from the general account on the same day that it paid the corresponding primary loan interest check and subscription interest check from the special account. Specifically, of the 37 checks listed in our findings and paid from the general account on these two dates, each can be matched with a set of two checks paid from the special account that together equal the amount of the general account check. Further, in all but 1 of the 37 two-check groupings in the special account, the checks correspond to primary loan interest at 18 percent and subscription interest at 12 percent for either a $ 19,000 purchase and $ 55,000 subscription program or a program with an exact ratio of 1 to 3 between purchase and subscription. The majority of the checks for Anseth Leasing on August 6, 1979, and August 16, 1979, can be similarly matched and categorized. Accordingly, after an investor endorsed the distribution check and the two accompanying checks *906 and then returned all three to Kersting, the following appears to have occurred at the bank on the same day: (1) The endorsed distribution check was paid from the general account and deposited to the special account; (2) the checks for primary loan interest and subscription interest were paid from the special account; and (3) the check for subscription interest was deposited to the general account. The support for step (3) is the exact match between a deposit of unknown origin to the leasing corporation general account and what we have derived as apparent subscription interest checks issued from the special account for each of August 6, 1979, August 16, 1979, and November 8, 1978. Those amounts are, respectively, $ 39,417.60, $ 156,948.40, and $ 45,090. For the date that is not an exact match, April 27, 1978, the numbers are close: a $ 143,730 deposit to the general account and $ 146,430 in apparent subscription interest checks issued from the special account. In sum, because Kersting appears to have waltzed the funds used for subscription interest in the Leasing Corporation Plan, either as part of a leverage loan waltz (the first year) or as part of a distribution check waltz *907 (in subsequent years), petitioners have not met their burden of showing that they "paid" subscription interest in the Leasing Corporation Plan. 4. Primary Loans
We consider now the primary loans in the Stock Purchase Plan, the Stock Subscription Plan, and the Leasing Corporation Plan, which petitioners used to purchase stock from Kersting corporations. The notes corresponding to the primary loan transactions were in form recourse. Interest actually paid on recourse notes may be deductible even if the purchase transaction being financed is itself a sham. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 95-96 (4th Cir. 1985), revg. on this issue 81 T.C. 184 (1983). We conclude here, however, that the purported recourse obligations were not in the nature of genuine indebtedness and that petitioners have not shown they paid the associated interest. We have found as a fact that Kersting and his investors had an understanding at the commencement of an investment program that the primary loan obligation could be satisfied in full at any time by a mere surrender of the associated stock certificate. Given the importance of this underlying *908 fact in these cases, the support for our finding merits some discussion. Kersting steadfastly maintained at trial that he did not represent to investors that they could exchange stock for a canceled primary note at any time. Instead, according to Kersting, he merely told them that should they desire to terminate he would try to find a buyer for the stock, generally a new participant in that particular program. [42] He seemed to say that although termination always occurred as an even stock-for-note swap if the investor was current on leverage loan interest payments, this was merely a fortuitous result that he did not promise to investors initially. He testified that he provided so-called "comfort letters" only to those "nervous Nellies" who insisted on having them, which did not include any of petitioners. *909 We do not doubt that Kersting only provided these personalized comfort letters to investors who insisted and that petitioners were not among that group. It does not necessarily follow, however, that the policy embodied in the letters was unknown or unavailable to petitioners or other investors. In fact, the record contains several indications, covering a span of several years, that Kersting applied this policy to everyone whether they requested personalized comfort letters or not: (1) Thompson testified that Kersting assured him of the policy at the outset, and no other petitioner testified that he tendered stock to Kersting and was refused. Kersting's refusal to accommodate Thompson is reasonably attributed to the serious falling out that occurred previously and to Thompson's apparent refusal to pay leverage loan interest. (2) Kersting described the 1976 Forbes Acceptance Stock Subscription Plan to Mil Harr this way: "The deal is self-liquidating as you can retire all of your debt by simple surrender of the stock certificate issued to you." (3) Gabriele Kersting sent a form letter to Owens also relating to a 1976 Forbes Acceptance Stock Subscription Plan, in which she advised *910 him to "Keep the [stock] certificate in a safe place as you will need it later to retire the $ 30,000.00 note." (4) In a form letter transmitting initiating documents for the Leasing Corporation Plan of Universal Leasing, Kersting stated: "All of your debt, except your monthly payment obligation, can be discharged at any time at your option by surrender of the stock certificate which will be issued to you after we have received the executed documents from you." (5) In a form letter marking the first anniversary of a Leasing Corporation Plan for Anseth Leasing, Kersting noted that "you do have the continuing option to retire the existing notes by a sale to your corporation of the stock which you have acquired." (6) Although in the form of a personalized comfort letter, Kersting wrote expansively in 1977: "there is, of course, no problem to reassure you of the self-sustaining and self-liquidating aspects of the transaction. We would, in fact, issue a letter to every participant in the deal outlining that understanding if it would not weaken YOUR position with the IRS." (7) In another personalized comfort letter, this time from 1978, Kersting again wrote broadly: "As to the *911 obligation under the promissory notes and subscription agreements there is no ongoing obligation as far as we are concerned. We will always repurchase the stock issued at a price sufficient to allow a borrower to discharge all of his debt." (8) In a 1980 credit-reference letter to a third party, Kersting wrote that the investor's "liabilities at * * * [the time of his stock purchases] and from there on would be equal to the assets acquired. His debt can be cancelled at any time of his choice by the sale of the assets in his possession." (9) Dixon received a 1985 form letter that told him how to terminate his participation in his Charter Financial stock purchase plan by returning an endorsed stock certificate, after which his notes and stock certificate would be canceled and notes marked "paid" would be returned to him. The letter contained similar unused "cancellation" lines for leasing corporation stock certificates and acceptance corporation stock certificates. Going beyond our conclusion that Kersting and petitioners had a prearranged understanding of the available stock surrender policy, we are convinced that neither Kersting nor petitioners ever contemplated that the *912 principal obligation on a primary loan would be paid except by a surrender of the stock. Only during the later years at issue did primary notes include an express notation that they were nonnegotiable and nonassignable. For all the record shows, however, they were always regarded as such. We have seen no evidence of any primary note that ended up in the hands of an individual or corporation not associated with Kersting. From Kersting's perspective, although he inquired about a prospect's general financial situation at the outset, the only things he could readily verify or apparently cared to verify were occupation status as a pilot and approximate salary. He at most infrequently required a loan application or financial statements (and only Owens claimed to have ever submitted either), and he also seldom if ever did credit checks. He did not even retain notes of his discussions with potential investors. The primary loans were unsecured, with the primary notes failing to list even the purchased stock as collateral. From petitioners' perspectives, we simply do not believe that at their high but not sky-high income levels, they would take on sizable primary loan liabilities *913 to purchase stock about which they knew little or nothing unless they had no expectation or intention of ever paying off those loans with cash. Although recourse in form, the primary loans in the stock investment programs were not genuine indebtedness in substance and thus cannot support interest deductions under section 163(a). Admittedly, in the early versions of his stock programs Kersting made no secret of the nonrecourse nature of the loans involved. In our list above of evidence supporting a pervasive stock surrender policy, items (2), (3), and (4) perhaps relate to such nonrecourse loans. Owens was also presumably involved in such transactions. Calling the loans nonrecourse, however, does not without more provide the missing substance. The emphasis in all three of items (2), (3), and (4) is in terms of the ultimate exchange transaction, stock for satisfaction of debt, rather than in terms of liability limited to the stock. Moreover, the failure to introduce proof of stock value, which in a genuine transaction would at least approximate the amount of the nonrecourse loan, has been termed a fatal defect. Estate of Franklin v. Commissioner, 544 F.2d 1045, 1048 (9th Cir. 1976), *914 affg. 64 T.C. 752 (1975); Narver v. Commissioner, 75 T.C. 53, 98-99 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982). Petitioners have failed to introduce any such proof other than the testimony of Kersting, which on this point like many others was vague, inconsistent, and not credible. Further support for our characterization of the primary loans as other than genuine indebtedness lies in the apparent circular flow of all primary loan funds, similar to the flow in Karme v. Commissioner, 73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982). In the Stock Subscription Plan on waltz day, as summarized step-by-step in our findings, two-party loan proceeds checks that originated with the primary lender were deposited to the account of the stock-issuing acceptance corporation, which transferred funds (either indirectly through Federated Finance or directly) back to the account of the primary lender. In essence, the deposit to the primary lender's account consisted of the same funds that it lent to investors as primary loan proceeds. The record does not provide clear and complete transactional *915 detail on the flow of primary loan funds in the Stock Purchase Plan and the Leasing Corporation Plan. We have cause to believe, however, that waltzes similar to that in the Stock Subscription Plan were parts of these two programs. First, the primary loan served the same fundamental function in all three programs, as an acquisition loan for the purchase of stock. Second, Kersting admitted that the holding companies in the Stock Purchase Plan and the leasing corporations in the Leasing Corporation Plan periodically transferred the funds received from new shareholders back to Federated Finance, the primary lender. In addition, Liberty Bank statements for Charter Financial and Candace Acceptance covering February 8, 1980, and May 22, 1980, seem to indicate that waltzes (albeit of a different type) were part of the Stock Purchase Plan. On May 22, 1980, the bank recorded 37 checks issued by Charter Financial in amounts of $ 7,200, $ 14,400, or $ 21,600, which happen to correspond to leverage loan amounts for standard Stock Purchase Plans of $ 40,000, $ 80,000, and $ 120,000, respectively. Among the deposits recorded was one for $ 597,600. For Candace Acceptance, the bank recorded *916 four deposits evenly divisible by $ 7,200, which totaled $ 597,600. Among the issued checks recorded was one for $ 597,600. The relationships were similar on February 8, 1980, when the common amount was $ 302,400. Accordingly, after several investors endorsed and returned their Stock Purchase Plan annual distribution checks, the following appears to have occurred at the bank on the same day: (1) The distribution checks were paid from the account of the holding company and deposited to the account of the leverage lender to pay off the leverage loans; and (2) the leverage lender issued a check in the amount deposited to its account to the holding company. Under this scenario, the same distribution amount was both deposited to and paid from the account of the holding company, with a stop in between at the leverage lender to provide a bank record of a satisfied leverage loan obligation. If Kersting waltzed distribution checks in the Stock Purchase Plan, as this bank account activity suggests, we do not doubt that he handled primary loan funds in the same program similarly. For primary loan funds in the Leasing Corporation Plan, Liberty Bank statements for Anseth Leasing and Escon *917 Leasing covering July 22, 1981, are instructive. We have already described these statements in connection with the circular flow of subscription interest. We there concluded that the account activity corresponded to three size variations of the Leasing Corporation Plan: A $ 19,000 stock purchase and $ 55,000 subscription, a $ 22,000 purchase and $ 66,000 subscription, and a $ 25,000 purchase and $ 75,000 subscription. For present purposes, we need only add that the apparent primary loan amounts of $ 19,000, $ 22,000, and $ 25,000 entered and exited the leasing corporation general account on the same day, a trademark of a Kersting waltz. In sum, in addition to the waltz of primary loan funds in the Stock Subscription Plan, which we know existed, we have described an apparent waltz of a different type in the Stock Purchase Plan and a partial apparent waltz of primary loan funds in the Leasing Corporation Plan. Kersting seems to have waltzed primary loan funds in these latter two programs in much the same way that he waltzed such funds in the Stock Subscription Plan. Another important factor in our consideration of the genuineness of an indebtedness is the backdating of documents *918 relevant to the loan transaction. Karme v. Commissioner, 73 T.C. 1163, 1191-1192 (1980), affd. 673 F.2d 1062 (9th Cir. 1982). [43] Backdating is not always meaningful in this analysis, such as when the documents are meant only to reduce to written form an agreement reached orally on the earlier date. The circumstances in the instant cases, however, are not so readily explained. Initiating documents sometimes bore a date that was long before the date that the documents were actually executed and even before the date that the investor informed Kersting he was ready to commence an investment program. Although we discuss backdating here in the context of the genuineness of primary loans, this analysis applies also to the other loans at issue in these cases. *919 Rina, as one example, entered into four different programs with initiating documents dated July 1, 1979, including a stock subscription plan involving Candace Acceptance. Yet Kersting sent him a letter dated November 7, 1979, describing available interest deductions for 1979 and stating that "necessary documents" would be produced when Kersting heard from him. In a letter dated November 12, 1979, Kersting informed him that "We did not have sufficient time this weekend to complete all documentation" for Candace Acceptance. Notably, but not surprisingly, the primary loan proceeds check for Rina's Candace Acceptance stock subscription plan was dated July 1, 1979, but not deposited into the account of Candace Acceptance as part of a primary loan waltz until December 11, 1979. Although DuFresne returned his executed initiating documents for a Delta Acceptance stock subscription plan in May of 1980 at the same time that he opened a Liberty Bank account, those documents were dated January 3, 1980. Mil Harr similarly returned executed initiating documents for his Forbes Acceptance stock subscription plan 6 months after the date on the documents. More generally, Kersting's form letter *920 of October 1, 1979, urged investors to have their tax deductions properly documented and recorded well before yearend. He referred specifically to deduction-generating documents that he sent out earlier in 1979, and asked the investors either to return the documents, implying that they be in executed form, or to inform him if they did not wish to "make use of the tax shelter." Concerning the incentive for backdating, Kersting presumably preferred an early January date for the initiating documents not only as a recordkeeping and administrative convenience for himself and his staff, but also as a deduction maximizer for his investors. If the loans were outstanding for the entire year, then a full year of interest was deductible if paid. If the loans were outstanding for less than the entire year, then even prepayment of a full year of interest would not support a full-year deduction. For a taxpayer using the cash method of accounting, paid interest that is allocable to a later year (excepting certain "points" associated with a principal residence) is not deductible in the year paid. Sec. 461(g). In reply to respondent's intimations of backdating, petitioners argue that the exact *921 date of entering an investment program is not important. According to petitioners, the appropriate consideration is whether they had an economic interest and thus a risk of loss in the program sometime before the end of the calendar year. This response, however, ignores the lack-of-substance inference that arises from parties who are not concerned with respecting the form of their transactions. Because of the document uniformity among the investors within a given program, this inference could justifiably carry over to even those investors whose documents were not backdated. Even if the primary loans did represent genuine indebtedness, petitioners have not shown that they paid the associated interest within the meaning of Beck v. Commissioner, 74 T.C. 1534 (1980), affd. 678 F.2d 818 (9th Cir. 1982). The question in this context is not whether Kersting waltzed primary loan funds, which we just considered, but whether he waltzed the funds used to pay interest on the primary loans. This is in large part a question of whether Kersting waltzed leverage loan funds, because leverage loans for the Stock Purchase Plan, the Stock Subscription Plan, and *922 the first year of the Leasing Corporation Plan supplied the funds to pay primary loan interest. As summarized in both our findings and our earlier analysis of subscription interest, Kersting did indeed waltz leverage loan funds in the Stock Subscription Plan. We also described in our analysis of subscription interest how Liberty Bank activity on July 22, 1981, appears to reveal a waltz of first-year subscription interest, which we would expect to be coupled with a waltz of primary loan interest, in the Leasing Corporation Plan. Whether Kersting waltzed primary loan interest in the subsequent years of the Leasing Corporation Plan turns on whether he waltzed distribution checks. We have already described the apparent subscription interest portion of a distribution check waltz based upon Liberty Bank statements for leasing corporations covering April 27, 1978, November 8, 1978, August 6, 1979, and August 16, 1979. In that context, we concluded that after an investor returned to Kersting an endorsed distribution check and the two accompanying checks, the following appears to have occurred on the same day: (1) The endorsed distribution check was paid from the general account and deposited *923 to the special account; (2) the checks for primary loan interest and subscription interest were paid from the special account; and (3) the check for subscription interest was deposited to the general account. For present purposes, we replace the third step and add a fourth: (3) The check for primary loan interest was deposited to the account of Federated Finance; and (4) Federated Finance issued a check in the amount deposited to its account to the general account of the leasing corporation. Although the record does not include the Federated Finance bank statements necessary to confirm these two new steps, a close match exists between a deposit of unknown origin to the leasing corporation general account and what we have derived as apparent checks to Federated Finance issued from the special account. For August 16, 1979, apparent checks to Federated Finance issued from the Anseth Leasing special account total $ 80,820, while the Anseth Leasing general account shows a deposit of $ 81,000. For Escon Leasing on April 27, 1978, the respective amounts are $ 75,240 and $ 78,000. For Escon Leasing on November 8, 1978, the respective amounts are $ 23,220 and $ 23,000. 5. Leverage *924 Loans
The one remaining type of loan for which petitioners claimed interest deductions under the stock plans is the leverage loan. In the Stock Purchase Plan, the investor used the proceeds of the leverage loan to pay interest on the primary loan. In the Stock Subscription Plan, he used the proceeds of the leverage loan to pay interest on both the primary loan and the subscription agreement. In the Leasing Corporation Plan, he used the proceeds of the initial leverage loan to pay interest on both the primary loan and the subscription agreement; subsequent leverage loans retired outstanding leverage loans. A leverage note, like a primary note, did not limit the personal liability of the maker. Contrary to the form, however, Kersting told some investors that surrendered stock would satisfy all outstanding debt, which would include leverage loans. Further, whether in the form of a personalized comfort letter or otherwise, an investor understood from Kersting that he would not be called upon to pay off his leverage loan if he followed instructions for participating in the applicable program. This meant endorsing and returning annual distribution checks for the Stock Purchase *925 Plan and the Stock Subscription Plan, and returning a renewal leverage note for the Leasing Corporation Plan. We have already analyzed, in the context of interest paid on subscription balances and primary loans, the waltz of leverage loan funds in the Stock Subscription Plan and the apparent waltzes of such funds (both first year and subsequent year) in the Leasing Corporation Plan. A particularly striking feature of a leverage loan is its common date with the other initiating documents in a stock program. Like the corresponding primary loan, the leverage loan was outstanding for the entire year in a typical January-initiated program. Because the primary note did not call for prepaid interest, an obvious question arises as to why investors obligated themselves to pay 9- or 15-percent annual interest on a seemingly premature leverage loan. [44] The more rational approach economically from the investor's standpoint would be to wait as long as possible before committing to the leverage loan, thus minimizing accumulating interest. Indeed, the interest on a leverage loan was not even part of the tax shelter benefits of a Kersting program because that amount, dwarfed by primary loan *926 interest and subscription interest, came straight out of the investor's pocket. The timing of the leverage loans appears especially suspect in the Stock Subscription Plan, in which the investor indirectly used leverage loan proceeds to pay primary loan interest and subscription interest. The use was indirect because the investor actually wrote his own checks for these amounts, after having been assured that the leverage loan proceeds check would be deposited to his account to cover the two checks. Kersting could not waltz the leverage loan proceeds until he had received the investor's checks, which the investor typically wrote several months after the date on the initiating documents. Thus, by the time Kersting waltzed the investor's checks and *927 the leverage loan proceeds check together, the initiating date was long past. In effect, the investor had accumulated an interest liability for several months prior to the waltz date on which he first had use of the leverage loan proceeds. In these circumstances of circular funds flows, backdating, substance not following form, and mutual expectations of no personal liability, the leverage loans were not genuine indebtedness that could support petitioners' claimed interest deductions. 6. Other Waltz Issues
Although neither respondent nor petitioners delved into the Kersting waltz details to the extent we did, both parties devoted a good portion of their arguments on brief to other aspects of the waltzes. Respondent, for his part, makes much of the small bank account balances that often prevailed among the Kersting corporations immediately before and after a waltz. Petitioners counter that sound cash management practices do not include tying up sizable amounts of investable funds in bank checking accounts, that the Kersting corporations involved in a waltz had immediate access to funds from other Kersting corporations in the event of insufficient funds, and that banking *928 today is commonly transacted with offsetting deposits and withdrawals in ways analogous to Government deficit spending. We are reluctant to place too much direct emphasis on the size of the account balances. We note first that small balances, while definitely the rule, were not universal. Furthermore, small beginning and ending balances on waltz days were often accompanied by unidentified check transactions in addition to the identified waltzed funds. For days that have not been established as waltz days, the record does not reveal the origins of most deposited checks or the destinations of most issued checks appearing in the bank statements. In any event, we do not believe that small account balances are necessary to respondent's position if the circular flow of funds can be established without reference to the underlying account balances, as we have done here. In our consideration of whether interest was paid and whether there was genuine indebtedness, the size of the account balances, after all, makes the flow of funds neither more nor less of a circle. We do agree with respondent, however, that the prevalence of small account balances on waltz days serves to illustrate that *929 the waltzes as designed and implemented were paper transactions, with no need for actual cash to be involved. Petitioners urge us to downplay the significance of the Kersting waltzes by adopting the analysis from a recent criminal case, United States v. Kilpatrick, 726 F. Supp. 789 (D. Colo. 1989), which dealt with deductions attributable to two types of tax shelters. One was a set of coal leasing programs in which participating sublessees sought to increase their deductible advance minimum royalty payments through nonrecourse borrowing repayable solely by coal production from the subleased properties. The other was a set of limited partnerships created for the purported purpose of developing processes to convert coal to methanol, with the tax advantage intended to come from payment of a deductible research and development expense partially with borrowed funds. The defendants were individuals related to corporations that sponsored, administered, and participated in the programs. The Government's burden was to prove beyond a reasonable doubt that each of them willfully participated in schemes designed to create false and fictitious tax deductions with the intent *930 to defraud the Government. The court, after acknowledging the existence of circular financing and check-swapping from bank accounts with otherwise inadequate balances, found the defendants not guilty. Before turning to petitioners' specific arguments, and without deciding whether we agree with the Kilpatrick analysis or holdings, we observe that the heightened burden-of-proof standard in Kilpatrick, which there rested on the Government in a losing cause, precludes us from attaching much significance to the case. The court summarized the Government's proof shortcomings as follows: although the government has admitted hundreds of exhibits and weeks of testimony, there are too many missing pieces to complete the picture portrayed by * * * the indictment. If this were a civil case, the defendants would be required to explain many things to meet a strong prima facie case of fraud. Here, however, the defendants need explain nothing. The government's approach to this prosecution has been simplistic: proof of check circles is proof of tax fraud. It is not that easy. * * * [United States v. Kilpatrick, supra at 798-799.]
Petitioners' main contention *931 derived from Kilpatrick is that waltzes of checks, including those passing through low-balance accounts, "had economic substance and constituted bona fide consideration." Petitioners draw on language in the opinion suggesting that the check-swapping parties in the coal leasing programs had new rights and obligations relating to coal production immediately after the swap. 726 F. Supp. at 791, 793. The facts here are similar, argue petitioners, because they "became the owners of shares of stock after execution of the original promissory notes and funding of the loan proceeds by check." We reject petitioners' characterization of their stock purchases. A Kersting waltz of primary loan funds typically occurred up to several months after the date on the stock certificate. Although petitioners vaguely emphasize that they became shareholders "after" certain events, they understandably have not attempted to argue that they became shareholders on or after the waltz dates, which would contradict the dates on the initiating documents that started the interest clock running. Petitioners' assertion that Kersting corporations came away from a stock purchase with enforceable *932 recourse notes, thus establishing bilateral economic substance, again ignores the questions of when and how those obligations supposedly arose, which was not on the date of or by means of the waltz. Even Kersting did not maintain that the waltz affected the rights and obligations already purportedly established by the initiating documents as dated. Unlike the examples petitioners cite from Kilpatrick, the Kersting waltzes were not intended to manufacture anything of economic substance. Petitioners also direct us to what the court in Kilpatrick considered a mitigating factor in the otherwise somewhat "sinister" (in the words of that court) circular flow of checks: the circularity and the amounts of the account balances were well known to the bank officers who participated in the financing. 726 F. Supp. at 792. Although this factor is admittedly present in the instant cases, petitioners conveniently ignore the court's second mitigating factor, which is clearly absent here: the defendants freely distributed offering memoranda to the public. 726 F. Supp. at 792. Petitioners' final argument directly related to Kilpatrick concerns, for *933 the coal leasing programs, the court's reference to "the government's failure to disprove the underlying assumption that the coal reserves were adequate to support the values underlying the transaction." 726 F. Supp. at 793-794. Seemingly recognizing that they must establish the "underlying assumption" in these cases, petitioners assert that if their notes constituted bona fide indebtedness, then that indebtedness would have been adequate to support the purchase of stock. We need say nothing more than that this position begs the question of whether the indebtedness was bona fide. Petitioners also seem to consider their high incomes analogous to the coal reserves in the quoted passage, as adequately underlying the transactions. Petitioners suggest that coal reserves were intended to pay off the nonrecourse loans in Kilpatrick just as high incomes were intended to pay off the recourse loans in these cases. The distinction, however, is that coal reserves were the subject matter of the coal leasing programs, not just a repayment method, whereas the pilots' incomes had no connection to the subject matter (i.e., the stock) of Kersting's investment programs. As a *934 final point on the Kersting waltzes, and one not stressed by either respondent or petitioners, we are mindful of the fact that transfers between Kersting corporations in a waltz were sometimes themselves documented as loans or as stock purchases, which suggests a change in economic position among the corporations that arguably provides some substance to the circular funds flow. We have already concluded, however, that petitioners' stock purchases in the three stock investment programs were shams, and we have no reason to believe that intercorporate stock transactions were any more substantive. As to documented loans, petitioners have pointed to no evidence that suggests the corporations respected the loan documents in terms of either interest or principal obligations. We would not be surprised to discover that the principal obligations were satisfied by a reverse circular flow of a subsequent waltz. 7. Collection Litigation
Petitioners emphasize throughout their briefs that several Kersting corporations pursued litigation relating to promissory notes not involving petitioners, sometimes obtaining judgments and collecting portions of amounts due. According to petitioners, *935 this confirms that the specific notes and underlying obligations at issue here were in substance, as well as in form, genuine recourse indebtedness. For many of these litigated actions, however, the evidence does not establish that the underlying transactions were the same as or even similar to those in the instant cases. The acts of litigating and even prevailing, therefore, do not aid petitioners' cause on the question of genuine recourse indebtedness. We have noted in our part II findings certain corporate litigation relating to the years at issue, but we believe this litigation is relevant only to the question of whether Kersting corporations carried on business activities outside of the investment programs. Nonetheless, the evidence does include some litigation that bears a direct relationship to the Kersting investment programs that are the subject of the instant cases. For these, we must address petitioners' argument concerning an inference of genuine recourse indebtedness. As to primary loans, the record contains only one established example of litigation regarding a primary note allegedly executed during the years at issue. In 1983, Atlas Funding commenced an action *936 against Continental pilot Steven Hane based upon a $ 30,000 renewal primary note for a stock subscription plan. No one testified, however, about the circumstances surrounding this action, and Hane did not testify at all, so we have no way of knowing whether he even tendered the acceptance corporation stock certificate. Nor did anyone explain how Hane had managed to accumulate 3 years of unpaid primary loan interest, which normally would have been paid by means of annual leverage loans. In any event, Atlas Funding dismissed the action voluntarily shortly after obtaining a default judgment. Although Kersting corporations pursued collection litigation on leverage loans against three other participants in stock investment programs, Carl Mott, George Vermef, and Robert Peterson, we do not believe that these activities give rise to an inference of genuine recourse indebtedness. Five Kersting corporations commenced actions against Carl Mott based upon a year of unpaid interest on 15 leverage notes, but the principal amounts of the notes were not in issue. The record is replete with copies of checks, drawn on personal bank accounts other than Liberty Bank or Hawaii National Bank, that *937 petitioners used to pay interest on leverage notes. Respondent does not dispute that Kersting insisted on these interest payments, but maintains that to the extent they were made they must be characterized as fees to Kersting for providing tax deductions. Consequently, that Carl Mott allegedly failed to pay interest on leverage notes is of no significance to the substance of his or anybody else's leverage loans. The litigation involving George Vermef and Robert Peterson has more potential probative value because both defendants were alleged to owe principal as well as interest on their leverage notes. Because investors were not automatically insulated from paying back the leverage loans with out-of-pocket funds, the argument goes, this demonstrates that the notes represented genuine recourse indebtedness. Although this is an appealing position at first glance, it does not survive closer analysis. If indeed these gentlemen owed principal amounts on the notes, there are only two readily apparent reasons why that situation might have arisen. As one possibility, the corporations in which they owned stock might have failed to issue distribution checks to extinguish the notes. [45] *938 This would be consistent, however, with neither the way the investment programs were intended to operate nor the way they apparently actually operated. In the latter regard, two of the leverage notes in the Vermef litigation and one in the Peterson litigation, all of which are dated July 1, 1980, relate to stock purchase plans. Both holding companies, Charter Financial and Investors Financial, issued distribution checks dated December 15, 1980, for stock purchase plans on a July annual cycle. If Vermef and Peterson did not receive distribution checks, this is an unexplained circumstance that can have no bearing on whether petitioners' leverage loans had substance. As the second possibility for principal owing on leverage notes, Vermef and Peterson may have received December distribution checks but failed to return them for application to their leverage notes. [46] Again, however, *939 any such failure is inconsistent with the intended operation of the investment plans and, as such, does not suggest that the leverage loans were genuine. Indeed, Kersting could not recall at either his pretrial deposition or at trial a single Stock Purchase Plan situation in which an investor failed to return a distribution check for application to the leverage loan. As illustrated by Kersting's pay-or-else letter to over 30 clients on September 25, 1980, and his 1986 correspondence with the Thompsons, his overriding concern was to be compensated by means of leverage loan interest. It was this amount that even he often referred to as a "fee" or a deductible "cost" of tax deductions. In encouraging clients by means of the September 25, 1980, letter to "discharge the debt to which you are a party," he sought only small amounts that could not have represented typical primary or leverage loans. His letters *940 to the Thompsons indicate that he only threatened or pursued collection of principal obligations when the investor neglected or refused to pay leverage loan interest. This rare occurrence, which Kersting did not testify he either intended or expected, is not sufficient to transform any of petitioners' loans from Kersting corporations into genuine recourse indebtedness. 8. Summary
We have concluded that petitioners' investments in stock associated with the Stock Purchase Plan, the Stock Subscription Plan, and the Leasing Corporation Plan were sham transactions. We have further concluded that the subscription agreements, primary loans, and leverage loans giving rise to petitioners' claimed interest deductions were not in the nature of genuine indebtedness and that petitioners did not show that they paid, within the meaning of section 163(a), either subscription interest or primary loan interest. We have considered the specific differences between petitioners' programs and, as applicable, the Stock Purchase Plan, the Stock Subscription Plan, and the Leasing Corporation Plan, and we have found those differences to be without significance to our conclusions. Accordingly, we *941 sustain the Commissioner's disallowance of claimed interest deductions attributable to the Kersting stock programs. B. CAT-FIT
We have set apart our analysis of the CAT-FIT Plan from our analysis of the Kersting stock investment programs. Although there are similarities (such as primary loans and leverage loans) that stretch across all four programs, the investment certificate used in the CAT-FIT Plan differs in form and function from a stock certificate. The CAT-FIT Plan differs from the other three programs in a second major respect. Despite the voluminous record in these cases, there remain significant gaps in the details of the CAT-FIT Plan that prevent us from fully understanding how it operated or how Kersting intended it to operate. This is especially troublesome because of the intrafamily transactions involved. Transactions among family members that create tax benefits are subject to careful scrutiny by the courts. Muserlian v. Commissioner, 932 F.2d 109 (2d Cir. 1991), affg. a Memorandum Opinion of this Court. As the CAT-FIT Plan in form unfolded, the parent borrowed the investment certificate acquisition funds from Windsor Acceptance, and *942 Atlas Guarantee issued an investment certificate in the child's name. At this point, the parent had a loan repayment obligation to the primary lender and the child had an investment certificate of a like face amount, typically $ 17,000. Although this suggests that the parent made or was deemed to have made a gift to the child, the nature and form of such a gift are unclear. Regarding the nature of the apparent gift, the parent might have made a gift of the primary loan proceeds to the child, who then purchased the investment certificate, or the parent might have purchased the investment certificate with the primary loan proceeds and then made a gift of that certificate to the child. Kersting's written description of the CAT-FIT Plan, which states that "Each parent will make a gift in the amount of $ 17,000," is vague on this point, as is his deposition testimony that "The proceeds would be applied to buy for the child a thrift certificate." Hongsermeier's testimony on this point was conflicting, and even petitioners' opening brief fails to adopt clearly one theory over the other. Regarding the form of the apparent gift, the record does not disclose whether it was made outright, *943 or as the subject of a custodial arrangement such as under the Uniform Gifts to Minors Act, or in trust. DuFresne testified that he held most of his daughters' legal documents, including the CAT-FIT investment certificates, and "took care of them for them." Kersting testified that he wanted to avoid involvement in custodial affairs, and only by rare special request might he have included a notation to the Uniform Gifts to Minors Act on the investment certificate. No such notated investment certificate appears in the record. Kersting also testified that he never intended or set up a Clifford trust arrangement. Owens described the program as setting up a "semi-trust" that he funded for his children, and, on brief, petitioners characterize CAT-FIT as an "educational benefit trust or account." The record, however, contains no relevant trust documents. Also a mystery is the ultimate destination of the interest checks received by a child in the leverage loan version of the CAT-FIT Plan. By the terms of the investment certificate, the child was to receive 12-percent annual interest on the face amount of the certificate. Atlas Guarantee periodically issued checks made payable to the *944 child, which, after endorsement, the parent generally returned to be added, supposedly, to the face amount of the certificate. The record, however, contains neither reissued certificates in increased face amounts nor separate supplementary certificates. Nor did the child receive increasing interest as the years passed, yet such an increase would be expected from a constant interest percentage applied to an increasing investment balance. Although there is no reliable evidence regarding how the parent paid off the annual leverage loan in the CAT-FIT Plan, the particulars of the three stock programs suggest that the endorsed interest checks could have served that purpose. When a parent decided to terminate, he returned the investment certificate to Kersting. His repayment obligation on the primary loan was then deemed satisfied, and he did not receive any cash from the termination. The rest of the termination stage is unclear. Kersting testified that there was essentially an exchange of the certificate for the primary note. However, because the investment certificate was in the name of the child rather than the parent, Kersting's explanation seems to entail, as a condition precedent, *945 a gift of the certificate from the child to the parent. [47]
The Dixons, the DuFresnes, and the Owenses, in their opening brief, requested the Court to find the following core facts relating to their CAT-FIT plans: (1) The parent paid all of the support for the child during the time of CAT-FIT participation; and (2) the CAT-FIT "funds," "monies," "proceeds of the funds," and "earnings from the funds" were not used to pay expenses "incidental to support" of the child. These petitioners have not enlightened us as to how these proposed *946 facts are relevant to the issues before us, [48] but we assume that they seek in part to persuade us that the interest income from an investment certificate was taxable to the child rather than the parent. Although income derived from transferred property under common custodial arrangements is generally taxable to the child, the IRS view of such income used to satisfy a legal obligation to support the child is that the income is taxable to the person so obligated. Rev. Rul. 59-357, 1959-2 C.B. 212. Similarly, trust income will be taxable to the grantor if applied or distributed for the support of a beneficiary whom the grantor is legally obligated to support. Sec. 677(b). Whether the interest income is taxable to the parent or the child, however, is not directly in issue in these cases. The Commissioner's notices of deficiency do not include increases to the interest income of these petitioners. *947 Petitioners' second proposed fact inexplicably focuses on "funds" and "proceeds" of the CAT-FIT Plan, implying that participating parents received cash from the program. Petitioners have not established, however, that the leverage loan CAT-FIT Plan generated cash at any stage. At initiation, neither the parent nor the child retained the primary loan proceeds because the check was used to purchase the investment certificate. The leverage loan proceeds check, similarly, was endorsed and returned to Kersting to offset the parent's check for interest on the primary loan. Also, the parent immediately returned to Kersting the endorsed checks representing earnings on the investment certificate. Finally, no net cash came out of the termination transaction. Although Dixon testified that he and Mrs. Dixon used CAT-FIT funds to educate their children, he failed to explain the source of those funds. Under the sham analysis as we have described and applied it to the Kersting stock programs, the acquisition of the Atlas Guarantee investment certificate is much more easily disposed of than the stock programs, but on similar principles. In terms of practical economic effects other than the *948 creation of income tax losses, we see none. First, none of the participating petitioners testified that he acquired the investment certificate with a profit motive, and we therefore conclude that they all lacked such a motive. [49] Second, there is nothing in this record suggesting a profit possibility. Kersting in fact described the investment certificate as just like a bank certificate of deposit, differing only in name. Although a bank certificate of deposit pays an interest "profit," that 12-percent annual profit on an Atlas Guarantee investment certificate was exactly offset by 12-percent annual interest paid to Windsor Acceptance on the primary loan. In these circumstances, the purchased investment certificate was totally lacking in economic substance. Its face value, typically $ 17,000, had no meaning except as a computational reference point for the interest amounts Kersting desired. *949 In Kersting's written description of the CAT-FIT Plan, he characterized the "object of the plan" as "to shift income from parents to their children." A more accurate description of the program is that Kersting created interest income and corresponding interest deductions out of nothingness and allocated them within the family unit to where the favorable tax effect of the manufactured deductions would more than offset the unfavorable tax effect of the manufactured income. The appropriate allocation was income to the child and deductions to the parent. Closer analysis reveals that the CAT-FIT Plan was at best a break-even proposition economically, with or without a leverage loan. The Hongsermeier version of the CAT-FIT Plan, with no leverage loans, was a precise "wash-out" as described by Gabriele Kersting in her letter to Hongsermeier of March 29, 1977. With checks that were paid and deposited without waltzing, the Hongsermeier family both received 12-percent annual interest and paid out 12-percent annual interest while holding on to an investment asset of unchanging redemption value. At the other end of these checks were Atlas Guarantee and Windsor Acceptance, which were paying *950 at 12 percent when the Hongsermeiers were receiving and receiving at 12 percent when the Hongsermeiers were paying. Because there was no apparent economic benefit on the Kersting side of the transaction, he presumably offered this uncommon version of the CAT-FIT Plan as a type of inducement to potential stock investors or as a reward to present clients. The leverage loan version of the CAT-FIT Plan was even less beneficial to the parent (and correspondingly more beneficial to Kersting). Economically, the parent now paid out-of-pocket interest on the leverage loan that he did not pay in the Hongsermeier version. From a tax standpoint, the parent in essence purchased the additional deduction for leverage loan interest dollar-for-dollar for cash, even though the tax benefit of the deduction would be something less than dollar-for-dollar. The primary and leverage loans underlying the CAT-FIT purchase transaction suffer from the same shortcomings as the loans in the stock programs, including at least occasional backdating of documents. The Dixons, for example, entered into CAT-FIT plans for three children with initiating documents dated January 2, 1977, yet Gabriele Kersting inquired *951 by letter dated March 17, 1977, whether Dixon was still interested in the CAT-FIT program, and added: "If you are interested, please notify me at your early convenience and I will see that the appropriate documents are sent to you immediately." The CAT-FIT primary loan, while in form recourse, was not in the nature of a genuine indebtedness because the parties never contemplated that it would be paid except by means of a redemption of the investment certificate, which had a constant arbitrary value and no apparent secondary market. In this sense, the relationship between the investment certificate and the primary loan is like that between stock and primary loan in the stock investment programs. Although the record does not provide transactional detail on the flow of primary loan funds in the CAT-FIT Plan, in our findings we list several dates in 1979 and 1980 on which Atlas Guarantee checks matched Windsor Acceptance deposits. This suggests a waltz of the primary loan funds and a lack of genuine indebtedness. Karme v. Commissioner, 73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982). Our findings summarize step-by-step the waltz of CAT-FIT *952 Plan leverage loan funds. In this waltz, the funds flowed from the leverage lender to the parent's account, then to the primary lender (as interest on the primary loan), then to Federated Finance, and finally back to the leverage lender. There is nothing unusual about this waltz compared to the Stock Subscription Plan waltz, and we accordingly reach the same conclusion. As we held in a similar situation in Beck v. Commissioner, 74 T.C. 1534 (1980), affd. 678 F.2d 818 (9th Cir. 1982), petitioners with leverage loan CAT-FIT plans did not pay interest on their primary loans. Regarding the deductibility of interest on CAT-FIT leverage loans, participating petitioners have the burden of showing the existence of a genuine indebtedness. Because they have not established even how the leverage loan principal obligations were satisfied or intended to be satisfied, the lawsuit by Mahalo Acceptance against George Vermef based upon an allegedly unpaid leverage note does not tend to prove that the leverage loans were genuine recourse indebtedness. Further, the waltz of leverage loan funds suggests a lack of genuine indebtedness. Like the leverage loans *953 in the Stock Subscription Plan, Kersting did not waltz the loan proceeds until a date long after the initiating date on the documents, so a parent in effect accumulated an interest liability for several months prior to the waltz date on which he first had use of the leverage loan proceeds. Petitioners have not met their burden of showing that their CAT-FIT Plan leverage loans were in the nature of genuine indebtedness. Consequently, petitioners must be denied deductions under section 163(a) for interest on those loans. Finally, we believe that the CAT-FIT Plan is similar to the loan transactions that were the subject of Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), affg. 44 T.C. 284 (1965). In Goldstein, an Irish Sweepstakes winner purchased Treasury notes with funds borrowed from two banks, pledging the Treasury notes as collateral to secure the loans. The loans bore interest at rates appreciably higher than the interest yield on the Treasury notes. Late in December, the cash basis taxpayer prepaid interest covering 1-1/2 years on one loan and covering over 2-1/2 years on the other, and claimed the prepayment amounts as a deduction *954 under section 163(a). The Court of Appeals concluded that this Court had been justified in finding that the taxpayer had entered into the transactions solely to secure a large interest deduction. The court rejected the deduction, holding that section 163(a) "does not permit a deduction for interest paid or accrued in loan arrangements, like those now before us, that can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences." 364 F.2d at 740. After acknowledging that deductible interest need not serve a business purpose, be ordinary and necessary, or even be reasonable, the court elaborated upon its "purpose, substance, or utility" standard: In order fully to implement this Congressional policy of encouraging purposive activity to be financed through borrowing, Section 163(a) should be construed to permit the deductibility of interest when a taxpayer has borrowed funds and incurred an obligation to pay interest in order to engage in what with reason can be termed purposive activity, even though he decided to borrow in order to gain an interest deduction rather than to finance the activity in some other way. *955 In other words, the interest deduction should be permitted whenever it can be said that the taxpayer's desire to secure an interest deduction is only one of mixed motives that prompts the taxpayer to borrow funds; or, put a third way, the deduction is proper if there is some substance to the loan arrangement beyond the taxpayer's desire to secure the deduction. * * * [Goldstein v. Commissioner, 364 F.2d at 741.]
This Court has interpreted Goldstein to mean that form will not be exalted over substance when the sole objective of a transaction is an interest deduction, even if the transaction has some minimal economic gain potential. Sheldon v. Commissioner, 94 T.C. 738, 767 (1990). As in Goldstein, those petitioners involved in CAT-FIT plans sought only to secure large interest deductions by participating in transactions that they did not anticipate being economically profitable. The CAT-FIT Plan lacks even the minimal economic gain potential mentioned in Sheldon v. Commissioner, supra.We hold, as an alternative to the sham analysis, that petitioners are not entitled to CAT-FIT Plan interest deductions, *956 whether purportedly paid on primary loans or leverage loans, based upon the Goldstein rationale. We have considered the specific differences between petitioners' CAT-FIT plans and the CAT-FIT Plan. We have found those differences to be without significance to the above conclusions. Issue 3: Income from Corporate Distributions
Respondent contends that if petitioners are entitled to any interest deductions based upon their participation in the Kersting investment programs, then they must also report additional income because of their receipt of so-called "nontaxable" distributions from Kersting corporations. Because we have concluded that the interest deductions are not allowable, we need not address this issue as framed by respondent. We observe, however, that in the Cravenses' notice of deficiency for 1980, in addition to disallowing the interest deductions, the Commissioner increased income by $ 18,000 for what the Cravenses had reported as a nontaxable dividend distribution from Candace Acceptance. The Rule 155 calculation for the Cravenses should be consistent with the language in the various notices of deficiency and with respondent's opening brief, both of which *957 treat the income adjustment as only an alternate position. On a related point, the Cravenses' 1980 return includes a reported long-term capital gain of $ 7,200, after the 60-percent capital gains deduction, on the disposition of Candace Acceptance stock. In his notice of deficiency, the Commissioner did not reduce income in this amount, which is arguably inconsistent with his position that the underlying transaction was a sham. Petitioners' counsel Izen made this inconsistency argument in a different context, without specific reference to the Cravenses, in petitioners' motion to reopen evidence filed on January 23, 1991. Respondent, in his notice of objection filed on February 26, 1991, apparently overlooked the Cravens circumstances in agreeing that this was indeed an improper inconsistency: 3. In the test case litigation, each of the party petitioners claimed interest expense deductions based upon Kersting interest expense programs which were disallowed by the respondent on the basis that the transaction[s] giving rise to the alleged interest expense were shams. None of the test case petitioners, to respondent's knowledge, reported any capital gain based upon their termination *958 of their participation in the Kersting interest deduction programs, which gains would be recognizable as the transactions were structured, to the extent the interest expense deductions are allowed or are allowable, the alleged "non-taxable" dividends used to "pay" this expense constituting a basis adjustment to the underlying stock. In those instances where participants in Mr. Kersting's programs have agreed to the disallowance of the claimed interest associated therewith, the respondent has always allowed an adjustment to the amount of the resulting deficiency to reverse the tax imposed based upon associated and reported capital gains. Only a small number of the Kersting participants actually reported capital gain upon the termination of their participation. To disallow the interest expense, but not allow adjustment of the capital gain reported, would result in almost doubling the tax consequences of the interest disallowance, a result that would be improper. [Emphasis supplied.]
Again, the Rule 155 calculation for the Cravenses should be consistent with respondent's stated position in the record concerning the treatment of reported capital gains. Issue 4: Owens Subchapter *959 S Corporations, Mortgage Funding, and Investment Expenses
In the Owenses' notice of deficiency, the Commissioner disallowed subchapter S losses of $ 7,207 from Maurier Leasing in 1975 and $ 67 from Aztec Leasing in 1976, on three grounds: The corporations were not viable tax entities, they had excessive interest income that caused an automatic termination of subchapter S status, and they did not file timely subchapter S elections. The Commissioner disallowed claimed interest deductions associated with these corporations on three other grounds: The transactions giving rise to the deductions were shams, the amounts were not paid or properly accrued, and the transactions did not result in any bona fide indebtedness or in any enforceable and bona fide obligation to pay compensation for the use or forbearance of money. Pursuant to Rule 90, respondent requested the following admission from the Owenses, as filed with the Court on August 25, 1988: 1. The Henry Kersting transactions for 1975 and 1976 underlying adjustments for subchapter S losses from Maurier Leasing and Aztec Leasing, interest expense and investment expense in the statutory notice, and as petitioned as assignments *960 of error * * *, are the same as the Henry Kersting transactions considered in and decided by the Court in the case of Pike v. Commissioner, 78 T.C. 822 (1982) [,affd. without published opinion 732 F.2d 164 (9th Cir. 1984)].
Rule 90(c) deems a matter admitted unless the party who is requested to admit its truthfulness answers timely and specifically in writing. On September 21, 1988, the Owenses filed a motion for enlargement of time to November 5, 1988, within which to respond to the request for admission. Although the Court granted the motion, they did not so respond. At trial, when counsel for respondent asked the Court to rule on whether the matter was deemed admitted, counsel for the Owenses stated he had discussed the request for admission with Owens and "We concede that at this time, that the same forms were used, and that the investment was structured, as far as filling out documents, similar to the Pike v. Commissioner investments." The Court then ruled that the matter was deemed admitted. Counsel for respondent later objected that opposing counsel was eliciting testimony from Owens pertaining to the matter deemed admitted. *961 However, because respondent had not moved for an order to show cause why the Owenses' case should not be controlled by Pike v. Commissioner, 78 T.C. 822 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984), the Court overruled the objection.[50]
In Pike, this Court addressed the net operating losses of Kersting subchapter S automobile-leasing corporations. Respondent *962 made several arguments against the pass-through of the net operating losses to the shareholders. We agreed with one and found it unnecessary to consider the others. The position we adopted was that the shareholders had no bases in the corporations and that, therefore, section 1374(c) precluded net operating loss deductions at the shareholder level. 78 T.C. at 838-839. Specifically, we concluded that the shareholders lacked a necessary "investment" in terms of an actual economic outlay. 78 T.C. at 839-840. Clearly, the shareholder-oriented rationale for our decision in Pike concerning subchapter S net operating losses does not coincide with any of the Commissioner's three asserted grounds in the notice of deficiency here, all of which focus on the corporation. We cannot adopt the result of Pike summarily, even with deemed admitted facts, when the analytical link between the Pike facts and result is not before us in this case. Nonetheless, despite the Owenses' prevailing on this point, they have not provided us with an appropriate setting within which to reach the substantive merits of their claimed subchapter S loss deductions. Simply *963 put, they have not met their burden of proof under Rule 142(a) to show that the Commissioner's determinations were erroneous. Regardless of whether they addressed the tax viability of the corporations at trial and on brief, they plainly ignored respondent's excess interest and untimely election positions. We therefore sustain respondent in his disallowance of loss deductions attributable to Maurier Leasing and Aztec Leasing. Regarding the claimed interest deductions attributable to Owens' involvement with these subchapter S corporations, respondent's grounds for disallowance are the same as those advanced against the other petitioners outside of the subchapter S realm. Although this Court in Pike did not analyze the leasing corporation transactions at issue there as "shams," we believe that the Pike analysis overall is consistent with our analysis of Issue 2 above and is therefore implicit in this part of the notice of deficiency. These petitioners do not argue that Pike was decided incorrectly or is no longer good law, but instead seek to distinguish the case factually. This position necessitates a return to their deemed admission and a consideration of which facts *964 in Pike that admission covers. As noted, the Owenses are deemed to have admitted that their Maurier Leasing and Aztec Leasing "transactions" are the same as the "transactions" considered in Pike. Bearing in mind that respondent drafted the request for admission and that ambiguities are generally construed against the drafter, we believe that "transactions" should be interpreted narrowly to mean that the form and structure, including documents, were the same. Counsel for the Owenses conceded such similar form and structure. These petitioners argue that Owens differs from the taxpayers in Pike in two respects, the first being that the taxpayers' lease payments in Pike were set artificially low. We disagree that this is a distinction. Even with a narrow interpretation of "transaction" similarity for purposes of the deemed admission, below-market lease rates were a part of the transaction "structure": "By structuring the transaction in this manner, the participants could claim a $ 900 interest deduction for tax purposes each year and were able to lease the cars for less than the fair rental value." Pike v. Commissioner, 78 T.C. at 828-829. *965 (Emphasis supplied.) The Owenses are thus deemed to have admitted that Owens paid a below-market monthly lease rate. Furthermore, we attach no significance to Owens' testimony that he believed the rate was "reasonable" for the type of automobile he leased from Universal Leasing in 1966. He did not testify about the particular knowledge or experience that enabled him to reach this conclusion, nor did he testify at all about the reasonableness of his lease payments to Maurier Leasing or Aztec Leasing. The Owenses' second purported distinction from the taxpayers in Pike is that those taxpayers had no bona fide intention or reasonable possibility of making a profit. Because the profit-motive part of this argument does not relate directly to the form or structure of the transactions, it is not foreclosed by the deemed admission. For the reasons discussed above in Issue 2, however, we conclude that Owens had neither a profit motive nor a reasonable possibility of a profit in entering into his Maurier Leasing and Aztec Leasing investments. Moreover, these petitioners have not explained the discrepancy between the 1976 Form 1120S for Maurier Leasing, which indicates that Owens *966 owned 7,000 shares throughout 1975, and the documents apparently relating to the purchase of 7,000 Maurier Leasing shares as of July 28, 1975. We accordingly sustain the Commissioner's disallowance of interest deductions corresponding to Maurier Leasing and Aztec Leasing. We have also considered the Owenses' claimed interest deductions relating to the mortgage funding program and their claimed investment expenses. The scant documentary evidence and vague testimony do not suffice to satisfy their burden of proof on these matters. Issue 5: Section 163(d) Investment Interest Limitation
Section 163(d) generally limits the deductibility of interest paid on indebtedness associated with investment property to a set amount plus the amount of net investment income. Because we have held that petitioners are not entitled to any of the interest deductions addressed under Issues 2 and 4, we need not consider whether section 163(d) serves to limit otherwise deductible interest. Issue 6: Section 6653(a) Negligence
If any part of an underpayment is due to negligence or intentional disregard of rules or regulations, section 6653(a) (and section 6653(a)(1) for taxable years after *967 1980) provides for the imposition of an addition to tax equal to 5 percent of the underpayment. Section 6653(a)(2) (effective for taxable years after 1980) imposes an additional amount equal to 50 percent of the interest payable on the portion of the underpayment attributable to such negligence or intentional disregard. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The taxpayer bears the burden of proving that the Commissioner's determination is erroneous. Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Except for the Thompsons' taxable year 1980, the Commissioner determined a section 6653(a) or (a)(1) addition to tax for all taxable years of all petitioners. He determined a section 6653(a)(2) addition for each of the post-1980 taxable years of the Thompsons, the Youngs, and the DuFresnes. This Court has held that in the case of a sham transaction known to be so by the taxpayer, the imposition of the addition to tax under section 6653(a) is appropriate. Brown v. Commissioner, 85 T.C. 968, 1001 (1985), *968 affd. sub nom. Sochin v. Commissioner, 843 F.2d 351 (9th Cir. 1988). As recently noted by the court in Howard v. Commissioner, 931 F.2d 578, 582 (9th Cir. 1991), affg. a Memorandum Opinion of this Court: In a case such as this where the taxpayers have been found to have entered into sham transactions without a primary profit motivation, they have failed to meet their burden of showing due care. No reasonably prudent person would have acted as they did. The penalties for negligence under * * * [section] 6653(a)(1) and (2) are appropriate.
We have already discussed in great detail the sham nature of the transactions at issue, including our conclusions that none of petitioners had a business purpose in entering into the transactions. We have also discussed petitioners' knowledge of the key components of the programs that indicate a lack of economic substance. In particular, they knew that the only real "value" of their investment asset was in satisfaction of a primary loan obligation and, from the opposite perspective, that their obligation on the primary loan was limited to the "value" of the investment asset. With these two variables *969 playing off one another, there was no reason for petitioners to care about the actual value of the stock or the face amount of the primary note. Each of these men was intelligent enough to know how a typical stock investment or borrowing transaction worked, and that their Kersting programs had no comparable economic substance. After all, we are dealing with simple stocks, certificates of deposit, and loans, and not with complex investment assets or markets that would cause us to question how much of the process the taxpayers actually understood. All of the complexity here resulted from manipulation of the loans for favorable tax effect. Petitioners knew that these transactions were shams. Petitioners generally offer two arguments against the imposition of these additions to tax. The first is that they relied on advice from certified public accountants in claiming interest deductions from the Kersting investment programs. The second is that they made full disclosure of all records to their accountants and return preparers. We consider the circumstances of the Cravenses separately. Reliance on a tax professional does not by itself insulate a taxpayer from the section 6653(a) *970 additions to tax. United States v. Boyle, 469 U.S. 241, 250, 83 L. Ed. 2d 622, 105 S. Ct. 687 (1985). Such reliance must be reasonable under the circumstances. Skeen v. Commissioner, 864 F.2d 93, 96 (9th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987). Unsophisticated, moderate-income taxpayers may be reasonable in relying on financial advisers and accountants. Here, however, although none of petitioners appear to fit a "sophisticated investor" profile, all were relatively high-income taxpayers, which is precisely the reason Kersting coveted them. With only a few exceptions, the return preparers and tax advisers used by petitioners were Philip Scheff, Earl LeMond, Gilbert Matsumoto, and Robert Knapp, all of whom had connections to Kersting and thus were not disinterested parties. Notably, no petitioner testified that he was unaware of a relationship between Kersting and any preparer he used. The Dixons used an accountant at Haskins & Sells for 1977, but even that accountant Dixon knew to be already involved with at least one Kersting investor. Although the evidence does not establish that the DuFresnes' 1983 preparer, William Lenahan, *971 was related to Kersting in any way, it also does not establish that he was not so related. A reasonable and ordinarily prudent person would have sought out independent and disinterested advice on transactions such as these. Such independent and disinterested advice does not include that of Kersting, whom the Thompsons claim to have relied upon, because to inquire of the promoter if the investment is sound will not overcome the addition to tax for negligence. Rybak v. Commissioner, 91 T.C. 524, 565 (1988). More fundamentally, if no reliable evidence reveals the nature of professional tax advice received, purported reliance on such advice is of no assistance to the taxpayer in the negligence analysis. Howard v. Commissioner, supra at 582. In the instant cases, the record contains no reliable evidence regarding the nature of the advice. Indeed, coupled with the scarcity of petitioner testimony about their dealings with their tax accountants is a complete lack of testimony from any of those accountants. Even if we were to find that petitioners received and relied upon professional advice, they would also have to show that the advice *972 was based upon all of the facts. Leonhart v. Commissioner, 414 F.2d 749, 750 (4th Cir. 1969), affg. a Memorandum Opinion of this Court. Petitioners testified very little about disclosures made to return preparers and advisers. What we find credible is contained in our findings of fact, and it is hardly enough to support petitioners' purported full disclosure of all records. Because the Cravenses' tax returns show no paid preparer, and Cravens did not testify about one, this forecloses the arguments raised by the other petitioners. The record also does not disclose Cravens' educational or investment background, which might lend support to an "unsophisticated investor" position. The Cravenses, like the other petitioners, have failed to persuade us that they were not negligent. We therefore sustain the Commissioner's negligence determinations under section 6653(a), including the section 6653(a)(2) amounts based upon the full amount of the deficiencies for the post-1980 years of the Thompsons, the Youngs, and the DuFresnes. Issue 7: Section 6651(a)(1) Failure to File
The Commissioner determined an addition to tax under section 6651(a)(1) for the Thompsons' *973 1981 taxable year. That section provides generally that the failure to file a return on the prescribed date, including applicable extensions, results in an addition of 5 percent of the tax for each month the return is late, up to 25 percent, unless it is shown that the failure to file is due to reasonable cause and not due to willful neglect. The burden of proof is on the taxpayer. Jackson v. Commissioner, 86 T.C. 492, 538 (1986), affd. 864 F.2d 1521 (10th Cir. 1989); Estate of Lang v. Commissioner, 613 F.2d 770, 774 (9th Cir. 1980), affg. in part and revg. in part 64 T.C. 404 (1975). The Thompsons did not present evidence on this matter, nor did they contest it in their brief. In these circumstances, the Thompsons are deemed to have conceded the addition to tax under section 6651(a)(1). Issue 8: Section 6661(a) Substantial Understatement
Section 6661 provides for an addition to tax for a substantial understatement of income tax liability. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 5,000. Sec. 6661(b)(1)(A). The Commissioner *974 determined that the Youngs for 1982 and the DuFresnes for 1982 and 1983 are liable for additions to tax under section 6661(a). During those years, the addition to tax was equal to 10 percent of the underpayment attributable to the understatement, and the Commissioner applied the 10-percent rate in his notices of deficiency here. Congress changed the rate to 25 percent in section 8002(a) of the Omnibus Budget Reconciliation Act of 1986 (OBRA), Pub. L. 99-509, 100 Stat. 1951. The 25-percent rate applies to section 6661 additions to tax assessed after October 21, 1986. OBRA, Pub. L. 99-509, sec. 8002(b), 100 Stat. 1951; Pallottini v. Commissioner, 90 T.C. 498 (1988). On brief, respondent seeks imposition of the 25-percent rate. However, because his original filed answers contain no reference to a rate other than that appearing in the notices of deficiency and because he has not amended his answers in this regard, we limit our consideration to the 10-percent rate. See Schirmer v. Commissioner, 89 T.C. 277, 286 n.8 (1987). The parties have not raised issues that often arise under section 6661, such as possible reduction of the understatement *975 on the grounds of substantial authority or adequate disclosure, sec. 6661(b)(2)(B), and special rules for "tax shelters," sec. 6661(b)(2)(C). The only argument offered by the Youngs and the DuFresnes is that their liability depends upon respondent's prevailing on their deficiencies to a sufficient extent to exceed the substantial understatement threshold of section 6661(b)(1)(A). Respondent has so prevailed. We therefore sustain his determinations concerning section 6661 liability. Issue 9: Section 6621(c) Increased Interest Rate
The Commissioner determined an increased interest rate under section 6621(c) for the Thompsons in 1981, for the Youngs in 1982 and 1983, and for the DuFresnes in 1982 and 1983, asserting for each year that the entire underpayment was attributable to tax-motivated transactions. In his opening brief, respondent contends that section 6621(c) is in dispute for every year and every petitioner. For petitioners other than the Thompsons, the Youngs, and the DuFresnes, however, neither the notices of deficiency nor the pleadings refer to this section. We will not consider the application of section 6621(c) to these other petitioners absent proper pleading *976 of the issue. Law v. Commissioner, 84 T.C. 985 (1985). Section 6621(c) provides for an increase in the rate of interest accruing on tax underpayments if there is a "substantial underpayment" (an underpayment exceeding $ 1,000) in any taxable year "attributable to 1 or more tax-motivated transactions." The increased interest rate is effective for interest accruing after December 31, 1984, even for transactions entered into before that time. Solowiejczyk v. Commissioner, 85 T.C. 552, 556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Section 6621(c)(3) defines tax-motivated transactions to include "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v). A transaction that lacks economic substance and in which the taxpayer lacks a profit motive is a sham transaction within the meaning of section 6621(c)(3)(A)(v). Friendship Dairies, Inc. v. Commissioner, 90 T.C. 1054, 1068 (1988); Cherin v. Commissioner, 89 T.C. 986, 1000 (1987); see Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987); affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), *977 affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). Because the entire underpayments for the Thompsons in 1981, the DuFresnes in 1982 and 1983, and the Youngs in 1983 were attributable to what we have concluded were sham transactions, they are liable for the increased rate of interest based on those underpayments. The underpayment for the Youngs in 1982 was attributable to what we have concluded were sham transactions and to a disallowed insurance deduction. Because the Youngs did not attempt to prove that the claimed insurance deduction was not attributable to a tax-motivated transaction, they are liable for the increased rate of interest based on their entire underpayment for 1982. To reflect the foregoing, Decisions will be entered for the respondent in docket Nos. 9382-83, 16900-83, 17640-83, 19321-83, 4201-84, 15907-84, 31236-84, 40159-84, 22783-85, 30010-85, 30965-85, 30979-85, 29643-86. Decision will be entered under Rule 155 in docket *978 No. 15135-84. Footnotes
1. Cases of the following petitioners are consolidated herewith: John R. and E. Maria Cravens, docket Nos. 16900-83, 15135-84; Ralph J. Rina, docket No. 17640-83; John R. and Maydee L. Thompson, docket Nos. 19321-83, 31236-84; 30965-85; Hoyt W. and Barbara D. Young, docket Nos. 4201-84, 22783-85, 30010-85; Robert L. and Carolyn S. DuFresne, docket Nos. 15907-84, 30979-85; Terry D. and Gloria K. Owens, docket No. 40159-84; and Richard and Fidella Hongsermeier, docket No. 29643-86.↩
2. Subsequent to the filing of the Court's opinion in Dixon v. Commissioner, 90 T.C. 237↩ (1988), which addresses certain matters severed from the issues herein, the Court granted the motions of Robert J. Chicoine, Darrell D. Hallett, and Robert M. McCallum to withdraw as counsel of record for the petitioners in docket Nos. 9382-83, 17640-83, 4201-84, 15907-84, 40159-84, 22783-85, 30010-85, and 30979-85, and the motions of Robert M. McCallum and L. N. Nevels, Jr., to withdraw as counsel of record for the petitioners in docket No. 29643-86.
3. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954 as amended and in effect for the relevant years, and Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. The Commissioner did not determine an addition to tax under sec. 6653(a)(2) for 1981.↩
*. Plus, under sec. 6653(a)(2), 50 percent of the interest due on the deficiency.↩
*. Plus, under sec. 6653(a)(2), 50 percent of the interest due on the deficiency.↩
*. Plus, under sec. 6653(a)(2), 50 percent of the interest due on the deficiency.↩
4. Unless otherwise clear from the context, the following words, their derivatives, and related terms are used for narrative convenience only, following the forms of the various transactions: "invest," "purchase," "borrow," "subscribe," "pay," "distribute," "promise," "lease," "loan," "note," "sale," "agreement," "obligation," and "interest." By our use of such terms, we do not mean to suggest any conclusions concerning the actual substance or characterization of the transactions for tax purposes.↩
5. References to "subchapter S" corporations are in keeping with how the shareholders and others treated the entities, and are not meant to suggest that the applicable provisions of subchapter S of chapter 1, subtitle A, Internal Revenue Code, were necessarily satisfied.↩
6. For convenience, corporations with name endings such as "Corporation," "Inc.," "Co.," or "Ltd." will often be referred to with the ending after the first reference.↩
7. "Lease" as a verb in ordinary usage can refer to what the lessor does or what the lessee does. As we use the term herein, a corporation that "leases" is a lessor and an individual who "leases" is a lessee.↩
8. The "years at issue" outside of part IV of these findings are 1975 through 1983. The "years at issue" within part IV are the years before the Court for the particular petitioner or petitioners being discussed.↩
9. We sometimes distinguish these entities and others by parenthetical reference to the State of incorporation, such as Charter Financial (Hawaii) and Charter Financial (Nevada). References without State designation are general and not directed specifically toward either.↩
10. Investors Financial, like most of the other Kersting corporations, used a noncalendar taxable year.↩
11. Pike v. Commissioner, 78 T.C. 822, 845 & n.36 (1982), affd. without published opinion 732 F.2d 164↩ (9th Cir. 1984).
12. A "form letter" is a typed letter with a general "Dear Friend" or "Dear Friends" salutation rather than a personalized one.↩
13. Although both names appear on documents in the record, Universal Leasing Corporation and Universal Corporation are the same entity.↩
14. Unless otherwise indicated, a reference hereinafter to an unspecified "leasing corporation" or "leasing corporations" is to one or more of the three non-subchapter S corporations described in this part II (D).↩
15. The record contains some prepared and signed corporate tax returns that were not filed with the IRS. In describing return contents, we refer to both filed and unfiled returns.↩
16. Although the usual function of a note is to document a lending transaction, the note and loan must sometimes be distinguished. Under the Uniform Commercial Code, for example, a negotiable note and its underlying obligation can be independently actionable. U.C.C. sec. 3-310(b)↩ (1990). Nonetheless, because the parties do not attempt to differentiate between the notes and their underlying obligations in the context of these transactions, we likewise generally assume only one obligation, except in our more precise descriptions of collection litigation undertaken by Kersting corporations.
17. In the early years of Kersting's investment programs, these loans were nonrecourse. The sec. 465 at-risk provisions, added to the Internal Revenue Code by the Tax Reform Act of 1976, Pub. L. 94-455, sec. 204, 90 Stat. 1520, 1531-1532, caused Kersting to make the change from nonrecourse to recourse.↩
18. We sometimes refer to these checks having "and" between two listed payees as "two-party" checks.↩
19. Paid-in or contributed capital, in this context, is the sum of capital stock recorded at par value and paid-in surplus. Paid-in surplus is sometimes known as paid-in capital in excess of par value or as additional paid-in capital.↩
20. On the short and simple promissory note forms for this and the other investment programs, Kersting's clerical personnel always typed in "on demand" before the preprinted words "after date." Because the note contained two typed-in dates, an effective date and a "due" date, it is not clear from the face of the note when the demand feature became operative. When we describe the term of a leverage note as some number of years, without express reference to a demand nature, we are referring to the time period between the effective date and the due date.↩
21. "Distribution" checks are those issued by Kersting corporations to their shareholders as part of the investment programs, and not representing loan proceeds.↩
22. From 1975 into 1978 the cost was $ 1 per share.↩
23. The word "buy" often appeared instead of "purchase."↩
24. The annual interest rate was 6 percent during 1975 and 1976 and 7 percent during 1977 and into 1978.↩
25. Sometimes the instructions on how to complete the transaction were included with the package of initiating documents sent to the investor. In such a case, Kersting expected the investor to return signed initiating documents and comply with the additional instructions at the same time.↩
26. The tax effect of lease payments is not at issue in these cases.↩
27. CAT-FIT is an inexact acronym for Children's Assistance To Financially Indigent (or Indolent) Parents.↩
28. The annual interest rate on CAT-FIT leverage loans was 6 percent in 1976, 6 or 7 percent in 1977, and 7 percent into 1978.↩
29. Sometimes the instructions on how to complete the transaction were included with the package of initiating documents sent to the parent. In such a case, Kersting expected the parent to return signed initiating documents and comply with the additional instructions at the same time.↩
30. Check-kiting is a fraudulent scheme in which the wrongdoer profits from a continual interchange of worthless checks between accounts at two or more banks, taking advantage of both the several-day check collection process and the willingness of the banks to pay a check even though the account balance consists only of a deposited check not yet collected. See generally H. Bailey, Brady on Bank Checks, par. 18.11, pp. 18-22 to 18-25 (6th ed. 1987).↩
31. The activity in the general accounts of the leasing corporations often included deposits and checks in addition to those we mention specifically.↩
32. The listed dates are not all of those with recorded activity during 1979 and 1980. For a given date, the listed amounts do not necessarily represent the only activity in the accounts.↩
33. We do not find as facts that Dixon and the other investing petitioners necessarily executed the various initiating documents (or even necessarily received complete sets of the documents) described in our part III discussion of the four investment programs. When we state in our findings that a petitioner "entered into" a given program, we mean only that he, in some way satisfactory to Kersting, commenced an investment that was patterned after the applicable program in part III. Although our findings disclose certain inconsistencies between a petitioner's specific transactions and their part III counterparts, we do not mean to imply that in all other respects precise or complete conformance with our part III descriptions has been established.↩
34. Dixon's primary note, however, listed loan proceeds of $ 30,000, making the combined loan proceeds $ 51,000.↩
35. The notice of deficiency erroneously arrives at $ 59,383.75, a 50-cent discrepancy, as the sum of the 1982 disallowed interest deductions.↩
36. As we use the term here, "dividend" does not include an annual distribution made as part of a Kersting investment program.↩
37. The record does not disclose Cravens' educational background.↩
38. The record does not disclose Cravens' length of service with American Airlines.↩
39. Kersting applied similar reasoning in explaining at trial why the bad debt reserves were so large. He testified that because of IRS challenges to his investment programs, large contingency reserves were set up in case the funds would have to be returned to investors. In that sense, the large reserves would be a result or output of his investment programs. On the other hand, those reserves were also an important input because they enabled Kersting to pay annual distributions that he could characterize as nontaxable, thus enhancing the tax benefits of his programs.↩
40. Using borrowed funds from a third party to pay interest does not alone cause the payment to be nondeductible. Beck v. Commissioner, 74 T.C. 1534, 1564 (1980), affd. 678 F.2d 818 (9th Cir. 1982); McAdams v. Commissioner, 15 T.C. 231, 235 (1950), affd. 198 F.2d 54↩ (5th Cir. 1952).
41. We do not find it necessary to decide in these cases whether petitioners "paid" interest amounts in the sense of writing or endorsing checks and sending them to the lender, followed by the applicable bank recording payments and deposits based on those checks. We note, however, that if we did confront this issue, at least some petitioners for at least some transactions would fall short in their burdens of proof. Although it is understandable that testifying petitioners had memory lapses when trying to recall specifics of complex transactions that commenced several years before trial, these memory gaps were not always filled in with documentary evidence. The completeness of the documentary record varies from petitioner to petitioner and from transaction to transaction for a given petitioner.↩
42. Because the acceptance corporation selling stock changed from year to year, we are left to wonder how Kersting supposedly matched buyers and sellers in the Stock Subscription Plan. There is no evidence that a new participant acquired stock of an obsolete acceptance corporation.↩
43. In Karme v. Commissioner, 73 T.C. 1163, 1191 (1980), affd. 673 F.2d 1062↩ (9th Cir. 1982), we distinguished between documents that were "backdated" and those that "were not executed, and sometimes not even written in final form, until long after their purported dates." Our references herein to "backdating" encompass all situations in which a document bears a date prior to the date of its execution.
44. The subscription agreements in the Stock Subscription Plan and the Leasing Corporation Plan did in effect call for a year of prepaid interest on the unpaid subscription balance. These agreements acknowledged amounts "paid on account" as of the dates of the agreements.↩
45. Alternatively, an acceptance corporation may have failed to provide a renewal leverage note for Peterson's leasing corporation plan.↩
46. Alternatively, Peterson may have failed to return a renewal leverage note for his leasing corporation plan.↩
47. Hongsermeier testified to a different form of termination that bypasses the apparent gift. He claimed that he paid off the principal on his two primary loans with his own funds and that, in a separate transaction, his children cashed their investment certificates for the face amounts. We did not find this as a fact. We left the record open for Hongsermeier to produce complete copies of the personal checks he purportedly used to pay off the loans, but such checks were not produced.↩
48. Whether DuFresne paid over half the support for his daughter, Carolyn, appears to be relevant to whether she was a dependent under section 152, which was necessary for the DuFresnes to be entitled to an exemption for her under section 151. The Commissioner denied this exemption for 1980 in his notice of deficiency. In an earlier 30-day letter from the IRS to the DuFresnes, the examining agent wrote: "You advised us at the opening conference that you should not had [sic] claimed your daughter Carolyn as a dependent in 1980 as she did not qualify." The agent also noted that Carolyn lived with her mother in California and had gross income of over $ 6,000 in 1980. Because DuFresne did not even mention the contents of the 30-day letter during his testimony, we do not find his testimony about providing all of Carolyn's support sufficient to meet the DuFresnes' burden of proof on the disallowed exemption issue.↩
49. DuFresne testified that he returned his children's investment certificates to Kersting because "They were not proving out to be a particularly good investment," but then referred to the earnings of his two older daughters, suggesting that the "investment" feature he had in mind was the avoidance of tax.↩
50. Counsel for respondent, in arguing at trial that the deemed admission related to "the issues underlying the transactions, and how the Court decided it," stretched the request for admission beyond its express terms. The request refers to "transactions * * * decided by the Court," which we read to mean transactions for which the Court reached a conclusion or holding. In other words, this merely identifies the transactions; it does not by its terms incorporate the Court's analysis or holdings. We will not deem the Owenses to have admitted something that respondent did not place before them.↩